IGNACIA S. MORENO
Assistant Attorney General
TERRY M. PETRIE, Attorney
STEPHEN R. TERRELL, Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO  80202
Telephone:      (303) 844-1369
Facsimile:      (303) 844-1350
Terry.Petrie@usdoj.gov
Stephen.Terrell@usdoj.gov

DANIEL G. BOGDEN
United States Attorney
NADIA AHMED
Special Assistant United States Attorney
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV  89101
Telephone:      (702) 388-6336
Facsimile:      (702) 388-6698

ATTORNEYS FOR THE UNITED STATES

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 2:12-cv-804-LDG-GWF |
| v. | |
| CLIVEN BUNDY, | **UNITED STATES' MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, LR 7-2, and LR 56-1, the

United States moves for summary judgment on its complaint against Defendant Cliven Bundy.

After having an injunction initially entered against him in 1998 and modified in 1999, Defendant

1

1   Bundy has continued to graze his cattle since 2000 on property owned by the United States

2   without any authority to do so.  The United States respectfully requests:  that judgment be

3   entered in favor of the United States; that a declaration be issued that Defendant Bundy has

4   placed or allowed his livestock to graze on these lands in trespass and in violation of federal

5   statutory and regulatory requirements; that Defendant Bundy be ordered to remove his livestock

6   from the land within 45 days of judgment; that the United States be authorized to seize and

7   impound Defendant Bundy's livestock if they have not been removed within 45 days of

8   judgment and for any future trespasses as well.  This motion is supported by the accompanying

9   memorandum of points and authorities and the exhibits attached to it.

10  Respectfully submitted December 21, 2012,

11                                          IGNACIA S. MORENO
                                            Assistant Attorney General
12

13                                          /s/ Terry M. Petrie
                                            TERRY M. PETRIE, Attorney
14                                          STEPHEN R. TERRELL, Attorney
                                            United States Department of Justice
15                                          Environment and Natural Resources Division
                                            Natural Resources Section
16                                          999 18th Street, South Terrace, Suite 370
                                            Denver, CO  80202
17                                          Telephone:     (303) 844-1369
                                            Facsimile:      (303) 844-1350
18                                          Terry.Petrie@usdoj.gov
                                            Stephen.Terrell@usdoj.gov
19

20                                          *Attorneys for the United States*

21

22                                          DANIEL G. BOGDEN
                                            United States Attorney
23                                          NADIA AHMED
                                            Special Assistant United States Attorney
24                                          333 Las Vegas Blvd. South, Suite 5000
                                            Las Vegas, NV  89101
25                                          Telephone:     (702) 388-6336
                                            Facsimile:      (702) 388-6698
26

27

28

                                            2

OF COUNSEL:

NANCY ZAHEDI
GREGORY LIND
Department of the Interior
Office of the Solicitor

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

By this motion, plaintiff, the United States, seeks summary judgment in its favor because defendant Cliven Bundy is trespassing on federal lands.  These federal lands include lands administered by the United States Department of the Interior's ("Interior") National Park Service ("NPS") within Lake Mead National Recreation Area ("NRA") and lands administered by Interior's Bureau of Land Management ("BLM") in southeastern Nevada.  The law and the undisputed facts conclusively establish the United States' sole ownership and regulatory authority over the lands at issue, and Defendant Bundy has no authority to use or occupy the federal lands for grazing his cattle.  Nonetheless, Defendant Bundy has knowingly and intentionally allowed his cattle to graze on these federal lands for years, causing damage to natural and cultural resources and presenting a threat to public safety.

Defendant Bundy is no stranger to this Court.  In 1998, this Court entered a permanent injunction against Defendant Bundy for unauthorized and unlawful grazing of his livestock on lands owned by the United States formerly known as the Bunkerville Allotment.[1]  United States v. Bundy, No. CV-S-98-531-JBR, ("Bundy I") Docket No. 19, Order dated November 3, 1998 ("1998 Order").  Defendant Bundy failed to comply with the 1998 Order, necessitating a request by the United States for an order enforcing the injunction, which the Court issued on September 17, 1999.  Bundy I, Docket Nos. 45 and 46 ("1999 Order").  Notwithstanding the 1998 and 1999 Orders, Defendant Bundy continues to defy the Court's injunction by grazing his cattle on the former Bunkerville Allotment.  In addition, he has expanded the size of his herd to over 900 cattle,[2] and in recent years has been grazing those cattle on other federal lands adjacent to the

---

[1]  Almost all of the federal lands within southeastern Nevada (referred to as the Gold Butte Area on the map, see Exhibit 1), including the Bunkerville Allotment, were closed to livestock grazing in 1998.  Exhibit ("Ex.") 2, Declaration of Mary Jo Rugwell ¶ 3A; Ex. 3, Declaration of Gary Warshefski ¶ 5.  As the Bunkerville Allotment is no longer open for grazing it is referred to as the "former" Bunkerville Allotment where appropriate.

[2]  In Bundy I, the United States had identified anywhere from 6 to 71 trespass cattle on the Bunkerville Allotment.  Bundy I, Docket No. 11, United States' Motion for Summary Judgment, Ex. 4, Declaration of Robert Stager ¶¶ 37-51.

1  former Bunkerville Allotment in the Gold Butte Area (herein, the "New Trespass Lands," and
2  depicted on Exhibit 1).

3       Defendant Bundy freely admits his livestock have continuously occupied both the former
4  Bunkerville Allotment (in violation of the permanent injunction in <u>Bundy I</u>) as well as the New
5  Trespass Lands since 2000.  Defendant Bundy has resisted or ignored the United States' efforts
6  to remove his cattle from the New Trespass Lands voluntarily.  Thus, the United States was
7  compelled to bring this action and, by this motion, seeks the injunction and relief requested
8  herein.  Undisputed material facts show that the United States is entitled to judgment in its favor
9  as a matter of law, and that this Court should enjoin Defendant Bundy's continuing trespass;
10  enjoin Defendant Bundy from trespassing on federal land in the future; declare the rights of the
11  United States; order Defendant Bundy to remove his cattle in trespass and permit the United
12  States to seize and impound any cattle in trespass should Defendant Bundy fail to comply with
13  this Court's permanent injunction.  The United States therefore respectfully requests that the
14  Court grant its motion for summary judgment.

15  **II.**     **SUMMARY JUDGMENT STANDARD**

16       Summary judgment is appropriate where there is no genuine issue of material fact and the
17  moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party seeking
18  summary judgment has the initial burden of showing that there is no genuine issue of material
19  fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>In re Oracle Corp. Securities Litigation</u>,
20  627 F.3d 376, 387 (9th Cir. 2010).  The moving party meets its burden by presenting evidence
21  that would entitle the movant to a directed verdict at trial, at which point the burden shifts to the
22  responding party to set forth specific facts demonstrating that there is a genuine issue of material
23  fact for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-51 (1986); <u>F.T.C. v.</u>
24  <u>Stefanchik</u>, 559 F.3d 924, 927-28 (9th Cir. 2009).  If the facts of the case make the respondent's
25  claim implausible, the respondent must present more persuasive evidence than would otherwise
26  be necessary to establish a genuine issue for trial.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>
27  <u>Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Cal. Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,</u>
28  <u>Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).

1    A material fact is one that affects the outcome of the litigation and requires a trial to

2    resolve the differing versions of the truth.  Anderson, 477 U.S. at 248-49; see also SEC v.

3    Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  In other words, where the record taken

4    as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

5    "'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (quoting First National Bank of Arizona

6    v. Cities Service Co., 391 U.S. 253, 289 (1968).

7    **III.    STATEMENT OF UNDISPUTED MATERIAL FACTS**

8        **A.    Bundy I litigation**

9        Defendant Bundy owns a ranch on private lands near Bunkerville, Nevada.  The former

10   Bunkerville Allotment contains approximately 154,000 acres of federal lands administered as

11   public lands by BLM ("BLM Lands") and federal lands administered by NPS ("NPS Lands").

12   Exhibit 1, Map; Ex. 2, Rugwell Declaration ¶ 10.  Prior to 1993, Defendant Bundy was

13   authorized to graze livestock on the Bunkerville Allotment under an ephemeral grazing permit.[3]

14   1998 Order at 1.  However, beginning in March 1993, Defendant Bundy refused to accept the

15   terms of renewal for the grazing permit offered by BLM and ceased paying any grazing fees, but

16   continued to graze his cattle on the Bunkerville Allotment.  Id. at 2.  In February 1994, BLM

17   issued a final decision canceling Defendant Bundy's ephemeral range grazing permit.  Id. at 4.

18   In 1998, after repeated efforts to resolve the trespass had failed, the United States sought

19   injunctive relief to prevent Defendant Bundy's continued unauthorized and unlawful livestock

20   grazing on the Bunkerville Allotment.  See Bundy I, 1998 Order.

21       On November 3, 1998, the Court granted the United States' motion for summary

22   judgment, declared the federal lands known as the Bunkerville Allotment to be the property of

23   the United States, permanently enjoined Defendant Bundy from grazing his livestock within the

24   Bunkerville Allotment, ordered him to remove his livestock from the Allotment no later than

25   November 30, 1998, and ordered the payment of damages for any cattle remaining in trespass

26

27   [3] An ephemeral grazing permit is for range that does not consistently provide enough forage to
     sustain livestock.  See 43 C.F.R. 4100.0-5 (2005) (defining ephemeral rangelands).  BLM issued
28   the grazing permit for both BLM Lands and NPS Lands.  Ex. 3, Warshefski Declaration ¶ 5.

6

1    after November 30, 1998.  Id. at 11.

2         Defendant Bundy appealed the Court's injunction in Bundy I, but on May 14, 1999, the

3    United States Court of Appeals for the Ninth Circuit denied Defendant Bundy's appeal.  See

4    United States v. Bundy, 178 F.3d 1301 (9th Cir. 1999).

5         Defendant Bundy did not comply with the 1998 Order to remove his livestock from the

6    Bunkerville Allotment by November 30, 1998.  As a result, the United States brought a motion

7    to enforce the injunction in 1999 based on evidence of continuing trespass.  This Court granted

8    the United States' motion, ordered Defendant Bundy to remove his livestock as previously

9    directed, and ordered him to pay a modified level of damages to the United States.  Bundy I,

10   Docket No. 45, Order dated September 17, 1999.

11        Defendant Bundy acknowledges he has not complied with the Court's orders to remove

12   his cattle from the former Bunkerville Allotment.  Ex. 4, Excerpts of Bundy Deposition

13   ("Depo."), pp. 99:20-100:6.  Nor did Defendant Bundy ever comply with the order to pay

14   damages.  Ex. 2, Rugwell Declaration ¶ 25.

15        **B.    New Trespass Lands**

16        The United States acquired what is now the State of Nevada in 1848 as part of the land

17   ceded from Mexico to the United States through the Treaty of Guadalupe Hidalgo.  9 Stat. 922

18   (1848); see also Sparrow v. Strong, 70 U.S. (3 Wall.) 97, 104 (1865) ("The Territory, of which

19   Nevada is part, was acquired by treaty."); United States v. Gardner, 107 F.3d 1314, 1318 (9th

20   Cir.1997) (reaffirmed that the United States has held title to the unappropriated public lands in

21   Nevada since Mexico ceded the land to the United States in 1848 and that the United States may

22   regulate grazing on those lands because it owns title to those lands).  The "New Trespass Lands"

23   are lands in southern Nevada, in the vicinity of Lake Mead and within an area known as Gold

24   Butte.  They are owned by the United States and administered by BLM and NPS as BLM Lands

25   and NPS Lands, respectively.  Ex. 5, Declaration of David D. Morlan ¶¶ 4-22; Ex. 2, Rugwell

26   Declaration ¶ 3; Ex. 3, Warshefski Declaration ¶ 2.  A map showing the location of these lands is

27   found at Ex. 1.

28

**C.      The New Trespass Lands Are Closed to Grazing**

With the exception of two small allotments, BLM Lands within the New Trespass Lands have been closed to all livestock grazing since 1998.  Ex. 2, Rugwell Declaration ¶¶ 3, 10, 11. NPS Lands within the New Trespass Lands have also been closed to all livestock grazing since 1998.  Ex. 3, Warshefski Declaration ¶ 5.

**D.      Defendant Bundy has no authorization to graze livestock or to construct or maintain range improvements on New Trespass Lands**

Defendant Bundy has never held a permit and has never been authorized to graze livestock on BLM Lands or NPS Lands that constitute the New Trespass Lands.  Ex. 2, Rugwell Declaration ¶ 11; Ex. 3, Warshefski Declaration ¶ 7.

Defendant Bundy has never had authorization to construct, use or maintain range improvements on the BLM portion of the New Trespass Lands.  Ex. 2, Rugwell Declaration ¶ 27.  Defendant Bundy also has no authorization to construct, use or maintain range improvements within the NPS portion of the New Trespass Lands.[4]  Ex. 3, Warshefski Declaration ¶ 7.[5]

Despite lacking authority to do so, Defendant Bundy has used and maintained range improvements on the New Trespass Lands.  See Ex. 2, Rugwell Declaration ¶ 27; Ex. 7, Declaration of Deborah J. Sullivan ¶¶ 9-13, 21 (photos of Defendant Bundy and a son at a corral); Ex. 8, Declaration of Lauren Brown ¶¶ 25, 35; Ex. 4, Bundy Depo. at 85:15-87:3. Defendant Bundy has also placed nutritional supplements and hay on the federal lands.  Ex. 7,

---

[4]  In the past, NPS has allowed Defendant Bundy to use temporary structures in order to gather and hold trespassing cattle until those cattle were removed from Lake Mead NRA. The last occasion was in the spring and summer of 2011, when NPS allowed Defendant Bundy to place and use a temporary corral on NPS Lands to facilitate the removal of trespassing cattle from Lake Mead NRA.  See Ex. 6, Declaration of Alice C. Newton ¶ 20.  However, that temporary permission is no longer in effect and Defendant Bundy currently has no authorization to place or use range improvements on NPS Lands. See Ex. 3, Warshefski Declaration ¶ 7.

[5]  Defendant Bundy previously was authorized to construct or maintain certain range improvements within the former Bunkerville Allotment, but those authorizations were canceled in 2008, and the cancellation decision was upheld on appeal by the Interior Board of Land Appeals.  Ex. 2, Rugwell Declaration ¶ 12.

Sullivan Declaration ¶¶ 9-11; Ex. 4, Bundy Depo. at 88:16-20.  Defendant Bundy does not dispute that he uses range improvements located on the New Trespass Lands.  Ex. 2, Rugwell Declaration ¶ 14 (statement by Defendant Bundy before Nevada Wildlife Commission that he had numerous range improvements in the Gold Butte area); Ex. 4, Bundy Depo. at 90:24–91:21 (use of a corral at Mockingbird Spring).  Defendant Bundy also admits that he has repaired water lines or water troughs used to support livestock and wildlife in the New Trespass Lands.  Id. at 85:15-87:3.

> **E.    Defendant Bundy has continuously grazed his livestock on New Trespass Lands since 2000**

Defendant Bundy admits that he has continuously grazed his livestock year-round on the New Trespass Lands since 2000.  Ex. 4, Bundy Depo. at 35:2-18; 47:15-21; 61:16-25; 62:1-5.  See also Ex. 1A, Bundy Depo. Map; Ex. 4, Bundy Depo. at pp. 52:12-62:5 (colloquy with Defendant Bundy marking the outer limits on Exhibit 1A where his cattle have grazed in the New Trespass Lands).  This is confirmed by BLM and NPS personnel, who have documented a large number of sightings of Defendant Bundy's livestock grazing within the New Trespass Lands.  See Ex. 9, Chart Documenting Sightings of Defendant Bundy's Livestock.  Indeed, Defendant Bundy has publicly stated that he "fired the BLM," that his cattle graze in the Gold Butte area without a permit, and that he has numerous range improvements in the area.  Ex. 2, Rugwell Declaration at ¶ 14.

Defendant also admits that he grazes unbranded cattle on the New Trespass Lands, that approximately 40 percent of his livestock are unbranded, and that one way of determining whether unbranded cattle are owned by him is whether they are with his branded cattle.  Ex. 4, Bundy Depo. at 64:17- 65:20.

Defendant Bundy is the only person known to have unauthorized cattle in the New Trespass Lands and former Bunkerville Allotment.  Ex. 3, Warshefski Declaration ¶ 8; Ex. 2, Rugwell Declaration ¶ 19.  There are two small BLM allotments within the New Trespass Lands where there is some authorized grazing.  The permittee for the Lower Mormon Mesa has grazed a small number of livestock (a maximum of 40 cattle) consistent with the terms of his grazing

permit and his cattle have not been found outside the allotment.  Ex. 2, Rugwell Declaration ¶ 11 and n.1.  There is also one other extremely small allotment of approximately 5000 acres of federal land  – the Flat Top Mesa Allotment – north of Highway I-15, on which another permittee is authorized to graze the equivalent of about five cows worth of forage.  Id.  However, no cattle have been grazed on that allotment for at least the past several years and only a handful of domestic horses are currently authorized to graze on those federal lands.  Id.  Defendant Bundy has never been authorized to graze any livestock in either the Lower Mormon Mesa or Flat Top Mesa Allotments.  Id.  The only unauthorized cattle documented on the New Trespass Lands either have Defendant Bundy's brand or earmark, or are unbranded (often intermingled with Defendant Bundy's branded cattle).  Id. at ¶¶ 19, 22; Ex. 3, Warshefski Declaration ¶ 8.

**F.     BLM and NPS have provided Defendant Bundy repeated opportunities to voluntarily remove his cattle from the New Trespass Lands**

The United States has reached out to Defendant Bundy in different ways to try to bring his trespass to a close.  As described below, those efforts have included letters, an overture to speak with him in person or by telephone, scheduling a meeting (that was subsequently canceled), contact with him to discuss safety concerns caused by his trespassing livestock, working through local law enforcement personnel, and an offer to provide him the proceeds from the sale of his cattle if impounded.  All of these efforts were to no avail.  Defendant Bundy refuses to cooperate.

BLM has repeatedly requested that Defendant Bundy remove his trespassing cattle from the federal lands.  In January 2011, BLM sent Defendant Bundy a letter reminding him that his cattle were in trespass.  Ex. 2, Rugwell Declaration ¶ 17.  The BLM District Manager also attempted to reach out to Defendant Bundy in an effort to resolve the trespass, but to no avail.  Id. ¶ 14 (explaining that a meeting with Defendant Bundy was set up by a county commissioner, but it fell through on the day of the meeting without explanation and it was not rescheduled); Id. ¶ 17 (explaining that Defendant Bundy ignored the BLM District Manager's attempt to speak with him in the fall of 2011 following a Nevada Wildlife Commission Meeting and never followed up with a requested phone call); Id. ¶ 24 (explaining that further efforts to speak with

1    Defendant Bundy to discuss whether he would remove his cattle voluntarily were unsuccessful).

2            Other efforts to elicit Defendant Bundy's removal of his cattle from federal lands without

3    court involvement included:  a Notice of Trespass and Order to Cease and Desist issued in June

4    2011 (id. ¶ 20); a Notice of Intent to Impound issued in July 2011 (id. ¶ 21); an Order to Remove

5    his trespassing cattle along with a Trespass Decision and Demand for Payment issued in

6    September 2011 (id. ¶ 22); and an April 2012 Trespass Decision and Order requesting that

7    Defendant Bundy remove his unauthorized range improvements (id. ¶ 27).

8            Like the BLM, the NPS has reached out to Defendant Bundy on several occasions in an

9    effort to cooperatively remove his cattle from NPS Lands.  As far back as 2004, Lake Mead

10   NRA staff contacted Defendant Bundy to let him know that his cattle were trespassing and

11   causing damage to resources within Lake Mead NRA.  Ex. 10, Declaration of Mary Hinson ¶ 4.

12   More recently, in November 2011, NPS sent Defendant Bundy a letter informing him that his

13   cattle were trespassing within Lake Mead NRA, damaging natural and cultural resources, and

14   threatening public health and safety.  Ex. 3, Warshefski Declaration ¶ 11a.  In March 2012, NPS

15   sent a follow up letter informing Defendant Bundy that his cattle were still trespassing within

16   Lake Mead NRA and that he should remove them immediately.  Id. ¶ 11c.  Defendant Bundy

17   failed to address the trespasses.  While Defendant Bundy has at times removed or claimed to

18   remove some of his cattle from parts of Lake Mead NRA, his efforts were neither comprehensive

19   nor permanent.  As of November 2012, despite telling NPS on several occasions that he has

20   removed trespassing cattle, Defendant Bundy's cattle still remained within Lake Mead NRA.

21   Ex. 10, Hinson Declaration ¶ 8; Ex. 6, Newton Declaration ¶ 25.

22           In April 2012, the Department of the Interior tried to obtain Defendant Bundy's

23   cooperation by offering, through the Clark County Sheriff, to gather and ship the cattle to a

24   facility of his choice for sale, and provide him all proceeds from the sale.  Ex. 2, Rugwell

25   Declaration ¶ 28.  Defendant Bundy rejected the offer and threatened legal action against the

26   party contracted to perform the gather, stating "that there is a volatile situation currently taking

27   place."  In responding to this offer, Defendant Bundy also made reference to a "range war."  Id.

28   at ¶¶ 28-31.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**G.      Defendant Bundy's cattle pose a threat to public safety on the New Trespass
        Lands**

Defendant Bundy's trespassing cattle are a safety hazard.  See Ex. 11, Declaration of

Victoria R. Worfolk ¶ 19 (describing instance when cows were present on the highway near

dusk); Ex. 10, Hinson Declaration ¶ 7 (describing a traffic accident in November 2011 when a

truck hit a cow on a road within Lake Mead NRA); Id. ¶ 9 (describing a March 2012

conversation with Defendant Bundy about the continued presence of his cows on a road in Lake

Mead NRA posing a safety threat to NPS staff and visitors); Ex. 8, Brown Declaration ¶ 39

(describing instance when four cattle in middle of road near Defendant Bundy's home near dusk

caused a driver to swerve to avoid hitting them); Ex. 3, Warshefski Declaration, ¶ 3 (explaining

that cattle have presented a danger to visitors and NPS staff at Lake Mead NRA); Id. ¶ 10

(explaining that cattle present a serious threat to public safety by roaming on public roads and

causing traffic accidents, and further explaining that parts of the Park have been closed at times

because cattle have attacked people in the Park); Ex. 4, Bundy Depo. at 6:8-7:16 (testifying that

a car hit one of Defendant Bundy's cows on the highway, resulting in a lawsuit); see also Cheek

v. FNF Construction, Inc., 924 P.2d 1347, 1348 (Nev. 1996) (confirming that a car struck a cow

owned by Defendant Bundy on northbound highway I-15 in the evening hours).

Unless removed from the New Trespass Lands, Defendant Bundy's trespassing cattle will

continue to present a risk to the health and safety of visitors and government employees on, and

adjacent to, the New Trespass Lands, and will continue to require staff time and resources that

could be expended on other purposes to manage federal lands.  Ex. 3, Warshefski Declaration ¶

12.

**H.  Defendant Bundy's cattle have caused damage to natural and cultural resources
    in the New Trespass Lands**

BLM manages nine special management areas called Areas of Critical Environmental

Concern ("ACECs") located within the New Trespass Lands.  BLM manages these ACECs to

protect and prevent irreparable damage to, among other things, significant historic, cultural, or

scenic values, as well as fish and wildlife resources.  Ex. 2, Rugwell Declaration ¶ 3.  The New

12

Trespass Lands include critical habitat for various species listed under the Endangered Species Act, including two fish species, one bird species, and the desert tortoise. Id. at ¶ 3. Those lands also include archeological resources, designated wilderness areas, and rare plant species and soil that are directly and indirectly impacted by cattle grazing. Id. at ¶¶ 3-8; see also Ex. 6, Newton Declaration ¶¶ 4-5, 7, 10 (explaining that the Overton Arm/Gold Butte area contains many sensitive and rare plant species, rare habitats including biological soil crusts, alkali meadows and aquatic herb communities, desert oasis woodlands, gypsum barren scrub, and important habitat for endangered species.  Cattle grazing within desert landscapes can adversely impact the ecological health of these natural resources and species.  Ex. 2, Rugwell Declaration ¶¶ 4-8; Ex. 6, Newton Declaration ¶ 7.

Defendant Bundy's livestock have caused damage to and adversely impacted natural resources on the New Trespass Lands.  See Ex. 10, Hinson Declaration ¶ 9 (describing NPS's concern about damages to resources because of continued presence of trespass cattle); Ex. 8, Brown Declaration ¶¶ 34-51 (cataloging damage including archeological damage, denuding of rangelands leading to invasive grasses and noxious weeds, damages to restoration efforts to protect critical habitats for endangered species, and the inability to restore high priority habitat because funding is diverted because of continuing presence of trespassing cattle); Ex. 3, Warshefski Declaration ¶¶ 3-4, 10 (explaining that cattle have damaged park resources); Ex. 6, Newton Declaration ¶¶ 6, 8-9, 12-13, 16, 22 (describing damages surveyed on approximately 1,920 acres); ¶ 24 (describing damage to various plants and habitats and structural damage to soils).  BLM and NPS have also documented damage to archaeological resources caused by trespass livestock.  See Ex. 12, Declaration by Mark Boatwright ¶¶ 5-13 (describing damage to archaeological resources attributable to unauthorized livestock documented in the summer of 2011 at 18 sites located within and outside the former Bunkerville Allotment, including damage to soil and petroglyphs); Ex. 6, Newton Declaration ¶ 16, Attachment G (describing NPS efforts to protect archaeological site from trespassing cattle).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.      **Defendant Bundy resists removing his cattle permanently from the New Trespass Lands**

The Department of the Interior has exercised significant restraint in managing Defendant Bundy's continued trespassing over the years out of concern that a confrontation with Defendant Bundy could lead to conflict, including physical resistance.  Ex. 2, Rugwell Declaration ¶ 13. These concerns also had led the Department not to use its impoundment authorities to remove the trespass livestock in the 1990s.  1998 Order at 3.

Defendant Bundy's sporadic contact with Department of the Interior personnel or its contractors over the years has been characterized by his often confrontational behavior.  For example, in February 2009, Defendant Bundy confronted two BLM contractors working in the Gold Butte Area on fencing that BLM had constructed to protect a cultural resource site and a sensitive threatened plant habitat.  Ex. 13, Declaration of Jimmy Linares ¶¶ 3-5, 10-13. Complaining that the fence would interfere with feeding his cows, Defendant Bundy challenged their presence, referring to the Gold Butte Area as his "property."  Id. ¶ 5-6.  He demanded their names, instructed them to contact the sheriff before coming to his "property" in the future, and threatened to file a lawsuit against them.  Id.  Similarly in April 2012 when BLM attempted to solicit his cooperation for an impoundment of his trespassing cattle, Defendant Bundy rejected an offer to ship his cattle to a facility of his choice for sale and to provide him the proceeds from the sale, threatened legal action against the party contracted to perform the gather, and hinted at other possible action on his part by stating that there was a "range war" and "a volatile situation currently taking place."  Ex. 2, Rugwell Declaration ¶¶ 28-31.

At his deposition, Defendant Bundy made clear his position that he does not feel bound by and does not intend to comply with federal law or orders that might be issued by this Court to enforce federal law:

Q.      Now, let's go back to the question.  Let's assume the federal authorities have the authorization to present themselves on land, whether you call it your ranch or the former Bunkerville Allotment, or for that matter the new trespass lands, and they've got the authorization in hand to remove cattle that belongs to you and they literally, physically, take the steps necessary to accomplish that right there and you're standing by.

14

> Are you going to undertake any effort to physically stop that?
> A.    Yes.
> Q.    What efforts would that be?
> A.    Whatever it takes.
> Q.    Okay.  Would that include -- when you say "whatever it takes," would that include the soliciting, the assistance of neighbors, friends, family, supporters of yours to do whatever it takes in the scenario I just described?
> A.    Yes.

Ex. 4, Bundy Depo. at 99:1-19.  As attested to in his deposition, and in his communications with the United States, Defendant Bundy has indicated that he does not rule out a physical confrontation with the federal government if attempts are made to remove his cattle from the New Trespass Lands or the former Bunkerville Allotment.  The United States has no way of determining – based on Defendant Bundy's statements during his deposition and his written communications with the United States and others -- whether such threatened confrontation would be peaceful or include physical resistance.

**J.    The State of Nevada and County Sheriff require an order authorizing the federal agencies to impound Defendant Bundy's livestock**

BLM and NPS have authority under federal law to impound trespass livestock, provided the appropriate notice and opportunity to cure have been provided, and the requirements set forth in the corresponding regulations have been followed.  See 43 C.F.R. §§ 4150.4-1 to 4150.4-5 (2005); 36 C.F.R. § 2.60(c) (2012).

The State of Nevada also regulates livestock within the State; it registers livestock brands, requires that livestock on the open range be branded, and issues the brand inspection certificates needed to transport or sell livestock in the State of Nevada.  See, e.g., NEV. REV. STAT. §§ 564.070; 564.025; 565.090; 565.100; 565.120.  The State Brand Inspectors play an important role under State livestock statutes in registering brands and in issuing the brand inspection certificates needed to transport or sell livestock in the State of Nevada, among other responsibilities.  Ex. 14, Declaration of Amy Lueders at ¶ 3.

In 2005, the State of Nevada enacted a new statute that prohibits the State Brand Inspector from issuing a brand inspection certificate to a federal agency unless the agency first obtains a court order approving its seizure of cattle.  This statute states:

**1.** Notwithstanding any provision of this chapter to the contrary, if a governmental entity seizes any privately owned animals subject to brand inspection pursuant to this chapter, the Department or its authorized inspector shall not issue brand inspection clearance certificates or permits to remove the animals from a brand inspection district or for the transfer of ownership of the animals by sale or otherwise unless:

  **(a)** Before the seizure, the governmental entity obtains approval for the seizure from a court of competent jurisdiction; and

  **(b)** The governmental entity submits a copy of the order approving the seizure to the Department or its authorized inspector.

**2.** The provisions of this section do not apply to:

  **(a)** An estray, as defined in NRS 569.0075;

  **(b)** Feral livestock, as defined in 569.008;

  **(c)** A wild horse or burro, as defined in 16 U.S.C. § 1332;

  **(d)** An animal that is impounded or sold by the Department pursuant to NRS 575.060; or

  **(e)** An animal that is seized by a governmental entity to protect the health and safety of the public or to prevent cruelty to animals.

NEV. REV. STAT. § 565.125.

Although BLM and NPS have the legal authority to impound trespass livestock under federal law (following notice and other regulatory requirements), as a practical matter, in order to transport or sell such livestock to private parties – which occurs if the impounded livestock are not redeemed by the owner – the State of Nevada requires a brand inspection certificate to either transport or transfer legal ownership of the cattle.  NEV. REV. STAT. §§ 565.090; 565.100; 565.120.  In other words, no rancher will agree to purchase impounded livestock if there is no brand inspection certificate that permits transportation or the transfer of ownership for that animal.  Ex. 14, Lueders Declaration ¶ 7.

Thus, the State's cooperation, as a practical matter, is necessary for a successful impoundment operation on the public lands, Ex. 14, Lueders Declaration ¶ 12.  In communications with BLM, however, the State of Nevada has clarified its position that a permanent injunction order prohibiting trespass on public lands, such as the order issued in Bundy I, does not meet the requirements under NEV. REV. STAT. § 565.125, which states that a court of competent jurisdiction must specifically approve of the proposed "seizure."  Ex. 14, Lueders Declaration ¶¶ 9-10 and Attachment C.  Without agreeing with its characterization of

16

the statute or the Bundy I ruling and merely to facilitate the Department of the Interior's

coordination with the State and allow the Nevada Department of Agriculture to cooperate in such

impoundment by issuing brand inspection certificates, the United States requests that any court

order granting relief explicitly authorize the United States to seize (i.e., impound) any trespass

cattle that remain on the New Trespass Lands.[6]

In addition to the State's requirement that a Court Order be presented for issuance of

brand clearance certificates by the State Brand Inspector, the Clark County Sheriff – whose

cooperation would also be vital should an impoundment be necessary – has also indicated that he

would require a court order authorizing such impoundment for purposes of cooperation with the

United States.  Id. at ¶ 13.  Therefore, a court order authorizing the impoundment of Defendant

Bundy's trespass cattle if such cattle are not removed from the federal lands, is essential to help

maintain public safety in a coordinated fashion between the federal and local government

authorities.  Id.

## IV.    STATUTORY AND REGULATORY FRAMEWORK

### A.    Management of Grazing on BLM Lands

BLM's authority to manage grazing on BLM Lands derives from the Taylor Grazing Act

("TGA"), 43 U.S.C. §§ 315-315r, and the Federal Land Policy and Management Act of 1976

("FLPMA"), 43 U.S.C. § 1752.  The TGA was enacted to address the substantial injury that

decades of unregulated livestock grazing had caused to the public rangelands.  See Pub. Lands

Council v. Babbitt, 167 F.3d 1287, 1290 (10th Cir. 1999), aff'd 529 U.S. 728 (2000).  The TGA

grants the Secretary of the Interior broad discretion to "make such rules and regulations . . . and

do any and all things necessary. . . to regulate their occupancy and use, to preserve the land and

resources from destruction or unnecessary injury, [and] to provide for orderly use, improvement

and development of the range. . . ."  43 U.S.C. § 315a.  In order to accomplish these purposes,

---

[6] In attempting to work within the confines of the Nevada statute, the United States does not thereby indicate that such statute is properly applied to the United States nor does the United States waive any potential legal challenges to the constitutionality of such statute as applied to the Federal Government.

the TGA authorizes the Secretary "to establish grazing districts" on lands "chiefly valuable for grazing and raising forage crops," 43 U.S.C. § 315, "to issue or cause to be issued permits to graze livestock on such grazing districts," 43 U.S.C. § 315b, and to require "the payment annually of reasonable fees" for grazing on the federal lands. Id.

Grazing of the federal lands requires compliance with both the TGA and its implementing regulations:

> A livestock owner does not have the right to take matters into his own hands and graze public lands without a permit. If there is dissatisfaction with the action of the officials in the granting of permits, or as to other decisions, the livestock owner's remedy is by appeal as provided for in the Act and the Code.

Chournos v. United States, 193 F.2d 321, 323 (10th Cir. 1951).

FLPMA also addresses grazing permits on BLM Land. For example, FLPMA empowers the Secretary of the Interior to incorporate in grazing permits and leases "such terms and conditions as [the Secretary] deems appropriate for the management of the . . . lands." 43 U.S.C. § 1752(e); see also Perkins v. Bergland, 608 F.2d 803, 805 (9th Cir. 1979). FLPMA affords the Secretary broad discretion to modify the numbers of livestock grazing and to set limits on seasonal use of grazing lands. 43 U.S.C. § 1752(e). FLPMA also reaffirmed the accepted legal principle that a grazing permit confers no vested rights in federal lands. 43 U.S.C. § 1752(h); H.R. Rep. No. 94-1163 at 12 (1976); see also 43 C.F.R. § 4130.2(c). FLPMA further reaffirmed the principle that federal public lands are to be managed for multiple use. That is, the lands and their resource values are to be used in the combination that will best meet the present and future needs of the American people. 43 U.S.C. §§ 1712(c)(1), 1732(a), 1702(c). The Public Rangelands Improvement Act of 1978 ("PRIA"), Publ. L. No. 95-514, 92 Stat. 1803 (codified at 43 U.S.C. §§ 1901-1908), amended FLPMA by establishing a long-term program to improve the condition and health of the public rangelands.

BLM regulations at 43 C.F.R. Part 4100 implement the statutory mandates of the TGA, FLPMA and the PRIA. Those regulations require a person or entity wishing to use BLM Lands for grazing or livestock purposes to apply for and receive authorization before using those lands.

1   See generally, 43 C.F.R. Subparts 4130, 4140, and 4150 (2005).[7]   Further, once a permit is

2   issued, the permittee must pay grazing fees before using the public lands.  43 C.F.R. § 4130-8-

3   1(e) (2005).  Once the fees are paid, the permittee can use specified federal lands for a specified

4   time period to graze a specified number of livestock.  See 43 C.F.R. § 4130.6-1(a) (2005); 43

5   C.F.R. § 4130.3-1(a) (2005).

6        The grazing regulations also prohibit certain conduct on BLM Lands, including grazing

7   livestock on or driving livestock across federal lands without a grazing permit or lease.  43

8   C.F.R. § 4140.1(b) (2005).  Engaging in a prohibited act, or failing to pay a required grazing fee,

9   constitutes unauthorized grazing.  A person engaging in unauthorized grazing is liable for

10  "damages to the United States for the forage consumed by their livestock, for injury to Federal

11  property caused by their unauthorized grazing use, and for expenses incurred in impoundment

12  and disposal of their livestock, and may be subject to civil penalties or criminal sanction for such

13  unlawful acts."  43 C.F.R. § 4150.1(b) (2005).  If a trespass is a repeated willful violation of the

14  grazing regulations, BLM has to suspend or cancel the trespasser's grazing permit, in whole or in

15  part.  43 C.F.R. § 4170.1-1(b) (2005).

16       BLM also has the authority to impound and dispose of trespass livestock found on BLM

17  Lands, provided it issues notice and an opportunity to remove the trespassing livestock and

18  complies with the regulatory requirements for impoundment and disposal.  See 43 C.F.R. §§

19  4150.4, 4150.4-1 through 4150.4-5 (2005).

20       Any construction or use of range improvements on BLM Lands must be authorized by

21  BLM.  43 C.F.R. § 4120.3-1(b) (2005) ("Prior to installing, using, maintaining, and/or modifying

22

23  [7]  Although BLM amended the grazing regulations found in 43 C.F.R. Part 4100 in 2006, those
24  2006 regulations were permanently enjoined by the District Court in Western Watersheds Project
    v. Kraayenbrink, 538 F. Supp. 2d 1302 (D. Idaho 2008).  This permanent injunction was
25  affirmed by the Ninth Circuit on appeal.  Western Watersheds Project v. Kraayenbrink, 632 F.3d
    472 (9th Cir. 2011).  As a result, the operative regulations are those that are found in the 2005
26  version of 43 C.F.R Part 4100, not the 4100 regulations currently available through a Lexis or
    Westlaw search or in the hardcopy C.F.R.'s for 2006 to 2012, which still reflect the enjoined
27  2006 regulations.

28

range improvements on the public lands, permittees or lessees shall have entered into a cooperative range improvement agreement with the Bureau of Land Management or must have an approved range improvement permit.").  The placement or use of range improvements on BLM Lands without a permit constitutes a realty trespass.  43 C.F.R. § 9239.7-1 (2012).

**B.**     **Management of Grazing on NPS Lands**

Lake Mead NRA is a unit of the National Park System administered by NPS.  16 U.S.C. § 460n et seq. (Lake Mead NRA Enabling Act).  When Congress created Lake Mead NRA in 1964, Congress directed that it be administered "for general purposes of public recreation, benefit, and use, and in a manner that will preserve, develop, and enhance, so far as practicable, the recreation potential, and in a manner that will preserve the scenic, historic, scientific, and other important features of the area . . . ." 16 U.S.C. § 460n-3(a).  NPS Lands within Lake Mead NRA are governed by the same statutes and regulations that apply to all national parks, monuments, recreation areas, and other units of the National Park System. 16 U.S.C. §§ 1c(a), 1c(b), and 460n-5.  Fundamental among those laws is the National Park Service Organic Act, enacted in 1916, which mandates that NPS manage all of the units of the National Park System "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.  In addition, Congress required that "[t]he Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service. . . ." 16 U.S.C. § 3.  The regulations applicable to all national parks and recreation areas are found, in part, at 36 C.F.R. Chapter 1, Parts 1 through 7 (2012).  36 C.F.R. § 2.60, the general NPS regulation governing livestock grazing within the National Park System, states that "[t]he running-at-large, herding, driving across, allowing on, pasturing or grazing of livestock of any kind in a park area. . . is prohibited, except . . . (1) [a]s specifically authorized by Federal statutory law . . . " 36 C.F.R. § 2.60(a) (2012).  Authorization to graze livestock on NPS Lands, including cattle, is granted by the park or recreational area's superintendent through a permit, license, or lease. 36 C.F.R. §§

1.6(a), 2.60(b) (2012).  Superintendents are empowered to impound and dispose of trespassing livestock pursuant to the process set out in NPS regulations.  36 C.F.R. § 2.60(c).  The NPS regulations governing livestock apply to NPS Lands within Lake Mead NRA. 16 U.S.C. §§ 1c(b) and 460n-5; 36 C.F.R. § 1.2(a)(1) (2012).

The Lake Mead NRA Enabling Act states that the Secretary of the Interior "may prescribe, and to such extent as will not be inconsistent with either the recreational use or the primary use of that portion of the area heretofore withdrawn for reclamation purposes." 16 U.S.C. § 460n-3(b)(2).

In the past, because federal statutory law authorizes the Secretary of the Interior to allow grazing within Lake Mead NRA, cattle grazing, and any associated range improvements, were allowed by permit.  See 36 C.F.R. §§ 1.6(a), 2.60(b) (2012).  NPS, however, did not issue permits directly; instead, under a cooperative agreement with BLM, grazing was at one time authorized on NPS Lands within Lake Mead NRA through grazing permits issued by BLM for areas that included BLM Lands and NPS Lands within Lake Mead NRA.  Ex. 3, Warshefski Declaration ¶ 5.  Since 1998, in part in response to the listing of the desert tortoise as an endangered species under the federal Endangered Species Act, no grazing has been permitted on NPS Lands in the Nevada portion of Lake Mead NRA, either by NPS directly or through a permit issued by BLM. Ex. 2, Rugwell Declaration ¶¶ 10-11; Ex. 3, Warshefski Declaration ¶ 4.  Accordingly, no grazing is now allowed on NPS Lands within the New Trespass Lands or the former Bunkerville Allotment.  Id.

V.    ARGUMENT

Put simply, defendant is willfully trespassing on the United States' property by grazing livestock on federal lands without a permit.  Defendant has never obtained a permit to graze cattle on the New Trespass Lands, is well aware of the presence of his cattle (both branded and unbranded) on the New Trespass Lands, and has defied repeated demands to remove his livestock.  Faced with this willful and open trespass, the United States filed this lawsuit seeking declaratory and injunctive relief and an order that authorizes BLM and NPS to impound any livestock found grazing on the New Trespass Lands.

21

1

**A.  The New Trespass Lands are Federal Lands**

2          The New Trespass Lands are federal lands in Nevada to which the United States holds

3   title.  Ex. 5, Morlan Declaration ¶¶ 4-19, 21-22.  See also Ex. 2, Rugwell Declaration ¶ 3; Ex. 3,

4   Warshefski Declaration ¶¶ 1-2; Ex. 1, Map**.**  The United States' ownership of the public lands in

5   Nevada (which includes the New Trespass Lands at issue in this case) extends back to February

6   2, 1848, when, following the Mexican American War, the land that now makes up the State of

7   Nevada was ceded to the United States by Mexico as set forth in the Treaty of Guadalupe

8   Hidalgo, 9 Stat. 922, 929 (1848).  Ex. 5, Morlan Declaration ¶ 6.  See also United States v.

9   California, 436 U.S. 32, 34 n.3 (1978) ("all nongranted lands previously held by the Government

10  of Mexico passed into the federal public domain" under the Treaty); Cappaert v. United States,

11  426 U.S. 128, 131 (1976) (stating that a limestone cavern located in Nevada is "situated on land

12  owned by the United States since the Treaty of Guadalupe Hidalgo in 1848"); Sparrow v. Strong,

13  70 U.S. (3 Wall.) 97, 104 (1865) ("The Territory, of which Nevada is part, was acquired by

14  treaty.").

15         In United States v. Gardner, 107 F.3d 1314, 1318 (9th Cir.1997), the Ninth Circuit

16  reaffirmed that the United States has held title to the unappropriated public lands in Nevada since

17  Mexico ceded the land to the United States in 1848.   Because the United States owns title to

18  those lands, the Ninth Circuit also ruled that the United States may regulate grazing on those

19  lands.  Id. at 1318.   This Court also has recognized that title to the federal lands upon acquisition

20  from Mexico within Nevada's boundaries rests in the United States.  United States v. Nye

21  County, 920 F. Supp. 1108 (D. Nev. 1996).   This Court also previously found that the United

22  States owns the land within the former Bunkerville Allotment.  1998 Order at 7-8.

23         **B.  The Federal Lands at Issue are Managed and Administered by BLM and NPS**

24         The large majority of the New Trespass Lands have remained in federal ownership since

25  1848, although a some of those federal lands were conveyed out of federal ownership after 1848

26  but have since been reacquired by the United States.  Ex. 5, Morlan Declaration ¶ 21.  The

27  United States retains and manages these federal lands pursuant to its powers under the

28  Constitution, primarily the Property Clause, which gives the Congress the "power to dispose of

22

and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Const. art. IV, § 3, cl. 2.  The Supreme Court has consistently interpreted this power to be expansive, repeatedly observing that "the power over the public land thus entrusted to Congress is without limitations."  United States v. City & County of S.F., 310 U.S. 16, 29 (1940).  See also Kleppe v. New Mexico, 426 U.S. 529, 539 (1976); Alabama v. Texas, 347 U.S. 272, 273 (1954); United States v. California, 332 U.S. 19, 27 (1947); Gibson v. Choteau, 80 U.S. 92, 99 (1871); United States v. Gratiot, 39 U.S. 526, 537 (1840).  The Supreme Court has emphasized that Congress properly exercises "the powers of both a proprietor and of a legislature over the public domain."  Kleppe, 426 U.S. at 540; Alabama, 347 U.S. at 273.

Over 100 years ago in Light v. United States, 220 U.S. 523 (1911), a case similar to the one before this Court, a rancher grazed his cattle on National Forest land without authorization and unsuccessfully argued, as a defense against the trespass action brought by the United States, that "Congress cannot constitutionally withdraw large bodies of land from settlement without the consent of the State where it is located."  Id. at 535-36.  The Supreme Court rejected this argument unequivocally, affirming that "'the public lands of the nation are held in trust for the people of the whole country.'"  Light, 220 U.S. at 537 (quoting United States v. Trinidad Coal Co., 137 U.S. 160 (1890)).  While the Supreme Court instructed that public lands could be used by private parties for grazing, it also deemed that such use does "not confer any vested right."  Light, 220 U.S. at 535.  Further, private use of the public lands occurs only by virtue of an "implied license," a consent which the United States may recall at any time.  Id. This consent was withdrawn with the enactment of federal statutes requiring a permit or other authorization to graze the federal lands.  See supra. Section IV.

There can be no reasonable dispute in light of the foregoing precedent that the federal lands at issue in this litigation are the property of the United States and rightfully managed and administered by NPS and BLM pursuant to federal law.

Defendant Bundy admits that he has not received authorization to graze livestock on the federal lands (Ex. 4, Bundy Depo. at 72:18-73:5), has received multiple requests to remove his livestock from the federal lands (see supra. Section III.F), and admits that he did not remove

livestock off the federal lands when so directed by the Court ( Ex. 4, Bundy Depo. at 99:20-100:6).  Defendant Bundy has not complied with federal law requiring a grazing authorization and payment of grazing fees to graze the federal lands.  43 U.S.C. § 315b, 43 U.S.C. § 1752; 16 U.S.C. §§ 1c(b), 3 and 460n-5, 36 C.F.R. § 2.60(b) (2012).

### C.  Defendant Bundy's Livestock Have Continuously Trespassed on the New Trespass Lands Since 2000

#### 1.  Trespass Law and Regulations

Trespass is defined as an entry upon real estate of another without the permission or invitation of the person lawfully entitled to possession.  United States v. Gardner, 903 F. Supp. 1394, 1402 (D. Nev. 1995) (citing RESTATEMENT (SECOND) of TORTS, §§ 158-159 (1965)).  The United States is entitled to protect federal lands from trespasses.  United States v. Beebe, 127 U.S. 338, 342 (1888); Camfield v. United States, 167 U.S. 518, 524-25 (1897).  The Property Clause of the United States Constitution also authorizes Congress to protect federal lands from trespasses and injuries.  United States v. Vogler, 859 F.2d 638, 641 (9th Cir. 1988).  The Ninth Circuit has also held that unauthorized grazing of federal lands constitutes a trespass.  Holland Livestock Ranch v. United States, 655 F.2d 1002, 1005 (9th Cir. 1981).  When the United States shows a trespass has occurred on federal lands, it is entitled to injunctive relief.  United States v. Nogueira, 403 F.2d 816, 825 (9th Cir. 1968) (citations omitted).

Both BLM and NPS regulations address trespass by livestock.  Both provide that civil or criminal penalties can be imposed if livestock use public lands without appropriate authorization.  See 43 C.F.R. § 4140.1(b)(1)(i) and Subpart 4170; 36 C.F.R. §§ 1.2(a)(1), 1.3, and 2.60(a) (2012).

#### 2.  Defendant Bundy's Livestock Have Continually Trespassed

It is undisputed that Defendant Bundy's cattle have trespassed, and continue to be in trespass, on the New Trespass Lands.  Defendant Bundy admits that he has continuously grazed his livestock year-round on New Trespass Lands since 2000.  See Ex. 4, Bundy Depo. at 35:2-18; 47:15-21; 61:16-25, 62:1-5; Ex. 1, Map; Ex. 2, Rugwell Declaration ¶ 14 (Bundy public

24

speech in which he states that he "fired the BLM" and that his cattle had continually grazed without a permit).  In addition, there are numerous documented sightings of Defendant Bundy's livestock on federal lands.  Ex. 9, Chart Documenting Sightings of Defendant Bundy's Cattle. Defendant Bundy admits that he has no authorization from BLM or NPS to graze his cattle on the New Trespass Lands.  Ex. 4, Bundy Depo. at 72:18-73:5.  Thus, the undisputed material facts establish that Defendant Bundy is unlawfully in trespass on the New Trespass Lands.

### D.    The United States is Entitled to Injunctive Relief

The United States is entitled to declaratory and injunctive relief to stop Defendant Bundy's continuing trespass and the irreparable harm that his actions have caused and will continue to cause.  The United States requests that the Court (1) declare that Defendant Bundy's cattle have trespassed without authority since 2000 on BLM Lands and NPS lands within the New Trespass Lands located in Nevada; (2) order Defendant Bundy to remove his livestock from the New Trespass Lands immediately and to desist from any further trespasses on federal lands administered by the United States located in Nevada; (3) order that the United States is authorized to seize and impound Defendant Bundy's livestock if they are not fully removed within 45 days of the Court's order; and (4) order that the United States may also seize and impound unauthorized livestock for any future trespasses on the New Trespass Lands.

### 1.   Standard for Injunctive Relief

In Winter v. NRDC, 555 U.S. 7 (2008), the Supreme Court stated that:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

Id. at 20.  The standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits rather than a likelihood of success.  Flexible Lifeline Sys., Inc. v. Precision Lift, Inc., 654 F.3d 989, 996 (9th Cir. 2011), quoting Amoco Prod. Co. v. Gambell, 480 U.S. 531, 546 n.12 (1987).

Injunctive relief is appropriate in cases dealing with a continuing trespass because

a landowner should not be forced to bring successive suits to remedy the ongoing tort. See City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 12 (1898) (an injunction is appropriate where the damage caused is such that its continuance occasions a constantly recurring grievance); Newfound Mgmt. Corp. v. Lewis, 131 F.3d 108, 115 (3rd Cir. 1997) (where repeated acts of wrong are done or threatened such as a repeated trespass, the entire wrong will be enjoined to avoid a repetition of similar actions). The Ninth Circuit has ruled that a district court "may not deny the United States injunctive relief or damages if trespass on the public lands is shown." See United States v. Noguiera, 403 F.2d 816, 825 (9th Cir. 1968) (citations omitted). The same result followed in Gardner, 903 F. Supp. 1394 (D. Nev. 1995), aff'd 107 F.3d 1314 (9th Cir. 1997), where this Court also held that the United States was entitled to injunctive relief to prevent a continuing trespass. The Gardner facts are very similar to this case. The Gardners grazed cattle on property owned by the United States that was declared off limits because of fire damage. The United States successfully sued for injunctive relief and damages to stop the continuing trespass. This Court held:

> [T]he United States is entitled to protect its property against this trespass by having a permanent injunction entered, the Gardners' cattle removed, and payment by the Gardners of the unauthorized grazing use fees . . . .

Id. at 1403. This Court also reached the same result when it enjoined Defendant Bundy in 1998 and 1999 from trespassing on federal lands within the former Bunkerville Allotment. 1998 Order; 1999 Order.

Further, FLPMA specifically authorizes the Secretary of the Interior to request injunctive relief to prevent the use of federal lands in violation of regulations promulgated pursuant to that Act. See 43 U.S.C. § 1733(b). The grazing regulations at issue in this case were adopted pursuant to FLPMA and other statutes. See 43 C.F.R. § 4100.0-3(b) (1993). Congress passed FLPMA in part to prevent the "unnecessary or undue degradation of the lands." See 43 U.S.C. § 1732(b). The grazing regulations further Congress' goal by requiring those who graze livestock on federal lands to apply for and receive authorization before using those lands for grazing purposes. This process allows the Department of the Interior to regulate grazing so as to

26

1   ensure that the public lands are protected from unnecessary damage or harm.

2          This Court should enjoin Defendant Bundy.  He has used the federal lands continuously

3   without any authority to do so for more than 12 years.  The damages caused by his livestock to

4   federal lands within Lake Mead NRA and within ACECs managed by BLM are documented,

5   serious and ongoing.  They will continue unabated if the trespass is not enjoined.

6                       **2.      Success on the Merits**

7          The undisputed material facts establish that Defendant Bundy is in trespass on the New

8   Trespass Lands.  Trespass is defined as an entry upon real estate of another without the

9   permission or invitation of the person lawfully entitled to possession.  RESTATEMENT

10  (SECOND) of TORTS, §§ 158-159 (1965).  It is well-settled that one who enters public lands of

11  the United States without right is a trespasser, see Jones v. United States, 195 F.2d 707, 709 (9th

12  Cir. 1952), and that the United States is entitled to protect its property against such trespassers,

13  see Camfield v. United States, 167 U.S. 518, 524 (1897); United States v. Gardner, 903 F. Supp.

14  at 1402.

15         A trespass exists when livestock are grazing federal lands without an appropriate permit.

16  See Holland Livestock Ranch, 655 F.2d at 1005; Gardner, 903 F. Supp. at 1403.  The regulations

17  expressly prohibit allowing livestock to graze on BLM and NPS lands without authorization.

18  See 43 C.F.R. §§ 4140.1(b)(1)(i) & (ii) (2005); 36 C.F.R. § 2.60(a).

19         BLM and NPS officials repeatedly have observed Defendant Bundy's livestock grazing

20  on the New Trespass Lands.  See Ex. 9, Chart of Sightings of Defendant Bundy's Cattle.

21  Defendant Bundy himself freely acknowledges that his cattle have continuously grazed on the

22  New Trespass Lands since 2000.  Ex. 4, Bundy Depo. at 35:2-18; 47:15-21; 61:16-25; 62:1-5.

23  Defendant Bundy has refused to remove his trespassing cattle from those federal lands, therefore

24  the trespass is continuing.

25                       **3.      Irreparable Harm**

26         Because the United States has established it is entitled to judgment on the merits, the

27  degree of irreparable harm to be established by the United States is lower.  However, the

28  undisputed facts of this case also clearly establish irreparable harm.  First, Defendant Bundy has

grazed his cattle in trespass on the federal lands for more than twelve years and refuses to remove his cattle.  In the case of continuing trespasses to real property, the irreparable harm element is met by virtue of the continuing nature of wrongdoing.  Walla Walla Water Co., 172 U.S. at 12; Lewis, 131 F.3d at 115.  Second, Defendant Bundy's cattle have caused and continue to cause damage to natural and cultural resources and pose a threat to public safety.  See supra. Sections III.G and III.H.

### 4.      Balance of Equities and Public Interest

The equities and the public interest strongly favor an injunction.  The public interest is best served by having the federal lands managed without the presence of trespass cattle on lands that are closed to grazing.  The public interest is also best served by removal of trespass cattle that cause harm to natural and cultural resources or poses a threat to the health and safety of members of the public who use the federal lands for recreation.  No doubt exists that the public interest is negatively affected by Defendant Bundy's continuing trespass.

The United States is entitled to injunctive relief as a matter of law if trespass on federal lands is proved.  Noguiera, 403 F.2d at 825 (citations omitted).  The public interest is also served by the enforcement of Congress' mandate for management of the public rangelands.

## VI.    CONCLUSION

Defendant Bundy has unlawfully grazed his cattle on public lands from 2000 to the present.  The trespass has presented, and continues to present, a threat to public safety and the environment.  Defendant Bundy has repeatedly refused to remove his cattle from the New Trespass Lands.  Thus, the United States is entitled to a declaration that Defendant Bundy has placed or allowed his livestock to graze on these lands in trespass and in violation of federal statutory and regulatory requirements; a judgment in favor of the United States; an order permanently enjoining Defendant Bundy from placing or allowing his livestock to graze on these lands; an order directing Defendant Bundy to remove his livestock from the land within 45 days of judgment; and an order explicitly authorizing the United States to seize and impound Defendant Bundy's livestock if they have not been removed within 45 days of judgment or if they are found on the federal lands at any time in the future.

Respectfully submitted December 21, 2012,

IGNACIA S. MORENO
Assistant Attorney General

/s/ Terry M. Petrie
TERRY M. PETRIE, Attorney
STEPHEN R. TERRELL, Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO  80202
Telephone:     (303) 844-1369
Facsimile:     (303) 844-1350
Terry.Petrie@usdoj.gov
Stephen.Terrell@usdoj.gov

*Attorneys for the United States*

DANIEL G. BOGDEN
United States Attorney
NADIA AHMED
Special Assistant United States Attorney
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV  89101
Telephone:     (702) 388-6336
Facsimile:     (702) 388-6698

OF COUNSEL:

NANCY ZAHEDI
GREGORY LIND
Department of the Interior
Office of the Solicitor

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 21, 2012, I caused the attached document to be served by Federal Express on the following:

Cliven D. Bundy
3315 Gold Butte Road
Bunkerville, NV  89007

_/s/ Terry M. Petrie
TERRY M. PETRIE

30

Exhibit List
to
United States Motion for Summary Judgment

1.      New Trespass Lands Map

1A.     New Trespass Lands Map marked by Def. Bundy at Oct. 6, 2012 Deposition

2.      Declaration of Mary Jo Rugwell, including attachments A-R.

3.      Declaration of Gary Warshefski, including attachments A-E.

4.      Excerpts from the Oct. 6, 2012 Deposition of Cliven D. Bundy.

5.      Declaration of David D. Morlan including attachment 1.

6.      Declaration of Alice C. Newton, including attachments A-O.

7.      Declaration of Deborah J. Sullivan including attachments A-N.

8.      Declaration of Lauren Brown including attachments A-L.

9.      Chart documenting sightings & incidents.

10.     Declaration of Mary Hinson including attachments A-E.

11.     Declaration of Victoria R. Worfolk including attachments A-K.

12.     Declaration of Mark Boatwright.

13.     Declaration of Jimmy Linares, including attachments A-E.

14.     Declaration of Amy Lueders, including attachments A-C.

15.     Declaration of Jesus Navarro, including attachments A-C.