IGNACIA S. MORENO
Assistant Attorney General
TERRY M. PETRIE, Attorney
STEPHEN R. TERRELL, Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone:    (303) 844-1369
Facsimile:    (303) 844-1350
Terry.Petrie@usdoj.gov
Stephen.Terrell@usdoj.gov

DANIEL G. BOGDEN
United States Attorney
NADIA AHMED
Special Assistant United States Attorney
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV 89101
Telephone:    (702) 388-6336
Facsimile:    (702) 388-6698

ATTORNEYS FOR THE UNITED STATES

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

      Plaintiff,

          v.

CLIVEN BUNDY,

      Defendant.

No. 2:12-cv-804-LDG-GWF

**DECLARATION OF
MARY JO RUGWELL**

## DECLARATION OF MARY JO RUGWELL

I, Mary Jo Rugwell, do declare as follows:

I have personal knowledge of the matters set forth in this declaration.

1

1.      I am currently the Associate State Director for the Bureau of Land Management Wyoming State Office and have been in this position since August 26, 2012. Prior to that, I served as the District Manager for the Bureau of Land Management (BLM), Southern Nevada District Office (SNDO) in Las Vegas, Nevada from April 13, 2008 through August 25, 2012. The BLM SNDO encompasses three Field Offices: the Las Vegas Field Office, the Red Rock/Sloan Field Office, and the Pahrump Field Office.

2.      As District Manager for the SNDO, I was responsible for management of over three million acres of public lands, including the public lands within the Gold Butte Area. I also oversaw a staff of approximately 150 BLM employees, including managers, supervisors, and resource experts.

*Public Lands & Resource Values in Gold Butte Area*

3.      Lands managed by the SNDO in the Gold Butte area in southeastern Nevada encompass public lands between Grand Canyon-Parashant National Monument in Arizona, the Overton Arm of Lake Mead National Recreation Area and west to the Valley of Fire State Park. See Attachment A: Map & legend identifying federal lands managed by the "Bureau of Land Management." The area consists of rugged mountains, tilted sandstone ridges, and braided washes that turn into slot canyons. The area at issue in this litigation includes more than a half a million acres of federal land (including public lands managed by the BLM) and is indicated on the map as New Trespass Lands. See Attachment A: Map of New Trespass Lands. The public lands portion of the New Trespass lands includes Areas of Critical Environmental Concern (ACEC), archeological resources, habitat for sensitive and endangered species, designated wilderness areas, and sensitive and rare plant species, as well as rare soil types.

A.      Areas of Critical Environmental Concern (ACEC):

(1)      There are nine ACECs in the Gold Butte area.  An ACEC is a special management area designated by the BLM to protect and prevent irreparable damage to significant historic, cultural, or scenic values; fish and wildlife resources; natural process or system; or to protect life and provide safety from natural hazards.  See Attachment B: Map of Public Land Special Management Units in Gold Butte Area.

(2)      Among the nine ACECs within Gold Butte, is the Virgin River ACEC, which is located in northeast Clark County just south of the City of Mesquite. The Virgin River flows within the tri-state area of Utah, Arizona, and Nevada and the ACEC designation protects the river's wild and scenic character and riparian habitat. The ACEC contains portions of designated critical habitat for two fish species listed as endangered species under the Endangered Species Act (ESA):  the Virgin River chub and the woundfin, as well as for one endangered bird species: the southwestern willow flycatcher (SWFL). The ACEC also supports habitat for the Yuma clapper rail, listed as endangered under the ESA and for the yellow-billed cuckoo, a candidate for listing under the ESA.  Riparian habitat is extremely limited in this eco-region, making this habitat very important to maintain species diversity and to support bird migration.

2

(3)     The public lands within the Gold Butte Area also include designated critical habitat for desert tortoise, a species listed as threatened under the Endangered Species Act. 52 Fed. Reg. 5820 (Feb. 8, 1994) (available at http://ecos.fws.gov/docs/federal_register/fr2519.pdf). Consistent with the Desert Tortoise Recovery Plan (USFWS 1994, 2011) and the Las Vegas Resource Management Plan (1998), most of the public lands within the Gold Butte area have been closed to all livestock grazing since 1998 to allow for recovery of desert tortoise habitat, an action that was made possible by Clark County's purchase and retirement of grazing privileges on BLM grazing allotments in this area. The County obtained funding to purchase and retire these grazing privileges as part of their obligations to minimize and mitigate impacts to desert tortoise in connection with the Clark County Multiple Species Habitat Conservation Plan, for which the USFWS issued Clark County an Incidental Take Permit under Section 10 of the Endangered Species Act, for development activities on other County lands within desert tortoise habitat (available at http://www.clarkcountynv.gov/Depts/dcp/Documents/Library/current%20HCP/cc-appa.pdf ).

B.     Archeological Resources: Archeological resources located within the Gold Butte area ACECs include rock shelters with blackened roofs, charcoal remnants, broken pottery, rock tools, and world-renowned petroglyphs.

C.     Designated Wilderness Areas: The Gold Butte area includes two designated wilderness areas: Lime Canyon Wilderness Area in the southern part of the gold Butte area, bordered on the west by Lake Mead NRA and on the east by the Gold Butte Back Country Byway; Jumbo Springs Wilderness Area in the extreme southern portion of the Gold Butte area, bordered on the south and the east by Lake Mead NRA. Additionally, there are two Wilderness Study Areas in the Gold Butte area: the Million Hills WSA and Virgin Mountains ISA [Instant Study Area]. The area is home to thousands of desert plants and animals, adapted to survive where rain is scarce and temperatures can soar to 120 degrees Fahrenheit.   See Attachment B: Map of BLM Special Management Units Within Gold Butte Area.

D.     Rare Plant Species and Soil:

(1)     The public lands in the Gold Butte area include many sensitive and rare plant species that are directly and indirectly impacted by cattle grazing, such as: *Eriogonum viscidulum* (sticky buckwheat), *Arctomecon californica* (Las Vegas bearpoppy), *Anulocaulis leiosolenus* var. *leisolenus* (sticky ringstem), *Astragalus geyeri* var. *triquestrus* (threecorner milkvetch), *Astragalus mokiacensis* var. Gold Butte (Mokiak milkvetch), *Circium virginensis* (Virgin River thistle), *Enceliopsis argophylla* (silverleaf sunray), *Eriogonum corymbosum* var. *nilesii* (Las Vegas buckwheat), and *Pediomelum castoreum* (Beaver Dam breadroot).

(2)     The public lands in the Gold Butte area also contain several plant communities, assemblages, and soil types that are extremely rare in the Mojave Desert and are directly and indirectly affected by cattle grazing, such as: biological soil crusts, alkali meadows and aquatic herb communities, desert oasis woodlands, and gypsum barren scrub.

*Impact of Cattle Grazing*

4.     Cattle grazing within desert landscapes can impact the ecological health of the land. Cattle tend to congregate around water sources and shady areas during hot periods, causing damage

3

to streams, springs, seeps, and wet meadows that provide riparian habitats critical for the survival and reproduction of many native wildlife and plant species. See e.g., U.S. Department of the Interior. 2006. Technical Reference 1737-20: Grazing Management Processes and Strategies for Riparian-Wetland Areas (available at: http://www.blm.gov/nstc/library/techref.htm).

5.    Cattle grazing can result in direct mortality to desert tortoise if cattle step on and crush tortoise burrows or indirectly by degrading range resources that are desert tortoise habitat. See e.g., Region 8, Pacific Southwest Region, US Fish & Wildlife Service. May 2011. Revised Recovery Plan for the Mojave Population of the Desert Tortoise at pp. 136-137 (available at: http://www.fws.gov/nevada/desert_tortoise/dt_recovery_plan.html).

6.    Cattle also feed preferentially on many native grasses and forbs, which can reduce or eliminate these native plants that are vital habitats and food sources for wildlife species, including federally listed species. Cattle can also cause or contribute to the destruction and loss of biological soil crusts, and to the disturbance, compaction, and erosion of soils. Overgrazing by cattle can lead to the depletion of grasses and forbs and erosion that promotes the invasion of alien or exotic plant species such as cheatgrass and noxious weeds. The spread of these invasive species contributes to ecological degradation and a loss of habitat for wildlife and other species that depend on healthy native vegetative communities. See e.g., Belsky, A.J. and Gelbard, J.L. April 2000. Livestock Grazing and Weed Invasions in the Arid West (available at: http://www.santafetrailranch.com/articles/BelskyGelbardWeedReport.pdf).

7.    Detrimental impacts associated with livestock grazing can be particularly pronounced around water troughs, spring developments, supplemental feeding areas, and other areas where livestock congregate. Cattle impacts at water sources include degraded water quality, which adversely impacts aquatic species. See e.g., Brooks, M. et al. 2006. "Effects of Livestock Watering Sites on Alien and Native Vegetation in the Mojave Desert" in the *Journal of Arid Environments* (available at: http://citeseerx.ist.psu.edu/viewdoc/summary?doi=10.1.1.62.2612).

8.    Cattle can also damage or destroy archeological resources, such as by trampling on archeological sites and resources (which are often located in proximity to water sources) or by rubbing against petroglyphs--which can cause spalling (i.e., the petroglyph breaking off the rock). These types of impacts were documented and reported to me by my staff archeologist within the areas where Mr. Bundy's unauthorized cattle grazing has been observed, including on the public lands at issue in this litigation.

*Trespass Grazing on Public Lands*

9.    Upon becoming District Manager for the SNDO in 2008, one of the first issues that I received a briefing on was the grazing trespass situation in the northeastern portion of the Southern Nevada District. According to SNDO records, cattle owned by Cliven Bundy were being observed and had been documented grazing without authorization on the public lands.

10.    Cliven Bundy grazed the federal lands within the former Bunkerville Allotment (approximately 154,000 acres), which is located in the northeast corner of Clark County

4

Nevada adjacent to the lands at issue in this litigation, under a grazing permit for about 20 years. However in 1993, he refused to sign an offered permit and started grazing livestock on federal lands in the Bunkerville Allotment without any authorization to do so and without paying grazing fees. This led the BLM to cancel Bundy's grazing permit on February 17, 1994, and to initiate a lawsuit (<u>United States v. Cliven Bundy</u>, Case No. CV-S-98-531-JBR (RJJ) or "Bundy I") that resulted in the Federal District Court for the District of Nevada issuing a Permanent Injunction on November 4, 1998 enjoining Cliven Bundy's grazing on public lands in the Bunkerville Allotment. See Attachment C. The Permanent Injunction Order was affirmed by the Ninth Circuit on May 10, 1999. See Attachment D. In addition to Cliven Bundy being permanently enjoined from grazing the Bunkerville Allotment, the entire allotment has been closed to all livestock grazing since 1998 to protect critical desert tortoise habitat.

11.     The public lands surrounding the former Bunkerville Allotment, with the exception of two small allotments where a limited amount of grazing is authorized,[1] have also been closed to all livestock grazing since 1998 and the 1998 Las Vegas Resource Management Plan (RMP) Record of Decision (ROD) designated the Bunkerville Allotment and surrounding public lands as closed to grazing. Cliven Bundy has held no authorization to graze any public lands outside the Bunkerville Allotment that make up the New Trespass Lands and does not currently hold an authorization to graze any public lands in the Gold Butte area (either within the Bunkerville or on the New Trespass Lands). As most of the public lands in the Gold Butte area are closed to grazing, any time BLM employees encounter cattle on the public lands within the Gold Butte area that are closed to livestock grazing, such cattle are known to be grazing without authorization.

12.     In April 2008, the BLM also cancelled Mr. Bundy's range improvement authorizations for the former Bunkerville Allotment and that decision was upheld on appeal by the Interior Board of Land Appeals. See Attachments E and F. Mr. Bundy has not complied with that decision and trespass investigations discussed below indicate that he continues to use those improvements.

13.     The directive to employees prior to my becoming the District Manager was to avoid any situations that might result in a confrontation with Cliven Bundy, as a result of notices he had sent to the BLM in the late 1990s which appeared to suggest a willingness to engage in potentially violent action in response to any efforts to resolve the trespass grazing. See e.g., Attachment G. As a result, the BLM employees occasionally documented trespass

---

[1] The Lower Mormon Mesa Allotment is the only allotment where there is currently any authorized cattle grazing, with one permittee authorized to graze cattle during a portion of the year within that allotment. That permittee has grazed a small number of livestock (a maximum of 40 cattle) consistent with the terms of his grazing permit and his cattle have not been found outside the allotment. There is also one other extremely small allotment of approximately 5000 acres of public land – the Flat Top Mesa Allotment – north of Highway I-15, on which another permittee is authorized to graze the equivalent of about five cows worth of forage. However, no cattle have been grazed on that allotment for at least the past several years and only a handful of domestic horses are currently authorized to graze those public lands. Mr. Bundy has never been authorized to graze any livestock in either the Lower Mormon Mesa or Flat Top Mesa Allotments, therefore any cattle owned by Mr. Bundy that are found in either of those allotments are also in trespass on the public lands.

cattle if they came across trespass cattle or evidence of unauthorized grazing in the course of their duties, but were not sent out to specifically document such trespass grazing.

14.    During my tenure as District Manager for the SNDO, I made efforts to reach out to Cliven Bundy and to any others (such as County officials) who might be willing or able to find a way to resolve Cliven Bundy's trespass grazing. However, those efforts were unsuccessful and Cliven Bundy rebuffed or ignored any efforts I made to speak to or meet with him. For example, County Commissioner Tom Collins, a personal friend of Mr. Bundy's, offered to broker a meeting with Cliven Bundy that I agreed to attend. But on the day of the meeting, the Commissioner's staff called to cancel the meeting, providing no reason for the cancellation. That meeting was never rescheduled by the County Commissioner. As another example, I attended a Nevada Wildlife Commission meeting in the fall of 2011 to make a presentation on the Gold Butte Road Designation. Mr. Bundy had also been invited to speak. I heard Mr. Bundy's presentation, during which he stated that he had "fired the BLM," and confirmed that his cattle had been continuously grazing in the Gold Butte area without a permit and that he had numerous range improvements in the area. Attachment H is a summary of those remarks from the official minutes of the meeting. After the Wildlife Commission meeting, I attempted to speak with Mr. Bundy. I stood by for several minutes while he spoke to one of the Commissioners. However, he made no effort to even acknowledge my presence. I therefore left my card with his wife and asked her to have him call me so that we could sit down and discuss the trespass. I never heard from Mr. Bundy and further attempts to speak with him were no more successful.

15.    Because of the sporadic and intermittent nature of the BLM's documentation of Cliven Bundy's trespass grazing on public lands during the years before my tenure as District Manager and my desire to develop a clear record that would allow BLM to take appropriate actions to resolve this trespass grazing, I worked with the Fish and Wildlife Service (FWS) and the BLM Nevada State Office to obtain funding in 2009 from the Section 7 Endangered Species Act desert tortoise account to initiate work on resolving the trespass grazing. We received Section 7 funding in subsequent years as well.

16.    The BLM's Section 7 account consists of funds obtained as mitigation money through development projects in desert tortoise habitat that are used in consultation with U.S. Fish and Wildlife Service for projects that will benefit critical habitat and populations of desert tortoise. We hired a contractor to assist us in getting a handle on the trespass grazing and assigned it as a priority to the Las Vegas Field Office, which is one of three Field Offices under my jurisdiction. That office identified a project manager starting in late 2010. The District Chief of Law Enforcement for the SNDO took the lead to work with the Project Manager on a law enforcement plan in the event that we needed to move forward with an impoundment action.

17.    Since there had been little recent correspondence with Mr. Bundy, the SNDO Associate District Manager sent a letter to him dated January 21, 2011, reminding him that his cattle remained in trespass and that BLM would proceed to resolve the issue. See

6

Attachment I.  The letter quoted a recent article in the December 10, 2010 *Las Vegas CityLife* paper where he admitted he was in trespass.  See Attachment J.

18.     In order to better document the actual extent of the trespass grazing in the Gold Butte Area, and to determine whether the trespass livestock on public lands were owned by Cliven Bundy or by other ranchers, I authorized preparations and funding for a comprehensive cattle count involving both aerial and ground team components.

19.     At my direction, my staff conducted a cattle count on public lands from March 21-25, 2011 using a helicopter and ground crews to determine locations, numbers and brands of trespass livestock.  The trespass count found over 900 livestock within the Gold Butte area.  Trespass livestock were found within the former Bunkerville Allotment, as well as on public lands outside the allotment and within the Lake Mead National Recreation Area (NRA).  More than half of the livestock observed had no brands or ear marks.  With the exception of one bull near the Arizona border bearing a brand that could not be located as a registered brand in either the Nevada or Arizona livestock brand books, all livestock for which ownership could be verified bore Bundy's brand and/or ear mark.  See Exhibit 8: Declaration of Lauren Brown at ¶¶ 4, 15 and Attachment A.  This trespass investigation therefore confirmed that Mr. Bundy is the only person known to have cattle on the public lands that make up the New Trespass Lands and former Bunkerville Allotment.

20.     After the trespass investigation, the BLM issued Cliven Bundy a Notice of Trespass and Order to Cease and Desist on June 8, 2011.  See Attachment K.  In response, Mr. Bundy sent us a "constructive notice" letter.  See Attachment L.

21.     On July 26, 2011, the BLM issued Bundy a Notice of Intent to Impound, see Attachment M, which was also posted in the Mesquite and Bunkerville Post Offices on July 29, 2011, and published for five days in the Las Vegas Review-Journal and/or Las Vegas Sun.  It was also published in the Desert Valley Times online and in the Mesquite Local NEWS.  See Attachment N.

22.     A follow-up aerial and ground inspection on August 15-19, 2011 confirmed that livestock, including those with Bundy's brand and/or earmarks, remained on federal lands managed by the BLM and the NPS and that Mr. Bundy had not removed the trespass livestock.  See Exhibit 8: Declaration of Lauren Brown at ¶¶ 19-20 and Attachment B.  Therefore, on September 20, 2011, the BLM issued another Order to Remove the trespassing livestock, along with a Trespass Decision and Demand for Payment for trespass livestock on the public lands that had been documented between May 29, 2008 and March 5, 2011 and between March 21 and August 19, 2011.  See Attachment O.  Bundy did not appeal the September 20, 2011 decision.

23.     All of the Notices and Decisions described above were sent to Bundy by certified mail.  The certified mail receipt cards were signed by Bundy or members of his family.

24.     In the years that I served as District Manager, it was my desire to try to find a means to engage in a conversation with Mr. Bundy to resolve the trespass through Mr. Bundy

7

voluntarily removing his livestock from the public lands. Unfortunately, I was unable to engage Mr. Bundy in any type of dialogue whatsoever due to his unwillingness to communicate with me.

25. As my attempts to give Mr. Bundy repeated opportunities to remove his livestock from public lands were not successful, and given that Mr. Bundy had also failed to comply with a permanent injunction obtained through judicial litigation in the late 1990s (nor did he pay damages for his trespass grazing as directed by the Court), I directed my staff to begin preparations for a livestock impoundment pursuant to BLM's regulations at 43 C.F.R. § 4150.4.

26. My staff conducted another follow-up aerial survey from February 1-3, 2012, that found approximately 650 cattle grazing in trespass on federal lands managed by BLM and NPS. Another aerial survey was conducted on March 28 and 30, 2012 in order to locate cattle for a planned gather operation. Approximately 740 cattle were found during this flight, including over 100 calves. These numbers indicated that while Mr. Bundy might have removed some cattle after the March 2011 inventory, he had not removed the bulk of his trespass cattle from the federal lands.

27. Mr. Bundy has never had any authorization to construct, maintain or use any range improvements on public lands outside the Bunkerville Allotment (i.e., within the New Trespass Lands), and no longer is authorized to use range improvements within the Bunkerville Allotment. However, during the aerial surveys, my staff documented many unauthorized range improvements both within and outside of the Bunkerville Allotment that are being actively used to manage the trespass cattle on the public lands. On April 9, 2012, the BLM issued a Trespass Decision and Order to Remove unauthorized range improvements from public lands in the Gold Butte area to Mr. Bundy via certified mail. See Attachment P.

28. Prior to beginning the actual impoundment operation, we worked through the Clark County Sheriff to make an offer to Mr. Bundy. The offer involved the BLM gathering all of the cattle currently grazing in trespass on federal lands, shipping them to the facility of his choice, and giving Mr. Bundy the proceeds from the sale of his livestock in exchange for achieving the goal of safely removing the cattle from the public lands and resolving the trespass. Mr. Bundy refused the BLM's offer to assist him in gathering and transporting his livestock so they could be removed from the federal lands.

29. At the request of the Clark County Sheriff, the BLM agreed to give the sheriff another opportunity to contact Mr. Bundy to determine if we could reach a mutually acceptable resolution that resulted in the removal of the trespass livestock from the federal lands and allowed Mr. Bundy to take possession of his livestock.

30. To allow the sheriff time to communicate with Mr. Bundy, the BLM delayed the start of the cattle trespass impoundment operation from April 7 to April 12, 2012. We had determined that it was important to gather and remove the trespass cattle that were widely distributed and that posed a potential threat to public safety and to natural resources on

8

the federal lands.  We had also notified Mr. Bundy that he would be given the opportunity to come claim his cattle (see Attachment Q), because the Nevada Department of Agriculture had notified BLM that it would not be able to issue brand clearance certificates due to state law.  See Exhibit 14: Declaration of Amy Lueders at ¶¶ 5-10 (discussing NRS § 565.125).

31.     On April 9, 2012, I was contacted by Sue Catoor, the Contractor for the gather who had received a hand-delivered letter and Constructive Notice from Mr. Cliven Bundy.  See Attachment R.  The letter threatened legal action against the Contractor and specifically stated "that there is a volatile situation currently taking place" as well as a reference to a "range war."

32.     On Tuesday morning, April 10, 2012, I received an email from Michael J. Pool, Deputy Director for Operations of the BLM, directing us to decommission the Bundy impound operations. Subsequently, this litigation was filed instead on May 14, 2012 to resolve the trespass and obtain injunctive relief for the federal lands that were not covered by the prior Bundy I litigation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Signed this 17th day of December, 2012 in Cheyenne, Wyoming.


_____
Mary Jo Rugwell

9

# ATTACHMENT  A



# Bundy Cattle Trespass Overview

**Legend**

- Former Bunkerville Grazing Allotment
- New Trespass Land
- City Location
- NHD Hydrology

**Major Road**

- Interstate
- US Highway
- State Highway
- County Highway
- Arterial
- Collector
- Local
- Back Country Byway
- Resource
- Restricted

**Land Status**

- Bureau of Indian Affairs
- Bureau of Land Management
- Bureau of Reclamation
- City of Las Vegas
- Clark County, NV
- Department of Defense
- Department of Energy
- Fish and Wildlife Service
- Forest Service
- National Park Service
- Nevada State
- Private
- Lake Mead

Prepared for
United States of America
v. Bundy
No. 12-cv-804
Not intended for any other use

0 2.5 5 10 Miles

U.S. DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT
NATIONAL SYSTEM OF PUBLIC LANDS

# ATTACHMENT B



# Bundy Cattle Trespass Overview

Legend

- Former Bunkerville Grazing Allotment
- New Trespass Land
- City Location
- NHD Hydrology

Major Road

- Interstate
- US Highway
- State Highway
- County Highway
- Arterial
- Collector
- Local
- Back Country Byway
- Resource
- Restricted
- Biological
- Cultural
- Cultural/Biological
- Desert Tortoise

Land Status

- Bureau of Indian Affairs
- Bureau of Land Management
- Bureau of Reclamation
- City of Las Vegas
- Clark County, NV
- Department of Defense
- Department of Energy
- Fish and Wildlife Service
- Forest Service
- National Park Service
- Nevada State
- Private
- Lake Mead
- National Park Wilderness
- BLM Wilderness Study Area
- BLM Wilderness

Prepared for
United States of America
v. Bundy
No. 12-cv-804
Not intended for any other use

0 2.5 5 10 Miles

Ex. 2 - Rugwell Dec. Att. B - Page 1 of 1

U.S. DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT
NATIONAL SYSTEM OF PUBLIC LANDS

# ATTACHMENT C

**AO 450 (Rev. 5/85)   Judgment in a Civil Case ⊕

# UNITED STATES DISTRICT COURT

***** _____ DISTRICT OF____NEVADA_____

UNITED STATES OF AMERICA,

            JUDGMENT IN A CIVIL CASE

    Plaintiff,

     V.

             CV-S-98-531-JBR(RJJ)

CLIVEN BUNDY,

    ___Defendant._____/


___ **Jury Verdict.** This action came before the jury for a trial by
the Court.  The issues have been tried and the jury has rendered
it's verdict.

_X_ **Decision by Court.** This action came to trial before the Court.
  The issues have been tried and a decision has been rendered.


   IT IS ORDERED AND ADJUDGED that Permanent Injunction is entered
in favor of Plaintiff and against Defendant.


___November 4, 1998___
    Date

          LANCE S. WILSON
            Clerk

         (By)Deputy Clerk,

ENTERED
SERVED

NOV 4 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY_____ DEPUTY

**FILED**

NOV 4 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY_____ DEPUTY

20

00000669



ENTERED AND SERVED

NOV 4 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA

BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CV-S-98-531-JBR (RJJ) |
| Plaintiff, | |
| v. | |
| CLIVEN BUNDY, | **ORDER** |
| Defendant. | |

This matter comes before the Court on Defendant Cliven Bundy's ("Bundy") Motion to Dismiss (#4), Plaintiff's Motion for Summary Judgment (#11), and on Bundy's Motion to Strike Motion for Summary Judgment (#14). Oppositions and Replies were filed for all motions.

## I. BACKGROUND

The United States filed a Complaint (#1) on March 27, 1998 for injunctive relief to prevent Bundy's alleged unauthorized and unlawful grazing of livestock on property owned by the United States and administered by the Secretary of the Interior, Bureau of Land Management ("BLM"), and for trespass damages.

Beginning about 1954, Bundy or his father or both have grazed livestock on public lands owned by the United States and administered by the BLM. For several years, Bundy or his father applied to the BLM to use the Bunkerville Allotment ("Allotment") for livestock grazing and paid the BLM for the use of the Allotment. Beginning in March 1993, Bundy refused to pay the grazing bills or apply for use of the Allotment.

19

1       From 1973 or before until 1993, the BLM issued to Bundy's father and Bundy, as his

2   father's representative, ephemeral grazing permits to graze livestock on the Allotment.  Regions

3   classed as ephemeral do not consistently produce forage, but periodically provide annual

4   vegetation suitable for livestock grazing.  33 FED. REG. 18245.  Before grazing on an ephemeral

5   range, a person must submit an application to the BLM.  The BLM will determine if adequate

6   forage is available and that the use is consistent with all of the terms and conditions of the permit.

7       The last grazing fees paid by Bundy to the BLM was for the period of December 1, 1992 to

8   February 28, 1993.  *See* Exhibit 7 to #11, Mot. Summ. Jud.  The last grazing application was for

9   the same period.  *See* Exhibit 8 to #11.  The government contends Bundy did not have

10  authorization to graze livestock on the Allotment after February 28, 1993.

11      On February 26, 1993, Bundy sent an Administrative Notice of Intent to the BLM, which

12  stated his intent to graze cattle "pursuant to my vested grazing rights."  *See* Exhibit 10 to #11.

13  Bundy sent several more Administrative Notice[s] of Intent in the months that followed.  On June

14  16, 1993, the BLM sent Bundy a letter informing him that his application had not been received to

15  graze livestock for the June 15, 1993 to August 31, 1993 period.  The BLM included another

16  application for Bundy to fill out and return.  *See* Exhibit 12 to #11.  Bundy responded to the BLM

17  letter with another Administrative Notice and Intent, stating, among other things, that the BLM has

18  produced no documents showing it had jurisdiction over the public lands.  *See* Exhibit 13 to #11.

19  The BLM began trespass detection efforts at the end of June 1993.

20      On July 13, 1993, the BLM sent Bundy a Trespass Notice and Order to Remove and gave

21  him ten days to respond.  As requested by Bundy, the BLM informed Bundy in a July 27, 1993

22  letter that it would extend the response time to 30 days.  On August 19, 1993, Bundy sent another

23  Administrative Notice and Intent, stating the BLM lacked proof that it had jurisdiction.  *See*

24  Exhibit 16 to #11.

25      On January 24, 1994, the BLM delivered a Proposed Decision Order to Remove and

26  Demand for Payment to Bundy by placing it on the dashboard of Bundy's vehicle while he was in

<div align="center">2</div>

1   the vehicle. BLM officials allege that Bundy became agitated, walked out of his truck and accused

2   the BLM of harassing him. He then returned to his truck, threw the decision out of the window

3   and drove away. One of Bundy's sons then picked up the decision, tore it into pieces and threw it

4   on the ground.

5        On February 17, 1994, the BLM issued a final decision canceling Bundy's ephemeral range

6   grazing permit. On March 3, 1994, Bundy sent a check for $1,961.47 to Clark County for grazing

7   fees. The BLM calculated that this amount is equal to the amount Bundy would pay to graze 85

8   cattle on the Allotment for a 12-month period if the fees were paid to the BLM in advance. Clark

9   County returned the check to Bundy since it did not have jurisdiction over the Allotment.

10        In March and April of 1994, the BLM sent letters to Bundy requesting that he pay past due

11   bills for grazing fees. Bundy responded by sending more administrative notices. In December

12   1994, Bundy or his agents served a Constructive Notice on a contractor hired by the BLM to gather

13   wild horses and burros. In August 1995, the BLM sent Bundy another Trespass Notice and Order

14   to Remove. Bundy responded by sending a Constructive Notice and Order to Stop, in which he

15   again questioned the United States' authority to manage the Allotment. See Exhibit 28 to #11.

16        In September 1997, the BLM tried to set up a meeting with Bundy to resolve the trespasses,

17   but Bundy declined to meet with the BLM.

18        The government contends it could have impounded Bundy's livestock, but it took no action

19   because any action could have resulted in physical confrontation. Since the trespass detection

20   efforts began in late June of 1993, the BLM has kept a record of observed livestock grazing on the

21   Allotment.

22        On April 17, 1998, Bundy, a pro se defendant, filed his Answer and Motion to Dismiss

23   (#4). Bundy alleged that this Court lacks jurisdiction to hear the case. On July 22, 1998, the

24   United States filed a Motion for Summary Judgment (#11) requesting injunctive relief and

25   damages.

26

<div align="center">3</div>

## II. DISCUSSION

A.   Subject Matter Jurisdiction

Bundy appears to argue in his Motion to Dismiss (#4) that the Complaint (#1) should be dismissed because this Court lacks jurisdiction since Article IV of the Constitution cannot be imposed upon him.  Bundy claims that he is a citizen of Nevada and not a citizen of a territory of the United States, and he also quotes religious texts.  Bundy also brings in the Property Clause, the Commerce Clause and International Treaty laws.  None of these statutes, laws or other citations is relevant to the jurisdictional issue.

Bundy is correct that federal courts have limited jurisdiction.  However, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.  Section 1331 provides that: "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *Duncan v. Stuetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996).  Section 1345 provides that: "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States ..." 28 U.S.C. § 1345; *United States v. State of Hawaii*, 832 F.2d 1116, 1117 (9th Cir. 1987).

This Court thus has subject matter jurisdiction under  28 U.S.C. § 1345 because this civil suit was commenced by the United States.

Federal laws regulating and managing federal public lands are involved in this case where the government alleges Bundy is grazing livestock on federal lands without authority and without paying the required fees.  Congress enacted the Taylor Grazing Act ("TGA"), 48 Stat. 1269, as amended, 43 U.S.C. § 315(f), in 1934 to regulate and preserve the federal lands. *Public Lands Council v. Babbitt*, No. 96-80831998 WL 559362, at *1 (10th Cir. Sept. 1, 1998).  Recognizing that the TGA had not adequately protected the federal lands, Congress in 1976 enacted the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785. *Id.* at *2.  The FLPMA provides that "the Attorney General may institute a civil action in any United States district court for an injunction or other appropriate order to prevent any person from utilizing public lands in

4

1   violation of regulations issued by the Secretary under this Act." 43 U.S.C. § 1733(b).  This Court

2   therefore has jurisdiction under the FLPMA.

3         In his Reply (#7), Bundy explains this action started in 1992 when he received a "Full

4   Force and Effect Decision Bunkerville Allotment" from the BLM.  Reply (#7), p. 5.  The letter to

5   which Bundy refers is in fact dated January 28, 1993.  Bundy claims this "decision concerning the

6   Desert Tortoise, if fully implemented, would lead to the end of ranching in Clark County," and his

7   ranching days would be over.  Reply (#7), p. 5.  The decision from the BLM does not inform

8   Bundy he can no longer graze livestock due to the protection of the Desert Tortoise, but instead

9   reminds Bundy that his grazing permit would end at the end of the next month, February 1993, and

10  the new permit application was attached to the decision.  The decision informed Bundy the BLM

11  would issue him a new ten-year federal grazing permit for the Bunkerville Allotment.  Mot. Dism.

12  (#4), Exh. E.  The terms and conditions for the new federal grazing permit allowed for livestock

13  grazing with some restrictions to be determined by the BLM.  For example, if tortoises were found

14  to be active in the early spring in a specific area, then grazing would not be allowed until the

15  amount of spring ephemeral forage had grown to a sufficient amount.

16        Bundy alleges the BLM does not have "Constitutional authority" to make the full force and

17  effect decision.  The Property Clause of the United States Constitution gives Congress the power

18  "to dispose of and make all needful Rules and Regulations respecting the Territory or other

19  Property belonging to the United States." *United States v. Gardner* ("*Gardner II*"), 107 F.3d

20  1314, 1318 (9th Cir. 1997); U.S. CONST. art. IV, § 3, cl.2.  This Congressional power over the

21  public lands is without limitations. *Gardner II*, 107 F.3d at 1318.  Congress enacted the FLPMA,

22  which instructs the Secretary of the Interior to manage through the BLM the public lands under the

23  principles of multiple use and sustained yield.  43 U.S.C. § 1732(a).  "Multiple use" requires

24  managing the public lands and their resources so that they "best meet the present and future needs

25  of the American people," and taking into account the long-term needs of future generations for

26  renewable and nonrenewable resources, including recreation, timber, wildlife and fish and

1  scientific values.  43 U.S.C. § 1702(c).  "Sustained yield" is defined as "the achievement and

2  maintenance in perpetuity of a high-level annual or regular periodic output of the various

3  renewable resources of the public lands consistent with multiple use."  *Id.* § 1702(h).

4       The FLPMA provides the Secretary of the Interior with the authority to regulate grazing

5  and issue grazing permits that require permittees to adhere to the terms and conditions of such

6  permits.  *Id.* § 1752(a).  The Allotment is administered by the Secretary of the Interior through the

7  BLM, thus the BLM had authority to issue the full force and effect decision.  The Allotment where

8  Bundy and his father before him have been grazing livestock is classed as an ephemeral region,

9  which does not consistently produce forage.  The BLM has authority under the FLPMA to place

10  restrictions on grazing when the forage declines to a level  that would defeat the goals of multiple

11  use and sustained yield.

12  **B.**     <u>Summary Judgment</u>

13       Summary judgment may be granted when, viewed in the light most favorable to the

14  nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);

15  *Intel Corp. v. Hartford Acc. and Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991), "the pleadings,

16  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

17  show that there is no genuine issue as to any material facts and that the moving party is entitled to

18  judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

19  (1986).  Summary judgment shall be entered "against a party who fails to make a showing

20  sufficient to establish the existence of an element essential to that party's case, and on which that

21  party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Summary judgment shall

22  not be granted if a reasonable jury could return a verdict for the nonmoving party. *Anderson v.*

23  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

24       The moving party bears the initial burden of showing the absence of a genuine issue of

25  material fact. *Celotex*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to set forth

26  specific facts demonstrating a genuine factual issue for trial. *Matsushita*, 475 U.S. at 588-87; Fed.

6

1    R. Civ. P. 56(e). The nonmoving party may not rest upon the mere allegations or denials of his or

2    her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials

3    provided by Rule 56(e), showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 256; Fed.

4    R. Civ. P. 56(e). The evidence of the nonmoving party is to be believed, and all justifiable

5    inferences are to be drawn in the nonmoving party's favor. *Anderson*, 477 U.S. at 255; Fed. R.

6    Civ. P. 56(e).

7        Bundy argues in his Opposition to Motion for Summary Judgment (#14) that the Court

8    should strike the government's Motion for Summary Judgment (#11) because his Motion to

9    Dismiss (#4) has not been ruled upon and thus the government's motion is "premature and

10   unnecessary." Bundy's argument is unpersuasive. The plaintiff may move for summary judgment

11   at any time more than twenty days after the commencement of the action. Fed. R. Civ. P. 56(a); *G*

12   *& G Fire Sprinklers, Inc. v. Bradshaw*, Nos. 95-56639, 96-55194, 1998 WL 596442, at *9 (9th

13   Cir. September 10, 1998). The government filed the Complaint (#1) on March 27, 1998, and it

14   filed its Motion for Summary Judgment (#11) on July 22, 1998, almost four months later.

15        Bundy argues since this Court does not have jurisdiction, it must deny the Motion for

16   Summary Judgment (#11). Bundy's argument fails again. Bundy's citation of *Steel Co. v.*

17   *Citizens for a Better Environment*, 118 S. Ct. 1003 (1998), does not help his case. The Supreme

18   Court in *Steel* stated: "Without jurisdiction the court cannot proceed at all in any cause." *Id.* at

19   1012. The Steel Court frowned upon "hypothetical jurisdiction" where courts assume jurisdiction

20   for the purpose of deciding the merits of cases. *Id.* However, this Court is not assuming

21   jurisdiction where none exist; this Court has federal question jurisdiction and the United States is a

22   party. Therefore, Bundy's jurisdictional argument must fail.

23   C.     Federal Lands

24        Bundy argues the federal government cannot have authority over lands "inside an admitted

25   state." *See* Motion to Dismiss (#4), p. 10. That argument must fail because federal lands located

26   within states are federal territories under federal jurisdiction. The FLPMA provides:

<div align="center">7</div>

The term "public lands" means any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership, except –

(1) lands located on the Outer Continental Shelf; and
(2) lands held for the benefit of Indians, Aleuts, and Eskimos.

43 U.S.C. § 1702(e).   The Bunkerville Allotment where Bundy is grazing his livestock falls within the definition of "public lands" administered by the Secretary of the Interior through the BLM.

An examination of the history of the lands in question further establishes federal ownership. On May 13, 1846, the United States declared war on Mexico.  The Treaty of Guadalupe Hidalgo ("Treaty"), 9 Stat. 922 (1848), which ended the war, was signed by the United States Congress on February 2, 1848 and ratified by the Mexican Congress on May 25, 1848.

In the Treaty, Mexico ceded land to the United States, including land that is now Nevada. *Gardner II*, 107 F.3d at 1317.  Where Mexico before the Treaty included land that is now California, Nevada, Arizona, New Mexico, Colorado, Texas and Utah, the Treaty drew the new boundary line starting at the Gulf of Mexico, opposite the mouth of the Rio Grande, following the river until the southern boundary of New Mexico, then westward until it touches the first branch of the River Gila River, then westward until it empties into the Colorado River, then to the Pacific Ocean. 9 Stat. 922, 926, Article V; *see also* Encyclopedia Britannica, Micropedia, 15th ed., vol. 5 at 528. The public lands in Nevada are the property of the United States because the United States has held title to those public lands since 1848, when Mexico ceded the land to the United States. *Gardner II*, 107 F.3d at 1318.

Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Bundy has failed to make such a showing.  He has set forth no specific facts showing a genuine factual issue for trial. *See Matsushita*, 475 U.S. at 588-87; Fed. R. Civ. P. 56(e).  Although courts construe liberally

8

1   pleadings of pro se litigants such as Bundy in their favor, pro se litigants are still bound by the

2   rules of procedure. *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995); *King v. Atiyeh*, 814 F.2d

3   565, 567 (9th Cir. 1987). As the nonmoving party, Bundy may not rest upon the mere allegations

4   or denials of his pleadings, but he must produce specific facts, by affidavit or other evidentiary

5   materials, showing there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256; Fed. R. Civ.

6   P. 56(e). Bundy has produced no specific facts, but instead has argued that this Court has no

7   jurisdiction. Bundy's failure to produce specific facts showing a genuine issue for trial gives the

8   Court sufficient grounds to grant the Motion for Summary Judgment (#11).

9   D.   Injunctive Relief

10        Injunctive relief is appropriate when the moving party shows irreparable injury will result

11  and remedies at law are inadequate. *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998). The

12  moving party must show actual success on the merits and the balance of equities favors injunctive

13  relief. *Id.*  As stated above, the United States owns the Allotment where Bundy is grazing his

14  livestock. Bundy is therefore trespassing upon United States property. Trespass is defined as

15  entering the real property of another without the owner's permission or invitation. *United States v.*

16  *Gardner* ("*Gardner I*"), 903 F. Supp. 1394, 1402 (D. Nev. 1995) (citing RESTATEMENT SECOND

17  OF TORTS, §§ 158-59). The Restatement of Torts provides that:

18
19        One is subject to liability to another for trespass... if he intentionally

20        (a) enters land in the possession of the other, or causes a thing ... to do so, or
          (b) remains on the land, or
          (c) fails to remove from the land a thing which he is under a duty to remove.
21

22  RESTATEMENT SECOND OF TORTS, §§ 158-59. Grazing on federal public lands without a permit is

23  a grazing trespass. *Holland Livestock Ranch v. United States*, 655 F.2d 1002, 1005 (9th Cir.

24  1981).

25        *Gardner I* had facts similar to this case, where the defendants grazed livestock without

26  authority. A permanent injunction was entered against the defendants; they were ordered to

9

1  remove the livestock, and pay the owed grazing fees. *Gardner I*, 903 F. Supp. at 1403. As in

2  *Gardner I*, the United States prevails in this case on the merits since Bundy is trespassing. The

3  other component of the test requiring a showing of irreparable injury and inadequate remedies at

4  law has also been met by the United States. Bundy has been grazing his livestock on the

5  Allotment without a permit since March 1993, and he has informed the BLM in several

6  "administrative notices" that he intends to graze cattle "pursuant to my vested grazing rights." *See*

7  Exhibit 10 to #11. Despite numerous trespass notices and demands for payment from the BLM,

8  Bundy has grazed livestock on the Allotment. Irreparable harm is established in cases of

9  continuing trespasses. *See, e.g., Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 892 (1st Cir. 1988)(a

10  continuing trespass on real property can properly be enjoined); *New York State Nat'l Org. for*

11  *Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989)(defendants' stated intent to continue illegal

12  actions showed harm was of a continuing nature and permanent injunction properly issued).

13      Section 4140.1 of the Code of Federal Regulations prohibits unauthorized grazing of

14  livestock on public lands. 43 C.F.R. § 4140.1(b)(1)(i) (1998). Any person who violates the

15  grazing regulations as set forth under 43 C.F.R. § 4140.1(b) is subject to civil and criminal

16  penalties. 43 C.F.R. §§ 4140.1(b), 4170.1, 4170.2. The regulations provide that the settlement for

17  repeated willful violations is three times the value of the forage consumed by the livestock as

18  determined by the average monthly rate per AUM (animal unit month)[1]. 43 C.F.R. § 4150.3. The

19  BLM is also authorized to impound and dispose of the unauthorized livestock after written notice

20  of intent to impound. 43 C.F.R. §§ 4150.2, 4150.4, 4150.4-1, 4150.4-2; *see also Klump v. United*

21  *States*, 38 Fed. Cl. 243 (1997)(government had not violated takings clause in impounding cattle as

22  sanction for unauthorized grazing on federal lands). The government alleges that the BLM has not

23  impounded Bundy's livestock due to its anticipation the action could result in physical

24  confrontation. *See* Mot. Summ. Jud., #11, pp. 11-12. For over five years, Bundy has been

25  _____

26      [1]An animal unit month is the amount of forage necessary for the sustenance of one cow for one
month.

10

1   trespassing on public lands and his livestock have consumed forage.  The government has shown

2   commendable restraint in allowing this trespass to continue for so long without impounding

3   Bundy's livestock.

4

5                                    **III. CONCLUSION**

6          This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1345.  The United

7   States owns the Allotment where Bundy is grazing livestock without authority.  Since Bundy is in

8   trespass on public lands,

9          IT IS ORDERED that Defendant's Motion to Dismiss (#4) is DENIED.

10         IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (#11) is

11  GRANTED as to the permanent injunction.

12         IT IS FURTHER ORDERED that Bundy is permanently enjoined from grazing his

13  livestock within the Bunkerville Allotment and shall remove his livestock from this allotment on

14  or before November 30, 1998.

15         IT IS FURTHER ORDERED that Plaintiff United States shall be entitled to trespass

16  damages from Bundy in the amount of $200.00 per day per head for any livestock belonging to

17  Bundy remaining on the Bunkerville Allotment after November 30, 1998.

18         IT IS FURTHER ORDERED that Defendant's Motion to Strike Motion for Summary

19  Judgment (#14) is DENIED.

20         The Clerk shall enter judgment accordingly.

21         DATED this 3rd day of November, 1998.

22

23

24                                    _Johnnie B. Rawlinson_
                                     JOHNNIE B. RAWLINSON
25                                   United States District Judge

26

                                          11

# ATTACHMENT D

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**F I L E D**

MAY 1 4 1999

CATHY A. CATTERSON
CLERK, U.S. COURT OF APPEALS

---

UNITED STATES OF AMERICA,

　　　　　Plaintiff-Appellee,

v.

CLIVEN D. BUNDY,

　　　　　Defendant-Appellant.

No. 98-17293

D.C. No. CV-98-531-JBR

MEMORANDUM[1]

**FILED**

JUL 2 2 1999

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
　　　　　　DEPUTY

---

Appeal from the United States District Court
for the District of Nevada
Johnnie B. Rawlinson, District Judge, Presiding

Submitted May 10, 1999[2]

Before:　REINHARDT, TROTT, and MCKEOWN, Circuit Judges.

　Cliven D. Bundy appeals pro se from the district court's entry of summary

judgment for the United States in its action for trespass and to enjoin Bundy from

grazing his livestock on land administered Bureau of Land Management.  We have

---

　[1]　This disposition is not appropriate for publication and may not be cited to or by the courts
of this circuit except as may be provided by 9th Cir. R. 36-3.

　[2]　The panel unanimously finds this case suitable for decision without oral argument.  *See*
Fed. R. App. P. 34(a)(2).

jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's entry

of summary judgment, *see United States v. Gardner*, 107 F.3d 1314, 1317 (9th

Cir. 1997), and we affirm.

Bundy contends that the district court erred by exercising jurisdiction over

the action. For the reasons stated by the district court in its November 4, 1998

order, we reject Bundy's contention.

**AFFIRMED.**

A TRUE COPY
ATTEST
JUL - 7 1999
CATHY A. CATTERSON
Clerk of Court

Deputy Clerk

2

# ATTACHMENT E

United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Las Vegas Field Office
4701 North Torrey Pines Dr
Las Vegas NV 89130
www.blm.gov/nv/



In Reply Refer to:
4120
(NV052.08)

CERTIFIED MAIL:      7006 0100 0000 5253 5309
RETURN RECIEPT REQUESTED                                        [APR 2 – 2008

Cliven D. Bundy
7175 Gold Butte Road
Bunkerville NV  89007

## NOTICE OF CANCELLATION

Dear Mr. Bundy:

This letter is a Notice of Cancellation of your Range Improvement Permit and Cooperative Agreements.

**Background**

The Bureau of Land Management (BLM), Las Vegas Field Office issued you a Final Decision on February 17, 1994 that cancelled your ephemeral grazing lease for the Bunkerville Allotment. The Decision was neither protested nor appealed.

**Notice of Cancellation of Range Improvement Permits and Cooperative Agreements**

**Section 4 Range Improvement Permits**

Your Section 4 range improvement permit is hereby cancelled and you are given notice that you have 180 days from the receipt of this Notice of Cancellation to remove all materials and clean up all debris placed on Public lands from the following Section 4 range improvement:

| Project Name | Project Number |
|---|---|
| Red Springs Drift Fence, (a.k.a., Red Springs Division Fence) | 575160 |

Remove the all wire, fence posts, h-braces, anchors, gates and associated hardware and debris associated with the Red Springs Drift (Division) Fence; no surface disturbance is permitted. Permit for project 575160 is cancelled.

Failure to remove the materials from the above section 4 range improvement within 180 days from the receipt of this notice is a prohibitive act under 43 CFR 4140.1 (a)(4) and (5). Therefore, Cliven Bundy will be considered in trespass. If the materials are not removed, the trespass may result in the BLM removing the materials, rehabilitating the site and the BLM may charge Cliven Bundy for the costs of removal and rehabilitation under 43 CFR 2808.11(a)(3).

1

The following projects are the property of the United States of America. According to the cooperative agreement for these projects, Cliven Bundy is no longer responsible for their maintenance and shall not attempt to remove any materials from these projects under the Cooperative Agreements, which are now cancelled. The Cooperative Agreements state in stipulation 5 (a) "Title to the said improvements in place, together with all labor and materials furnished by either party and used in construction and maintenance thereof, shall be in the United States of America."

| Project Name | Project |
|---|---|
| Nickle Creek Truck Trail | 570185 |
| South Well (Trough) | 570182 |
| White Rock Spring | 570223 |
| Jump Spring Development | 570180 |
| Black Rock Spring | 570221 |
| Sheep Trough Water Development | 570176 |
| Key West Seasonal Use Fence | 570749 |
| Culinary Pipeline | N5-4-42 |
| Darling Pipeline | N5-4-42 |
| Sheep Trough Pipeline | N5-4-42 |

## Authority

The authority for this decision is contained in Title 43 of the Code of Federal ]
Subpart 4120-Grazing Management, which states in pertinent parts:

2808.11(a)(3)  "Rehabilitation and restoring any damaged lands or resources. If you do not rehabilitate and restore the lands and resources within the time set by BLM in the notice, you will be liable for the costs the United States incurs in rehabilitating and restoring the lands and resources."

4120.3-6(b)  "The authorized officer may require permittees or lessees to remove range improvements which they own on the Public lands if these improvements are no longer helping to achieve land use plan or allotment goals and objectives or if they fail to meet the criteria under 4120.3-4 of this title.

4120.3-6(d)  "Permittees and lessees shall be allowed 180 days from the date of cancellation of a range improvement permit or cooperative range improvement agreement to salvage material owned by them and perform rehabilitation measure necessitated by the removal.

4140.1(a)(4)  "Grazing permittees or lessees performing the following prohibitive acts may be subject to civil penalties under 4170.1": "Failing to comply with the terms, conditions, and stipulations of cooperative range improvement agreements or range improvement permits."

4140.1(a)(5)  "Refusing to install, maintain, modify, or remove range improvements when so directed by the authorized officer."

2

Appeals

A person who wishes to appeal to the Interior Board of Land Appeals must do so under 43 CFR 4.411 and must file in the office of the officer who made the decision (not the Board), in writing to Patrick Putnam, Assistant Field Manager, Las Vegas Field Office, 4701 North Torrey Pines Drive, Las Vegas NV 89130. A person served with the decision being appealed must transmit the notice of appeal in time to be filed in the office where it is required to be filed within 30 days after the date of service. The notice of appeal must give the serial number or other identification of the case and may include a statement of reasons for the appeal, a statement of standing if required by subpart 4.412(b), and any arguments the appellant wished to make. Form 1842-1 (attached) provides additional information regarding filing an appeal.

No extension of time will be granted for filing the notice of appeal. If a notice of appeal is filed after the grace period provided in subpart 4.401(a), the notice of appeal will not be considered and the officer from whose decision the appeal is taken will close the case. If the notice of appeal is filed during the grace period provided in subpart 4.401(a) and the delay in filing is not waived, as provided in that section, the notice of appeal will not be considered and the Board will dismiss the appeal.

The appellant shall serve a copy of the notice of appeal and any statements of reason, written arguments, or briefs under §4.413 on each adverse party named in the decision from which the appeal is taken and on the Office of the Solicitor, Pacific Southwest Regional Solicitor, U.S. Department of the Interior, 2800 Cottage Way, Room E-2753, Sacramento, California 95825-1890. Service must be accompanied by personally serving a copy to the party or by sending the document by registered or certified mail, return receipt requested, to the address of record in the bureau, no later than 15 days after filing the document.

In addition, within 30 days of receipt of this decision you have the right to file a petition for a stay of the decision together with your appeal in accordance with the regulations at 43 CFR 4.21. The petition must be served upon the same parties specified above. Should you wish to file a petition for stay, the appellant shall show sufficient justification based on the following standards:

    (1) The relative harm to the parties if the stay is granted or denied.
    (2) The likelihood of the appellant's success on the merits.
    (3) The likelihood of immediate and irreparable harm if the stay is not granted, and
    (4) Whether the public interest favors granting the stay.

43 CFR 4.471(d) provides that the appellant requesting a stay bears the burden of proof to demonstrate that a stay should be granted.

At the conclusion of any document that a party must serve, the party or its representative must sign a written statement certifying that service has been or will be made in accordance with the applicable rules and specifying the date and manner of such service (43 CFR 4.422(c)(2)).

Patrick Putnam
Assistant Field Manager


Enclosures:    Form 1842-1
               Copies of Range Improvement Permit and Cooperative Agreements

Cc: Donald & Connie Whitney
Harold & Annita Wittwer
The Nature Conservancy
Lewis Wallenmeyer
Meghan Wereley
Mandy McNitt
Glen Anderson
Scott Florence
M. Joe Tague
Leon Sprouse
Robert Lewis
Kent Turner
Keith Brose
Ray Klein

4

Form 1842-1
(September 2005)

## UNITED STATES
## DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT

## INFORMATION ON TAKING APPEALS TO THE INTERIOR BOARD OF LAND APPEALS

### DO NOT APPEAL UNLESS
1. This decision is adverse to you,
#### AND
2. You believe it is incorrect

### IF YOU APPEAL, THE FOLLOWING PROCEDURES MUST BE FOLLOWED

| | |
|---|---|
| **1. NOTICE OF APPEAL**.............. | A person served with the decision being appealed must transmit the notice of appeal in time for it to be filed in the office where it is required to be filed within 30 days after the date of service.  If a decision is published in the FEDERAL REGISTER, a person not served with the decision must transmit a notice of appeal in time for it to be filed within 30 days after the date of publication (43 CFR 4.411 and 4.413). |

**2. WHERE TO FILE NOTICE OF APPEAL**...........

U.S. Dept. of the Interior
Bureau of Land Management
4701 North Torrey Pines Drive
Las Vegas NV 89130

And

U.S. Dept. of the Interior
Office of Hearings & Appeals
Interior Board of Land Appeals
801 N. Quincy St., MS 300-QC
Arlington, VA 22203

**WITH COPY TO SOLICITOR**..........................

U.S. Dept. of the Interior
Office of the Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-2753
Sacramento, CA 95825-1890

**3. STATEMENT OF REASONS**

Within 30 days after filing the Notice of Appeal, File a complete statement of the reasons why you are appealing.  This must be filed with the United States Department of the Interior, Office of Hearings and Appeals, Interior Board of Land Appeals, 801 N. Quincy Street, MS 300-QC, Arlington, Virginia 22203.  If you fully stated your reasons for appealing when filing the Notice of Appeal, no additional statement is necessary (43 CFR 4.412 and 4.413).

**WITH COPY TO** ...........................

U.S. Dept. of the Interior
Office of the Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-2753
Sacramento, CA 95825-1890

And

U.S. Dept. of the Interior
Bureau of Land Management
4701 North Torrey Pines Drive
Las Vegas NV 89130

**4. ADVERSE PARTIES**.................

Within 15 days after each document is filed, each adverse party named in the decision and the Regional Solicitor or Field Solicitor having jurisdiction over the State in which the appeal arose must be served with a copy of: (a) the Notice of Appeal, (b) the Statement of Reasons, and (c) any other documents filed (43 CFR 4.413).  If the decision concerns the use and disposition of public lands, including land selections under the Alaska Native Claims Settlement Act, as amended, service will be made upon the Associated Solicitor, Division of Land and Water Resources, Office of the Solicitor, U.S. Department of the Interior, Washington, D.C. 20240.  If the decision concerns the use and disposition of mineral resources, service will be made upon the Associated Solicitor, Division of Mineral Resources, Office of the Solicitor, U.S. Department of the Interior, Washington, D.C. 20240.

**5. PROOF OF SERVICE**..............

Within 15 days after any document is served on an adverse party, file proof of that service with the United States Department of the Interior, Office of Hearings and Appeals, Interior Board of Land Appeals, 801 N. Quincy Street, MS 300-QC, Arlington, Virginia 22203.  This may consist of a certified or registered mail "Return Receipt Card" signed by the adverse party (43 CFR 4.401(c)).

**6. REQUEST FOR STAY**............

Except where program-specific regulations place this decision in full force and effect or provide for an automatic stay, the decision becomes effective upon the expiration of the time allowed for filing an appeal unless a petition for a stay is timely filed together with a *Notice of Appeal* (43 CFR 4.21).  If you wish to file a petition for a stay of the effectiveness of this decision during the time that your appeal is being reviewed by the Interior Board of Land Appeals, the petition for a stay must accompany your notice of appeal (43 CFR 4.21 or 43 CFR 2804.1).  A petition for a stay is required to show sufficient justification based on the standards listed below.  Copies of the *Notice of Appeal* and Petition for a Stay must also be submitted to each party named in this decision and to the Interior Board of Land Appeals and to the appropriate Office of the Solicitor (43 CFR 4.413) at the same time the original documents are filed with this office.  If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

Standards for Obtaining a Stay.  Except as other provided by law or other pertinent regulations, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards: (1) the relative harm to the parties if the stay is granted or denied, (2) the likelihood of the appellant's success on the merits, (3) the likelihood of immediate and irreparable harm if the stay is not granted, and (4) whether the public interest favors granting the stay.

(Continued on page 2)

Unless these procedures are followed your appeal will be subject to dismissal (43 CFR 4.402). Be certain that all communications are identified by serial number of the case being appealed.

**NOTE:** A document is not filed until it is actually received in the proper office (43 CFR 4.401(a)). See 43 CFR Part 4, subpart b for general rules relating to procedures and practice involving appeals.

## 43 CFR SUBPART 1821--GENERAL INFORMATION

Sec. 1821.10  Where are BLM offices located?  (a) In addition to the Headquarters Office in Washington, D.C. and seven national level support and service centers, BLM operates 12 State Offices each having several subsidiary offices called Field Offices. The addresses of the State Offices can be found in the most recent edition of 43 CFR 1821.10. The State Office geographical areas of jurisdiction are as follows:

STATE OFFICES AND AREAS OF JURISDICTION:

| | |
|---|---|
| Alaska State Office ---------- | Alaska |
| Arizona State Office --------- | Arizona |
| California State Office ------- | California |
| Colorado State Office -------- | Colorado |
| Eastern States Office --------- | Arkansas, Iowa, Louisiana, Minnesota, Missouri and, all States east of the Mississippi River |
| Idaho State Office ------------- | Idaho |
| Montana State Office --------- | Montana, North Dakota and South Dakota |
| Nevada State Office ----------- | Nevada |
| New Mexico State Office ---- | New Mexico, Kansas, Oklahoma and Texas |
| Oregon State Office ----------- | Oregon and Washington |
| Utah State Office ------------- | Utah |
| Wyoming State Office -------- | Wyoming and Nebraska |

(b) A list of the names, addresses, and geographical areas of jurisdiction of all Field Offices of the Bureau of Land Management can be obtained at the above addresses or any office of the Bureau of Land Management, including the Washington Office, Bureau of Land Management, 1849 C Street, NW, Washington, DC 20240.

(Form 1842-1, September 2005)

# ATTACHMENT F



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy St. Suite 300
Arlington, VA  22203

703 235 3750                    703 235 8349 (fax)

December 22, 2008

| | | |
|---|---|---|
| IBLA 2008-207 | ) | NV052.08 |
| | ) | |
| CLIVEN D. BUNDY | ) | Notice of Cancellation |
| | ) | |
| | ) | Affirmed |

### ORDER

Cliven D. Bundy appeals from a Notice of Cancellation, issued April 2, 2008, by the Las Vegas Field Office, Bureau of Land Management (BLM), cancelling a Range Improvement Permit for the Red Springs Drift Fence, Project Number 575160, and ten Cooperative Agreements, Project Numbers 570185, 570182, 570223, 570180, 570221, 570176, 570749, N5-4-4291, N5-4-4290, and N5-4-4289.  The Range Improvement Permit and the Cooperative Agreements were issued between 1966 and 1985 to Bundy, his father, and in some cases also to other individuals, to allow improvements for grazing on the public lands of the United States on the Bunkerville Allotment in Clark County, Nevada.  In response to the Notice of Cancellation, Bundy served a "Constructive Notice" Letter on BLM, which BLM construes as a Notice of Appeal.  Because Bundy has not argued or demonstrated error in BLM's Notice of Cancellation, we affirm.

*Background*

This case represents another chapter in a long-running dispute between Bundy and BLM in which Bundy contends that he has "'unalienable' pre-emptive" rights with respect to use of the public lands for grazing in association with his ranch.  Although he has been disabused of this notion by Federal courts, which have held him to be in trespass and enjoined his continued use of the public lands for grazing, Bundy continues to act in disregard of the law by grazing cattle on the public lands.[1]

The record shows that sometime around 1954, Bundy or his father David Bundy began to graze livestock on the public lands in the Bunkerville Allotment with

---

[1]  The background information regarding the permit and its history is found in the decision of the United States District Court for the District of Nevada. *United States v. Cliven D. Bundy*, CV-S-98-531-JBR (RJJ) (D. Nev. Nov. 4, 1998).

ephemeral grazing permits issued pursuant to the Taylor Grazing Act of 1934, 43 U.S.C. § 315-315r (2000), for preference awarded to a predecessor grazer in association with base property. As an ephemeral authorization, the Allotment only provided forage resources randomly depending on natural conditions, and therefore BLM determined on an annual basis what forage was available.[2]

On May 20, 1966, David Bundy entered into six Cooperative Agreements with BLM, authorizing various range improvements for the Bunkerville Allotment. Record Documents 16-21. The agreements specified that title to all improvements was in the United States, *see* section 5(a), and that the agreements could be terminated, *inter alia*, by BLM "after due notice in writing" because of default or violation by the "cooperator," *see* section 11. In 1968, David Bundy was one of five "cooperators" who entered into another Cooperative Agreement with BLM with the same terms. Record Document 15. David Bundy entered into three more Cooperative Agreements in 1973, with the same terms. Record Documents 11-13.

In 1973, David and Cliven D. Bundy entered into a Designation of Authority ensuring that the two could represent each other's interests. Record Document 14. On December 5, 1985, BLM issued a Range Improvement Permit to Bundy and several neighbors for the Red Rock Springs Drift Fence. This permit divided the Bunkerville and Gold Butte Allotments, and was subject to cancellation both for failure of the permittee(s) to comply with applicable regulations, and also if the improvement ceased to be compatible with multiple use objectives for the area. Record Document 10.

During the early 1990s, BLM developed management plans for the desert tortoise and its habitat, which are found within the Bunkerville Allotment. Such plans would impose timing constraints on grazing authorizations within the Allotment depending on tortoise sightings. Accordingly, in 1993, BLM advised Bundy in its annual notice that changes would take place in future permits.

Bundy's last authorization to graze the Bunkerville Allotment ended on February 28, 1993, but he continued to graze cattle on the Allotment and refused to

---

[2] "Ephemeral rangelands" are "areas of the Hot Desert Biome (Region) that do not consistently produce enough forage to sustain a livestock operation but may briefly produce unusual volumes of forage to accommodate livestock grazing." 43 C.F.R. § 4100.0-5 (2004). Special rules apply to ephemeral rangelands; permittees must apply for annual grazing authorizations which may be granted "whenever forage exists or climatic conditions indicate the probability of an ephemeral forage crop." 33 Fed. Reg. 18245 (Dec. 7, 1968); *see Defenders of Wildlife*, 144 IBLA 250, 251-52 (1998); *Wild Horse Organized Assistance*, 172 IBLA 128, 133 (2007).

2

apply for annual grazing authorizations, pay grazing fees, or otherwise cooperate with BLM in any way with respect to the Allotment. When BLM attempted to communicate with him, Bundy issued various written documents to BLM declaring his intent to graze pursuant to "vested grazing rights," and claimed that the United States did not own the public lands or have authority to exercise jurisdiction over the Allotment. In the summer of 1993, BLM issued various notices to Bundy, and finally issued a "Trespass Notice and Order to Remove" livestock.

On January 24, 1994, BLM issued a Proposed Decision, Order to Remove, and Demand for Payment. Record Document 9. After documenting violations of law and regulation, the Proposed Decision cancelled Bundy's grazing preference in the Bunkerville Allotment which was attached to base properties that had been acquired by his father no later than 1966. *Id.* In the absence of a response or Notice of Appeal, this decision became final on February 17, 1994. Bundy continued to deny the United States' authority over the public lands and to commit actions in pursuit of grazing on the public lands of the Allotment.

In 1998, the United States filed a complaint against Bundy in the United States District Court for the District of Nevada. In its opinion dated November 4, 1998, the District Court explained the law to Bundy in considerable detail, as well as the United States' authority, as set forth in the United States Constitution, over public lands acquired by the Treaty of Guadalupe Hidalgo and managed by Congress in the Taylor Grazing Act and in the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701-02, 1732, 1752 (2000). *United States v. Cliven D. Bundy*, CV-S-98-531-JBR (RJJ) (D. Nev. Nov. 4, 1998); *see also Public Lands Council v. Babbitt*, 529 U.S. 727 (2000). The Court permanently enjoined Bundy from grazing his livestock on the Bunkerville Allotment, ordered him to remove all livestock from the public lands, and granted damages to the United States. Bundy appealed to the United States Court of Appeals for the Ninth Circuit, which denied his appeal by Memorandum Order. *United States of America v. Cliven D. Bundy*, No. 98-17293 (9th Cir. July 22, 1999).

BLM has documented Bundy's continued use of range improvements on the Bunkerville Allotment, *see* Record Document 9, and contends that Bundy has never complied with the Federal court mandates. On April 2, 2008, BLM issued to Bundy a Notice of Cancellation for the 1985 Range Improvement Permit, Project No. 575160, and for all ten Cooperative Agreements. BLM explained that Bundy was obligated to remove all materials associated with the Red Rock Springs Drift Fence and that failure to comply with the Notice would be a prohibited act pursuant to 43 C.F.R. § 4140.1(a). BLM explained that Bundy's failure to comply would constitute a trespass pursuant to 43 C.F.R. § 2808.11(a)(3), such that BLM could remove materials in trespass, rehabilitate the site, and charge Bundy for its costs. Notice of Cancellation at 1. With respect to the Cooperative Agreements, BLM advised Bundy

IBLA 2008-207

that pursuant to section 5 of each agreement, title to all improvements belonged in the United States. BLM cited, as authority for the Notice, 43 C.F.R. §§ 2802.122, 4120.3-6, and 4140.1. The Notice, at 3, advised Bundy of his right to appeal. It was served on one organization and 15 individuals.

On May 13, 2008, Bundy served on BLM a "Constructive Notice."[3] Bundy asserts that he has "managed [his] ranch adhering to state and local law and customs," and that his ranch is a working unit on **Fee Lands** in Clark County, Nevada, Bunkerville and Overton Townships, and the City of Mesquite, Nevada, U.S.A." In the only statement of objection to the Notice of Cancellation, Bundy asserts: "By inhibiting me from maintaining and improving my vested water rights, access roads, division fences and also drift fences, BLM could stifle my 'unalienable' pre-emptive forage, water, and access rights within the area of my ranch." He asserts that "continued efforts through **whatever it takes**, to protect my rights and solve the people's concern, will be taken." BLM made and documented efforts to communicate with Bundy to ascertain whether his Constructive Notice was intended as an appeal, but BLM received no response from him. Record Documents 2-3.

BLM submitted a response to the Constructive Notice. Bundy submitted no further pleadings.

*Analysis*

While those with grazing preferences and permits have particular rights pursuant to the Taylor Grazing Act, *see, e.g., Joe B. Fallini v. BLM,* 162 IBLA 10 (2004), *and cases cited,* Bundy no longer has such rights as his grazing preference was terminated well over a decade ago, and he has been adjudicated by a Federal Court to be a trespasser on the public lands. Bundy therefore maintains no particular rights under that statute or its implementing regulations.

As a party to the Range Improvement Permit and Cooperative Agreements associated with permits that have long since terminated, Bundy's burden is to show that BLM erred in construing those permits and their cancellation terms, or otherwise abused its discretion. In this direction, Bundy alludes to various unstated rights in association with his ranch, which he claims to be located on fee lands, but BLM has taken no action with respect to his ranch or fee lands.

Bundy's Constructive Notice fails to demonstrate error in BLM's decision. According to BLM, the ten Cooperative Agreements at issue in this appeal terminated

---

[3]  Bundy correctly notes that he was served with the Notice of Cancellation on Apr. 15, 2008. Record Document 6 (Track and Confirm Receipt).

Ex. 2 - Rugwell Dec. Att. F - Page 4 of 6

of their own terms in 1993, and Bundy has not averred any error in BLM's declaration as to their status, or the status of the improvements that the Agreements authorized years ago.[4]

Likewise, we find no basis in the Notice upon which to consider BLM to have erred in terminating the Red Rock Springs Drift Fence. The Notice of Cancellation orders Bundy to remove all fencing materials from the Red Rock Springs Drift Fence authorized under the 1985 Range Improvement Permit. This permit was issued to Bundy and his neighbors on the Gold Butte Allotment, and the fence was to serve as a physical barrier between the Bunkerville and Gold Butte Allotments, splitting the Red Rock Spring between the two for equal usage. Bundy was enjoined by the Federal Courts from grazing on the Allotment some years ago, and has no legal right to maintain any barrier to protect the stream from incursion by others. Bundy does nothing to refute the suggestion that the fence should be removed, as he continues to use the fence as a means of trespassing with his cattle on the Federal lands, nor does he contend that BLM abused its discretion in ordering his removal of the fence under 43 C.F.R. § 4120.3-6(b). While Bundy claims that the inability to maintain drift fences could affect rights to water "within the area of [his] ranch," he has no such rights on the public lands.[5]

Bundy's Constructive Notice demonstrates a continued misunderstanding of the nature of the public lands. We need not repeat the legal analysis provided to him by the United States District Court and refer Bundy to the decision adverse to him in the 1998 litigation, for answers to any questions of legal authority. *United States v. Cliven D. Bundy*, CV-S-98-531-JBR (RJJ) (D. Nev. Nov. 4, 1998), *aff'd*, No. 98-17293

---

[4]  Several of the Cooperative Agreements were issued to Bundy and one or more grazers. Project Numbers 570749, 570182, 570223, 570176, 570221, 570180. The Notice of Cancellation was issued only to Bundy, but copied to a list of 15 individuals who may or may not be successors in interest to the grazers originally party to a particular cooperative agreement. BLM's retention of the improvements means that its decision would not affect the rights of any parties, if any remain, to use the improvements. Moreover, nothing in the Notice of Cancellation purports to have any bearing on improvements outside the Bunkerville Allotment.

[5]  None of the parties on the service list has submitted an appeal from the Notice of Cancellation. Because we cannot identify the various persons served with the Notice, when the case is returned to its jurisdiction BLM is directed to verify that the rights of any persons who may maintain an interest in the fence, if any remain or succeeded to the 1985 Permit, have been protected by service of the Notice. Bundy does not suggest that any other person's right has been affected and we will not manufacture causes for him not articulated in his appeal.

IBLA 2008-207

(9th Cir. July 22, 1999). That decision is *res judicata* as to the termination of his status as a permittee on the Bunkerville Allotment. In addition, we recommend that Bundy review the Supreme Court's decision in *Public Lands Council v. Babbitt,* 529 U.S. 727 (2000).

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the Notice of Cancellation is affirmed.

Lisa Hemmer
Administrative Judge

I concur:

James Jackson
Administrative Judge

APPEARANCES:

Cliven D. Bundy
P.O. Box 7175
Bunkerville, NV   89007

Nancy S. Zahedi, Esq.
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA   95825

**TELEFAX:   (916) 978-5694**

RECEIVED

DEC 29 2008

Regional Solicitor
Pacific Southwest Regional

# ATTACHMENT G

---

**CLIVEN D. BUNDY**  #346.5564
P.O. Box 7175
Bunkerville, Nevada 89007
Tel: 702-346-5564

---

## CONSTRUCTIVE NOTICE AND DEMAND FOR PROTECTION

### November 27, 1998

TO:

**Sheriff Clark County, Nevada**
**District Attorney Clark County, Nevada**
**Commissioners Clark County, Nevada**
**Governor of Nevada**
**Governor Elect of Nevada**
**Attorney General of Nevada**
**Director - Nevada Division of Brand Inspection**
**Nevada Legislature**
**Any person aiding and abetting to destroy my Life, Liberty or Property**
*Chief Murphy*
**RE:  Unconstitutional Jurisdiction Being Imposed Causing An Emergency**

1. The above Nevada officials are hereby given constructive notice that an unconstitutional jurisdiction **without limitations** is being imposed upon me and my family's life, liberty and property.  Because a court has ordered this upon me I fear for the well being and safety of me and my family because of what federal agents did at Ruby Ridge and Waco.  The Supreme Court has ruled this jurisdiction to be unconstitutional within a state. All I want to do is stand up for my rights and make sure no violence occurs.   The above officials are also given demand to intervene on my behalf against the United States and its agents enforcing this jurisdiction and prevent an emergency from escalating.  In addition, any person aiding and abetting the destruction of my rights is noticed that he will be held liable for their actions in a state court of proper jurisdiction.

2. This emergency is the result of several fiat rulings by the federal judiciary involving public lands matters here in Nevada, and the most recent ruling in *United States v. Bundy, Case No. CV-S-98-531 JBR(RJJ)*. The court stated in part as follows:

   "Bundy alleges the BLM does not have 'Constitutional authority' to make the full force and effect decision.  The Property Clause of the United States Constitution gives Congress the power 'to make all needful Rules and Regulations respecting **the Territory** or other Property belonging to the United States.'  (citation omitted); U S. Const. art. IV Sec.3, cl.2.  **This Congressional power over the public lands is without limitations.**  *Order 6Pg3, Ln16-31* (citation omitted)(emphasis added).

3. The United States and its agents started in 1992 to remove all livestock from the ranges in Clark County by means an arbitrary and capricious document titled *Full Force and Effect Decision*.  The implementation of this decision has destroyed the livestock industry in Clark County and to the best of knowledge I am the last active Rancher to be removed.

4. I have consistently throughout this period been persistent in the defense of my vested rights and ability to perform the vocation of ranching guaranteed me in the Nevada constitution.  The United States and its agents

1

have obtained a ruling from a federal district court judge here in Las
Vegas that states I have no constitutional rights and that they can operate
against my life, liberty and property without limitations. The judge in
this decision has also nullified Nevada Water Law. Furthermore, the court
creates a constitutional paradox even against its own judicial independence
through this without limitations ruling. Moreover, the federal courts in
this subject matter have in essence ruled that they have no power to limit
the federal agents when oppressing the rights of the People in Nevada.

5. In my motion to dismiss I put before the court numerous Supreme Court cases
which hold that Art IV is the authority Congress implements when governing
areas obtained through conquest or purchase from another nation in the
international theater. The case law is clear that matters in this Art IV
authority shall only be adjudicated by special Art IV courts within the
conquered or purchased territory that have been established by congress.

6. Art IV courts are to cease operation once a state is admitted into the
union. Accordingly, would not this without limitations authority also
cease? The cases law goes on to hold the constitution and its protections
do not apply under Art IV within conquered areas and only privileges
granted by congress through statute are allowed. The holding in *Torres v.
Puerto Rico, 442 US 465,* demonstrates that the citizens of Puerto Rico
actually have been granted more protections and privileges than the People
in Nevada with respect to the 90% public lands area in Nevada. Congress
has yet to created a statutory privilege for the protection of free speech
while on public lands. Remember, there are no limitations on the United
States or its agents. *Order @ pg5.*

7. The judge ruled that I have no constitutional rights, no vested water
rights or right to the beneficial use of the forage rights under Nevada
Law. I must also remove my livestock no later than November 30, 1998 or be
fined a trespass fee of $200 per day per cow on the range after the
deadline. In addition, the United States wants hundreds of thousands of
dollars for what they allege are damages I have caused to the range. The
grazing permit system in conjunction with Nevada Water Law that worked well
for so many years was abolished with that one agency decision. Once I am
gone, there will no longer be developed water on the range. Not even for
the Desert Tortoise.

8. The United States, its agents and the federal judiciary hold there are no
limitations on the agencies when they usurp Nevada Law and our rights on
the public lands. No agency or court in the land has the authority to
impose such an unlimited government within our Nation. Nevada: an admitted
state or conquered territory? This ruling is nothing more than fiat law
that can only be enforced through illegal actions of government agents.
Therefore I have no intention of removing my livestock from the range by
November 30th. I lodged a proper defense through a motion to dismiss based
on the case law that this court has no jurisdiction over Art IV matters.
To proceed the court created for itself a *hypothetical jurisdiction.* I am
appealing the decision.

9. The State of Nevada being an admitted state of the union, its political
subdivisions and elected and non-elected officials therein, have a duty to
protect me, my family and my rights from this usurpation and emergency.
This obligation is ordered within each and every one of their Oaths of
Office to uphold and defend the constitution. The federal judge has ruled
I am stripped of the constitution and to be ruled by an unlimited power.
The 14th Amendment to the constitution guarantees me protection from such
oppression and orders the State of Nevada to secure this protection for me
and my property.

10. I have been a rancher and steward of the range in this area for many more
years than there has been a BLM. If I were so dangerous and destructive
for the range how have I been able to continue in the ranching business
producing livestock for all these years as my heirs before me?

2

11. I fear that my stand is an endangerment to my life and the lives of my family members and will cause the destruction of my property rights by illegal acts of agents of the United States. They have often attempted to paint me as a violent person when all I have done is stand up for my property and rights. This fight today is no different than the civil rights days when Rosa Parks defied illegal local law and took her rightful seat in the front of the bus. I have to take that same front seat and stand for my rights here today. I have always conducted myself in a professional manner during this battle with words on paper. I take issue with anyone who would try to paint me as some wacko extremist. I do not advocate violence and only want a legal and peaceful conclusion to this issue and my rights protected. Either I have rights or don't have rights. There can be no in between on this matter or have we gone completely over the edge and no longer have a Republic under the Rule of Law. The federal courts have ruled there is no Rule of Law and no limitations of the federal government here in Nevada. This is the emergency the above Nevada officials have to remedy. If the above Nevada officials can not bring forth remedy, then what is their purpose, why have such official positions? All that is then needed are federal regions with federal agents possessing unlimited power within those conquered areas.

12. Therefore, demand is hereby made to the above Nevada officials to enforce their Oaths of Office and the constitutional republican form of government guaranteed me and my family. In addition, demand is hereby made that the above Nevada officials intervene and secure my 14th Amendment rights guaranteed in the constitution and prevent an emergency which has the potential of causing the loss of me and my family's life, liberty and property.

Note: With this unlimited power, federal agencies could prevent all forms of access on the public lands with the stroke of a bureaucrat's pen. No more water transmitted across public lands for small towns; electric, gas television cable and telephone transmission lines ordered removed, state and county roads ordered closed. All forms of recreation could eventually be abolished. Explain how this could not happen under an unlimited power in the hands of government agents. This is why I have to take the stand I am taking and raise the red flag on the severity of the situation. The 1st Amendment guarantees me the right to redress my government. That is what I am doing.

Respectfully submitted,

*Cliven D. Bundy*

cc: PRESS

# ATTACHMENT H

**DRAFT MINUTES - videotape of the meeting is available for viewing at ndow.org.**
Nevada Board of Wildlife Commissioners' Meeting
Clark County Government Commission Chambers
500 S. Grand Central Parkway
Las Vegas, NV 89155
Final Agenda

Friday, February 4, 2011 – 10:30 a.m.

1    Call to Order, Pledge of Allegiance, Introduction and Roll Call of County Advisory Board Members to Manage Wildlife (CABMW) – Chairman Raine

2    Presentation of the Wayne E. Kirch Wildlife Conservation Award – Chairman Raine

3    Approval of Agenda – Action
The Commission will review the agenda and may remove items from consideration or adjust in the order in which they appear on the agenda.

4    Member Items/Announcements

5    County Advisory Boards to Manage Wildlife (CABMW) Member Items CABMW members may present emergent items. No action may be taken by the Commission. Any item requiring Commission action may be scheduled on a future Commission agenda.

6    Public Comment Period -

> Note: Public comment will also be limited to three minutes per speaker on each individual agenda item.

7    Approval of Minutes – Action
Commission minutes from the Dec. 3 and 4, 2010, meeting.

8    Big Game Division Computer Model and Recommendation Process Report – Big Game Division Chief Larry Gilbertson and Big Game Biologist Mike Cox – Informational

    A    Big Game Division Computer Model and Recommendation Process – Chairman Raine - Action
The Commission may discuss and request information concerning the Department's computer model and recommendation process.

9    Wildlife Damage Management Fiscal Year 2011 Plan Report – Chief of Game Larry Gilbertson – Informational

    A    Wildlife Damage Management Committee Report – Commissioner Vogler – Informational
The Commission will hear a report from the Wildlife Damage Management Committee.

    B    Wildlife Damage Management Fiscal Year 2011 Plan – Commissioner Vogler - Action
The Commission will discuss and provide guidance to the Department concerning development and information provided in the 2011 and future Wildlife Damage Management plans.

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

10    Reports – Informational

A    Wolf Regulation Status Update – Chief of Game Larry Gilbertson

B    Wildlife Heritage Trust Fund Principal and Interest Fiscal Year 2012 – Deputy Director Patrick Cates

C    2011 Legislative Session Update – Management Analyst III Kim Jolly

11    Clark County Road Access – Commissioner Shrum, Chief of Habitat Elmer Bull and Bureau of Land Management Representative (BLM) - Action
The Commission will hear a report on the Bureau of Land Management's designated routes, restricted grazing and desert tortoise management in Clark County and may draft letters, resolutions and or policy, concerning any or all of these items.

2 p.m. Agenda Item #12

12    Commission Regulation 11- 07, Black Bear Hunt – Chief of Game Larry Gilbertson and Big Game Biologist Carl Lackey – Action
The Commission will consider adoption of recommendations to the 2011 - 2012 black bear hunt seasons, dates and quotas, including limits, hunting hours, special hunt eligibility, animal gender, and physical characteristics, and legal weapon requirements and manner of hunting.

13    Administrative Procedures, Regulations and Policy (APRC) Committee Report and Recommendations – Commissioner Lent – Action
The Commission will be asked to take action on the APRC Committee's recommendations for changes to Heritage regulations.

14    Report from Feral Horse Committee, Horse Monument and Letters and/or Resolutions – Committee Chairman Mike Stremler - Action

A    The Commission may consider approving a draft letter to the State Water Engineer in reference to the issue of giving water rights meant for wildlife to wild horses – Mike Stremler, chair – Action

B    The Commission will discuss the Pickens Horse Monument in Eastern Nevada, may provide guidance to the Department on the matter and may approve, modify, create, or deny a resolution and/or letter – Chairman Raine – Action

15    Correspondence – Chairman Raine – Informational
The Commission will review and may discuss correspondence sent or received by the Commission since the last regular meeting and may provide copies for the exhibit file (Commissioners may provide hard copies of their correspondence for the written record). Correspondence sent or received by Acting Secretary Mayer will also be discussed.

Saturday, February 5, 2011 – 8:30 a.m.

16    Call to Order, Pledge of Allegiance, Introduction and Roll Call of County Advisory Board Members to Manage Wildlife (CABMW) – Chairman Raine

17    Member Items/Announcements

Ex. 2 - Rugwell Dec. Att. H - Page 2 of 9

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

18   Public Comment Period

Note: Public comment will also be limited to three minutes per speaker on each individual agenda item.

19   CABMW Budget Adjustments Fiscal Year 2011 – Deputy Director Patrick Cates - Action
The Commission will review CABMW budget status reports and may make adjustments to CABMW budgets for Fiscal Year 2011.

20   Management Bull Elk Hunt and Seasons – Action – Chairman Raine
The Department will provide a report and recommendations to the Commission on "management bull elk seasons" as described in a report from Cory Lytle of the Lincoln CABMW, and the Commission will discuss options for possible development of regulation changes for "management bull" elk seasons: Options to set all cow elk seasons after the bull seasons; convert all muzzleloader bull seasons into "management bull seasons"; convert all archery bull seasons to "management bull seasons"; create new any legal weapon "management bull seasons"; and no management bull seasons.

21   Nevada Waterfowl Hunt Zone and Swan Hunt Area Changes – Game Division Staff Biologist Russell Woolstenhulme – Action
The Commission will hear options for the addition of a new waterfowl hunt zone for Nevada and an expanded hunt area for tundra swan. The Commission may accept   these   changes   and initiate action by the Department to pursue these changes with the Pacific Flyway Council.

Commission Regulations – Action

22   Commission Regulation 11 – 03, Big Game Seasons 2011- 2012 – Big Game   Biologists   Mike Cox and Tony Wasley – Action
The Commission will consider adoption of the 2011 and 2012  hunting seasons and dates for mule deer, pronghorn antelope, elk, bighorn sheep, and mountain goat,  including limits, hunting hours, special hunt eligibility, animal gender, physical   characteristics   and   legal   weapon requirements, hunt boundary restrictions, and legal weapon requirements, emergency depredation hunt structure and statewide quotas, the 2011 – 2012 nonresident restricted deer tag quotas and seasons, and dates and times for indoctrination courses. Note: Support material will be sent under separate cover.

23   Commission Regulation 11 – 04, Big Game Season Application Eligibility, Deadline and Remaining Tag Regulations 2011 - 2012 – Program Officer III Maureen Hullinger – Action
The Commission will consider adoption of the 2011 - 2012 big game tag draw application eligibility, deadline and return card questionnaire information including Restricted Nonresident Guided Deer Hunt draw application deadline and return card questionnaire information.

24   Commission Regulation 11 – 05, Silver State Tag and Partnership in Wildlife Season and Quotas 2011 – Big Game Biologist Mike Cox and Program Officer III Maureen Hullinger – Action
The Commission will consider the adoption of the 2011 Silver State Tag and Partnership in Wildlife hunt species, seasons and quotas. Note: Support material sent separately.

25   Commission Regulation 11 – 06, Heritage Tags, Silver State Tag and Partnership in Wildlife Season and Quotas 2012 - Program Officer III Maureen Hullinger and Big Game Biologist Mike Cox – Action
The Commission will consider the adoption of the 2012 Heritage Tag, Silver State Tag and Partnership in Wildlife hunt species, seasons and quotas.

3

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

26   Commission Regulation 11- 08, Mountain Lion Seasons 2011- 2012 and 2012 - 2013 –   Staff Biologist Russell Woolstenhulme – Action
The Commission will consider adoption of recommendations to the 2011-2012 and 2012 – 2013 mountain lion seasons, dates, and harvest limits, including limits, hunting hours, animal gender, physical characteristics, hunt boundary restrictions, legal weapon requirements, method of take and manner of hunting.

27   Findings of Mule Deer Restoration Committee - Chairman Raine - Action
The Commission will have a second discussion of the report from the Mule Deer Restoration Committee. The Commission will be asked to accept the findings of the Mule Deer Restoration Committee and adopt some or all of them as findings and recommendations of the Nevada Board of Wildlife Commissioners.

Commission Regulations – Action

28   Commission Regulation 09 – 09, Amendment #1 – Fisheries Biologist Jon Sjoberg – Action
The Commission will consider closure of a water(s) within the Clark County Wetlands in Las Vegas Wash, Clark County and a name change for the Fuji Park Pond in Carson City to the Baily Fishing Pond.

29   Reports - Informational

A   Western Association of Fish and Wildlife Agencies (WAFWA) 2011Mid-Winter Conference Report – Commissioner Capurro

B   Elk Damage and Incentive Committee Report – Commissioner Vogler

C   Gifts, Grants, Donations, and Bequests – Deputy Director Cates

D   Litigation Report – Deputy Attorney General David Newton

E   Department Activities/Leadership Team Notes – Acting Secretary Ken Mayer

30   Additional Application Hunt System Report Format – Chief of Operations Bob Haughian - Action
The Commission may endorse or deny a request made previously at the December 2010 Commission meeting from Commissioner Cavin to introduce an additional report format   to publicly display a list of successful tag applicants by hunt unit on the huntnevada.com website.

31   Nevada Department of Wildlife Director Selection/Recruitment Process – Chairman Raine – Informational
In accordance with NRS 501.333 the Commission will review and discuss the selection process for recommending a new Director for the Nevada Department of Wildlife.

32   Future Commission Meeting – Acting Director Ken Mayer – Action
The next Commission meeting is scheduled for March 11 and 12, 2011, in Reno; and the Commission will review potential agenda items for the meeting and the biennial County Advisory Board to Manage Wildlife Workshop. The Chairman may designate and adjust committee assignments as necessary. The Acting Secretary of the Commission will report on the status of the requested joint meeting with the Utah Commission in 2011.

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

### Nevada Board of Wildlife Commissioners present for two day meeting:

Chairman Scott Raine        Vice Chairman Gerald Lent        Commissioner Daryl E. Capurro
Commissioner Tom Cavin      Commissioner Howell             Commissioner Michael McBeath
Commissioner Hal Shrum      Commissioner Hank Vogler        Commissioner Grant Wallace

Secretary/Director Kenneth E. Mayer             Robert Whitney, Deputy Attorney General
Suzanne Scourby, Recording Secretary            David Newton, Deputy Attorney General

### Nevada Department of Wildlife personnel present:

Deputy Director Rich Haskins                    Deputy Director Patrick Cates
Chief of Game Larry Gilbertson                  Chief Game Warden Rob Buonamici
Program Officer III Maureen Hullinger           Big Game Biologist Carl Lackey
Supervising Fishers Biologist Jon Sjoberg       Administrative Assistant IV Kathleen Teligades
Administrative Assistant III Jamie Wise         Big Game Biologist Mike Cox
Supervising Big Game Biologist Ken Gray         Big Game Biologist Tony Wasley
Big Game Biologist Russell Woolstenhulme        Management Analyst III Kim Jolly
Acting Chief of Conservation Chief John McKay   Biologist Cris Tomlinson
Big Game Biologist Patrick Cummings             Big Game Biologist Mike Scott

### Others in Attendance/Two Day Meeting:

Paul R. Dixon, Clark CABMW                      Keith Rogers, LV Review-Journal
Gil Yanuck, Carson CABMW                        Eric Scheetz, Douglas CABMW
Glenn Bunch, Mineral CABMW                      Ken Wellington, Elko CABMW
Paul Harris, Clark CABMW                        Ray Sawyer, White Pine CABMW
Clint Bentley, self                             Cindy Alexander, self
Cory Lytle, Lincoln CABMW                       Lee Graves, Lyon CABMW
Joe Crim, Pershing CABMW                        Mary Jo Rugwell, Bureau of Land Management (BLM)
Carolyn Running, BLM                            Gayle Marrs-Smith, BLM
Mary JoErika Schumacher, BLM                    Bol Ross, BLM
Shanna Dooman, BLM                              Jessie Stegmer, BLM
Judi Carson, Coalition for Nevada's Wildlife    Brett Jefferson, Nevada Bighorns Unlimited (NBU)
Chris Steven, Southern Nevada Water Authority   Jenny Ramirez, U.S. Forest Service
Walt Gardner, self                              Cliven Bundy, rancher/speaker
Carol Bundy, rancher                            Dane Bradfield, Lincoln CABMW
Jennifer McCarty, self                          Catherine Matz, self
John Hiatt, Red Rock Audubon Society            Amy Ogden, People Ethical Treatment of Animals PETA
Randy Ogden, PETA                               Karen Layne, Las Vegas Valley Humane Society
Gina Greisen, NV Voters for Animals             Heather Spaniol, self
Billy Howard, NoBearHuntNV.org                  Linda Faso, Humane Society of the U.S.
Debora Toro, self                               Pamela Coburn, LV Valley Humane Society
Nancy Salazar, NV Political Action for Animals  Mac Kasraian, self
Stacia Newman, NV Political Action for Animals  Tracy Hammond, self
Megan Sewell, Humane Society of the U.S.        Kirsten Comm (illegible), BLM
Hillerie Patton, BLM                            Chris Schwamberger, NoBearHuntNV.org
Martin Scholl, self                             Steve Hemp, Humboldt CABMW
Monty Martin, Systems Consultants               Don Sefton, Systems Consultants
Carmen Rhoda, none                              Jelindo Tiberti, self
Cindy MacDonald, resident                       Kensen Lee, self
Kevin Strozzi, Nye CABMW                        Jason Cork, self
Micki Jefferson, self                           Kathryn Bricker, NoBearHuntNV.org
Heather Lunsford, NoBearHuntNV.org              Robin Picardo, self and animals

5

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

11      Clark County Road Access – Commissioner Shrum, Chief of Habitat Elmer Bull and
        Bureau of Land Management (BLM) Representative

Commissioner Shrum said he has spent much time in Nevada and in the past years has
been running into road closed signs and did research and he ended up at the BLM office
and picked up books and spent time over there with BLM District Manager Mary Jo
Rugwell who is here along with BLM staff. He also invited representatives from Clark
County sheriff's office, and he prepared a small pamphlet (exhibit file) of the issues. To
balance this out he went to Bunkerville, Nevada, and met with Cliven Bundy and family,
and he is present today as well. He read the pamphlet (exhibit file) that he prepared for
this agenda item along with questions for Ms. Rugwell.

BLM District Manager Mary Jo Rugwell addressed the questions from Commissioner
Shrum's pamphlet and said authority to designate or close roads and primary legal
authority is in Federal Land Policy and Management (FLPMA) Act of 1976, BLM is part of
executive branch of government and their responsibility is to implement laws Congress
passes and when FLPMA passed, BLM had to promulgate regulations to implement laws
and manage and administer BLM public lands. Second question, who decides what
roads to close, BLM has the responsibility to make the final decision but with public
input. Clark County road designations were implementation action of Resource
Management Plan (RMP) completed in 1998 and plan took over three years to develop
with input from over 400 stakeholders and rural community assisted with documenting
the roads. BLM had four public meetings and a 50 day public comment period and after
the decision, the public is allowed another 30 days to appeal and BLM did not receive
any appeals on road decision and then their job was to implement. Important to note
that of over 906 miles of roads analyzed that BLM left 90 percent of those roads open,
did not close anywhere near the majority of roads. Next question was how long will plan
stay in effect, road designations in effect as long as RMP in effect. Agency continues
with help of partners to monitor roads and effect on resources and changes to road
decisions can be made through analysis and another public process. Another question
was who decides when desert tortoise recovered, and U.S. Fish and Wildlife Service
makes that decision. The criteria for delisting tortoise, is outlined in the recovery plan
which was developed when the tortoise was listed. Other question, when ranchers leave
who maintains water – springs, seeps, and the answer is the BLM does in conjunction
with NDOW, Nature Conservancy, the folks who have water rights. Another question is
when travelling on a road and you are at an intersection and take wrong road that is
closed and get citation, what happens. She said when BLM puts sign up for designated
road through planning process we give people time to get used to closure before citing
them. The Gold Butte area is signed and folks vandalize signs which costs taxpayers, and
results in confusing recreating people, and if people knowingly use closed roads they are
cited. Working hard to insure signage is there for the public. Who has the authority in
Gold Butte, sheriff or BLM, she said the answer depends on the situation or crime, BLM
has few law enforcement rangers and are happy to help Clark County Sheriff's Office.

16

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

The violation of any federal regulation is under BLM rangers under authority of FLPMA, some examples are theft of government property, vandalism of a sign and off-road travel in a closed area. A Memorandum of Understanding in place with Las Vegas metro for search and rescue in Wilderness Area as BLM does not have that capability. Prior to the meeting a copy of the fact sheet and Gold Butte map was provided to the Commission and that information will be on the website after refinement to the map. She said that concluded the answers to the written questions from Commissioner Shrum.

Commissioner Shrum introduced Cliven Bundy who is a rancher from Bunkerville. Commissioner Shrum said there is contention between the ranching families and BLM up there and he wants people to be informed of both sides of the question.

Mr. Cliven Bundy said he is a rancher and co-partners with the resource and has great respect for the Commission. He said he is a god fearing man and believes we live in a country of choice and the resources provided are for man's use and we need to take care of them. He showed the group a slide on jurisdiction of the "proper form of government" which started with "We the People" and he reviewed the forms of government starting with 13 original colonies which formed the U.S. Constitution, 13 sovereign states, state's independence and that Nevada became a state in 1864 with the state divided up into counties. He said when talking about public lands we are talking about the public lands of Clark County that is land belonging to the people. County Commission and sheriff are government closest to the people, and when we started we were after protection of life, liberty and property, and created Constitution. We now have sheriffs paid to do that and his question is who has the authority over the land, jurisdiction and sovereignty. Federal government jurisdiction challenged and "We the People" formed proper form of government and that is not the proper authority we have now as the people are not taking care of the land.

Commissioner Shrum asked if Mr. Bundy can explain how this has affected him with wilderness designations and other items.

Mr. Bundy said he is well known for firing the BLM about 15 – 20 years ago as they don't have jurisdiction to manage his ranch in Clark County and all the 57 ranchers of Clark County are gone, he is the only one with viable livestock business. He learned BLM is only manager and when he quit signing contracts he released them from their assistance and from that time on has been able to manage and claim rights to forage, the water, the access, and range improvements. He said he claims rights to hunt, fish, and camp and enjoy public lands in Nevada.

Commissioner Shrum asked what effect a Wilderness designation would have on his ranch.

17

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

Mr. Bundy said he has presumptive rights created through beneficial use and if they designate area as National Conservation Area onto this public land, and or Wilderness, that will make it hard for him to run his cattle and harder for outdoor recreationists and he foresees that they will create a byway that you just stay on and that is where we are headed. This area in Southern Nevada that has not been designated yet and is the last piece of free land in Southern Nevada and we are about to lose our freedom there.

Public Comment on Agenda Item #11 –

Ken Wellington, Elko CABMW, said he is representing himself on this issue and that Mr. Bundy needs to move to Elko County, as everyone carries a copy of the Constitution in their pocket in Elko County. He said in Elko CABMW members are active on the Resource Management Commission and they get people involved, and the forms that he provided to the Commission's recording secretary are BLM's documents such as Environmental Assessment's and proposed closures, and they are providing their input into the plans and the Commission could comment if public comment period still open.

Commissioner McBeath said 1998 RMP was mentioned earlier which is currently in process of being revised and they are in process of putting together plan and noted road access portion of that plan and he would ask BLM staff the effect on sportsmen and NDOW, and secondly on Jan. 28 he saw in the Federal Register what appears to be a transportation plan for Clark County, and is similar to what we have dealt with up north. He said it is absolutely critical that access be maintained for sportsmen.

Ms. Rugwell said her agency is in early stages of revising the RMP and the reason for the revision is because of energy concerns in Southern Nevada and some decisions that were conflicting in old plan that needed to be resolved. Local governments are offered the opportunity to participate as cooperators and they are getting Memorandum of Understandings signed with local governments right now and the county will be very involved. RMP for Southern Nevada District is beginning and these are two efforts that are crucial for public engagement and want to hear from the public to insure this is what the public wants before the process gets too far along.

Commissioner McBeath said the Clark CABMW should assume a role such as Elko CABMW has done to weigh in and make sure wildlife stakeholder interests are heard on access issues in Clark County.

Commissioner Vogler asked Mr. Bundy if he had been told that he could not run livestock due to the desert tortoise listing.

Mr. Bundy said that is correct and there a many desert tortoises and he has data showing surveys for Kern River pipeline done by the bureaus and what happened there

18

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

is where there are cattle there are five to seven tortoises in a strip. There are higher tortoise numbers in grazing areas that areas where there is no livestock grazing.

**COMMISSIONER SHRUM MOVED TO DRAFT A RESOLUTION TO SEND TO ALL CONGRESSIONAL REPRESENTATIVES, INTERIOR SECRETARY KEN SALAZAR, CLARK COMMISSION COUNTY COMMISSIONERS, AND APPROPRIATE PARTIES TO REMOVE THE GOLD BUTTE AREA FROM CONSIDERATION NOW OR ANY TIME IN THE FUTURE AS WILDERNESS AREA, CONSERVATORY OR ONE OF THOSE DESIGNATIONS. SUCH A DESIGNATION WOULD HAVE A NEGATIVE IMPACT ON WILDLIFE AND WOULD DENY ACCESS FOR DISABLED, ELDERLY, AND FURTHERMORE DESIGNATION NEGATIVE IMPACT ON DESERT FLORA AND WATER RESOURCE DISTRIBUTION SYSTEMS WHICH ALL WILDLIFE DEPEND. COMMISSIONER HOWELL SECONDED THE MOTION.**

Commissioner Shrum offered to draft the resolution for Chairman Raine's signature.

Commissioner Capurro said his concern is this should be placed on a future agenda for full discussion and have staff develop a resolution along lines mentioned, under circumstances would recommend action for a future agenda and follow-up.

**COMMISSIONERS IN FAVOR OF THE MOTION: COMMISSIONER LENT, HOWELL, SHRUM, AND VOGLER. COMMISSIONERS OPPOSED: CAPURRO, CAPURRO, WALLACE, AND MCBEATH. CHAIRMAN RAINE VOTED IN FAOVR OF THE MOTION TO BREAK THE 4 -4 TIE. MOTION PASSED 5 – 4 WITH CHAIRMAN RAINE'S VOTE.**

**MOTION AND A SECOND TO CONTINUE WITH #8 GO TO #12 THEN PICK UP #9 AND #10 AT THE END. MOTION PASSED 8 – 0.**

8    Big Game Division Computer Model and Recommendation Process Report – Big   Game Division Chief Larry Gilbertson and Big Game Biologist Mike Cox –  Informational

Chief of Game Gilbertson said the model was shown to the Commission a few years ago when there was intense interest in the elk population relative to NDOW's modeling. He said since that time there are new Commissioners and CABMW members and the Department is pleased to present this item. He provided background on evolution of the modeling process:  Before 1975 not as much need to conduct deer population estimates due to the hunt structure and in the old days the population estimates used were simply harvest representing a percentage of the population. He said in 1975 Nevada switched to total quotas for the entire state, and at that point the Department either needed population estimates for real numbers to use to calculate quotas commensurate with the ability of the population to provide that harvest, or one method that may be used still is to look at long-term average harvest. In the mid-1970s we could have looked at average harvest and applied hunter success and could have started that way. Instead the Department decided as we collect data and implement helicopter surveys that we

19