1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEVADA
2

3    ------------------------------x
                                   :
4    UNITED STATES OF AMERICA,      :
                                   :
5              Plaintiff,           :
                                   :
6              v.                   :  Case No.
                                   :  2:12-CV-804-LDG-GWF
7    CLIVEN D. BUNDY,               :
                                   :
8              Defendant            :
                                   :
9    ------------------------------x

10

11                        333 Las Vegas Boulevard, South
                          Las Vegas, Nevada
12

13                        Tuesday, October 23, 2011

14   Deposition of:

15                        CLIVEN D. BUNDY

16   a witness, called for examination by counsel for the

17   Plaintiff, pursuant to notice and agreement as to time and

18   place, at the United States Attorney's Office, Las Vegas,

19   Nevada, before Sandy A. Dahlheimer, a Notary Public, where

20   were present on behalf of the respective parties:

21

22

23

24

25

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 1 of 20

1               A P P E A R A N C E S

2

On Behalf of the Plaintiff:

3

TERRY M. PETRIE, ESQ.
4 United States Department of Justice
Environment and Natural Resources Division
5 Natural Resources Section
999 18th Street, South Terrace
6 Suite 370
Denver, Colorado  80202

7

NANCY C. ZAHEDI, ESQ.
8 GREGORY LIND, ESQ.
Department of the Interior
9 Office of the Solicitor
Pacific Southwest Region
10 2800 Cottage Way
Suite E-1712
11 Sacramento, California  95825

12 ALICE C. NEWTON
Lake Mead National Recreation Area
13 601 Nevada Way
Boulder City, Nevada  89005

14
LAUREN BROWN
15 Bureau of Land Management
4701 North Torrey Pines Drive
16 Las Vegas, Nevada  89130

17 On Behalf of the Defendant:

18 CLIVEN D. BUNDY, IN PRO PER
Post Office Box 7175
19 Bunkerville, Nevada  89007
702-346-5564

20

21 Also Present:  Carol Bundy

22

23

24

25

U.S. Mot. Summ. J. - Ex. 4
Page 2 of 20

6

```
 1            Do you see that, sir?

 2       A.   Yes, I understand it.

 3       Q.   Sir, you've seen this document before?

 4       A.   Yes, I have.

 5       Q.   Thank you.  Sir, that's just simply to establish

 6   we're having a deposition today and here's the document

 7   that lined it up.

 8            Sir, have you ever been deposed before in a

 9   proceeding like this?

10       A.   One other time.  Yes, I have.

11       Q.   When was that?

12       A.   It's been several years dealing with a Department

13   of Transportation, State of Nevada.

14       Q.   Anything to do with cattle?

15       A.   Yeah, it was.

16       Q.   Can you tell us what that was about?

17       A.   We had cattle get hit on the freeway, and I was

18   in there giving deposition on that case.

19       Q.   Was this a case brought by the Department of

20   Transportation?

21       A.   No.  I was with them.  They sued -- or State of

22   Nevada, I guess, and it was my cattle involved so they sued

23   me also, and there was a contractor involved.  They sued

24   them so there's a three-way suit with a private, you know,

25   party suing.
```

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 3 of 20

1      Q.   I understand.  So the "they" that you're

2  mentioning are the people whose car hit the cattle?

3      A.   Yes.

4      Q.   Was this like in a local State Court or District

5  Court?

6      A.   State Court.  It was a case, which in the freeway

7  fence, you know, we have the open range laws, but this was

8  inside the freeway fence so they had a case against the

9  State because of, you know, maintenance or our gate wasn't

10  closed -- that type of thing.

11      Q.   About where was this accident?  About where did

12  it happen?

13      A.   Probably about mile marker 115, I-15 North.

14      Q.   Okay.  This was several years ago?

15      A.   Yeah. I don't know.  At least over ten years ago

16  probably.

17      Q.   Any other depositions, sir?

18      A.   That's the only one.

19      Q.   I've been deposed myself so it's quite an

20  experience.

21           Sir, let me go through a couple of basics about

22  this deposition.  First, in a big general way, I want to

23  talk to you about your cattle operations as a general

24  subject.

25           When I ask you questions, if you don't understand

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 4 of 20

 1        A.    No.

 2        Q.    Since the year 2000 -- my question is going to

 3   focus from the year 2000 through today -- have you grazed

 4   your cattle on lands both inside the former Bunkerville

 5   Allotment, which you now have characterized here today as

 6   your ranch, as well as lands outside of the Bunkerville

 7   Allotment outside your ranch?

 8        A.    Yes.

 9        Q.    Has that been done routinely over the course of

10   those now 12 years?

11        A.    Yes.

12        Q.    When you graze your cattle, is there some kind of

13   a system or methodology that you use with it?  In other

14   words, is it like a continuous grazing operation that you

15   have out there?

16        A.    Yes.

17        Q.    Year round basically?

18        A.    Yes.

19        Q.    What I'm going to do here, sir -- let's go off

20   the record.

21              (Off the record.)

22              (On the record.)

23              BY MR. PETRIE:

24        Q.    What I'm going to do, sir, is hand you a map that

25   we'll mark as Exhibit 4 that was prepared for this case.

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 5 of 20

1  questions up to this point, if I might express, you know,

2  you asked me if I run cattle on the Bunkerville -- old

3  Bunkerville Allotment, and you asked if I run cattle on the

4  new trespass land, and my answer is yes; then you hand me a

5  map that is a lot broader in my thinking that I had cattle

6  so there's a problem there.  In other words, I answered the

7  question before I seen the map.  Make that part of the

8  record.

9        Q.   That's a good point, and I appreciate that.  I

10 have an appreciation for that, and indeed where I'd like to

11 go next -- and I apologize because I can tell as an aside

12 from your manner, your demeanor, that you feel a little

13 perturbed like maybe I mislead you.  And I apologize

14 because that certainly was not my intent.

15           What I'd like to do next is what I'd like you to

16 do is to mark on this map certain things.  Okay.  To

17 include your understanding of where you ran your cattle,

18 that sort of thing.  Okay?  So that, for example, the map

19 here is not meant to suggest -- and let's just use this as

20 an example of my point -- if you take a look at the map,

21 sir, that we have marked, sir, as Exhibit 4.

22           You see -- if you take a look at where I-15 as it

23 works its way northeast from Las Vegas how it eventually

24 intersects into the portion of the map where you see the

25 new trespass lands being denoted with the hash marks and

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 6 of 20

 1        A.    It's all right.  I think I'll be able to --

 2        Q.    What we might do is if I could ask somebody to go

 3   to the main office --

 4        A.    I've got it good enough.  We'll scratch it on

 5   there.

 6        Q.    We really want it -- if you could indulge me here

 7   for a moment, sir, and we'll go off the record.  We'll have

 8   hopefully a better marker device and ask you to just

 9   retrace it so it's clear to anybody that looks at it

10   they'll be able to figure out what you drew there.

11        A.    Yes, I'll do that.

12              MR. PETRIE:  We can go ahead and go off the

13   record.

14              (Off the record.)

15              (On the record.)

16              BY MR. PETRIE:

17        Q.    Mr. Bundy, we're back on the record.  And during

18   the break, we took steps to address a failing on my part.

19              Lawyer 101 says you have markers that make

20   bright, delible marks that are easy for all to see; and the

21   original instrument we used, a red ink pen, was not up to

22   the task.

23              So what we've done is over that red ink line and

24   we have asked you and you have retraced that red line with

25   a black Magic Marker; is that correct, sir?

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 7 of 20

 1        A.    Yes.

 2        Q.    And, again, just for the record here so that it's

 3   clear, those black lines represent by your understanding

 4   the outer limits of where your cattle have grazed?

 5        A.    Yes.

 6        Q.    I'm going to hand you, sir, another document.

 7   We'll have this marked as Exhibit 7.

 8              (Whereupon, Exhibit 7 was marked for

 9   identification.)

10              BY MR. PETRIE:

11        Q.    I think this will look familiar to you.

12        A.    Well, I got interested in reading, I guess.

13        Q.    Sir, do you recognize this document?

14        A.    Well, let me go through it a little bit more.

15        Q.    Sure.

16        A.    Okay.  I recognize at least part of it.

17        Q.    Sir, I'm focused specifically on the first page.

18   Sir, does this document appear to be information contained

19   on a blog spot that's titled bundyranch.blogspot.com?

20        A.    Yes.

21        Q.    Sir, on the first page of this exhibit, there's

22   an entry that's dated May 12, 2012.  Do you see that?

23        A.    Yes.

24        Q.    And at the bottom of that entry appears to be

25   your name, Cliven D. Bundy.

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301—261—1902**
**Balt.& Annap. 410—974—0947**

U.S. Mot. Summ. J. - Ex. 4
Page 8 of 20

64

 1        A.    Right.

 2        Q.    Where is the Gold Butte headquarters located?

 3   And let's go ahead and mark it again on this map.  We'll

 4   use the black marker and we'll just use HQ to denote that.

 5        A.    This thing turned round right here. HQ?

 6        Q.    Yes, sir.

 7        A.    (Witness complies.)

 8        Q.    Thank you.  And this appears to be located in

 9   what would be the southeast corner of the area that you

10   previously marked for the outer limits for where you

11   understand your cattle have grazed; is that correct, sir?

12        A.    Yes.

13        Q.    And that appears to be a portion of the map,

14   which the Government contends is new trespass lands?

15        A.    Yes.

16        Q.    Thank you.

17              Speaking of the cattle that were grazing, sir, we

18   talked earlier about how your ranch has employed the use of

19   brand marks and earmarks, brands and earmarks; is that

20   right, sir?

21        A.    Yes.

22        Q.    Okay.  Some of the cattle that you have grazed,

23   are they unbranded?

24        A.    Yes.

25        Q.    About what percentage, if you've got a sense of

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 9 of 20

 1  that?

 2      A.   On the knoll -- new trespass land, I would just

 3  estimate -- you wanted to know about the branded or

 4  nonbranded now?

 5      Q.   Nonbranded.

 6      A.   I would say approximately 40 percent of them are

 7  nonbranded.

 8      Q.   If -- don't laugh at this question because it's

 9  probably got a very logical answer, but you're fielding a

10  question from a guy who does not run cattle.  For somebody

11  like Petrie, he goes out there and he comes across one of

12  your unbranded cattle.  Is there anything about the cow

13  that would tell Petrie that, yes, this cow belongs to

14  Cliven Bundy?

15      A.   Two things, the genetic of the animal and the

16  herd it was running with.

17      Q.   The latter suggesting that, if an unbranded cow

18  is in the presence of other Bundy marked cattle, there is

19  pretty good odds it's also a Bundy cow?

20      A.   Yes.

21      Q.   I wasn't clear on that and I appreciate you're

22  educating me.

23           Sir, and this will revisit an item we were

24  discussing earlier, but specifically to the new trespass

25  lands, do you have any kind of fee title to any of those

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 10 of 20

 1   Nevada statute's saying that State of Nevada has as it says

 2   in NRS 321.596 that the State of Nevada has a strong moral

 3   claim to the land?

 4        A.   A strong moral claim?

 5        Q.   Yeah.  If you actually read the first statute in

 6   that citation, but aside from the strong moral claim

 7   language, I understand that you're saying the effect of

 8   that statute allows you to use, but it's not the same thing

 9   as a lease; is it?

10        A.   No, it's not.  But it is a form of a lease, I

11   guess, if I have the rights.

12        Q.   Form of an authorization to use it?

13        A.   Yes.

14        Q.   But it's just not the typical lease?

15        A.   No, it's not a typical lease between you and me.

16        Q.   Okay.  I get what you're saying there and I

17   appreciate that.

18             Sir, do you -- and, again, it's the same line of

19   questions here -- do you have any authorization from BLM to

20   use any of the new trespass lands that the Government, BLM,

21   administers on behalf of the United States recognizing that

22   you dispute the ownership of it but nonetheless BLM does

23   carry out activities to administer some of the lands

24   located within the new trespass?  Do you have any kind of

25   authorization from them?

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 11 of 20

1        A.    No.

2        Q.    How about -- the same question but from the

3   vantage point of Nation Park Services.  Do you have any

4   kind of authorization from National Park Service?

5        A.    No.

6        Q.    Okay.  Let's just take a quick break.

7              (Off the record.)

8              (On the record.)

9              BY MR. PETRIE:

10       Q.    Sir, are you aware that the Federal Government

11  has designated certain portions of the lands out there in

12  the Gold Butte area as lands where it has designated

13  habitat for different species to be protected under the

14  Endangered Species Act such as the desert tortoise and the

15  southwestern willow fly catcher?  Are you aware of that?

16       A.    Yes.

17       Q.    Sir, do you have any understanding about whether

18  or not your cattle in the course of their grazing have

19  sometimes damaged the vegetation and the habitat for these

20  different species?

21       A.    No.

22       Q.    Are you aware that your cattle have sometimes

23  eaten newly planted vegetation in areas, which are trying

24  to restore the land, the vegetation on it?

25       A.    No.

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 12 of 20

1        A.    Could be.

2        Q.    Okay.  How about 20?

3        A.    Could be.

4        Q.    30?

5        A.    Could be.

6        Q.    How about 50?

7        A.    Could be.

8        Q.    Okay.  At what point would you say definitely no,

9   I don't have 100, or I don't have 200?  Any sense of that?

10       A.    Well, I probably have near 100 range improvements

11  on that land.

12       Q.    So that we're clear, when you say "that land," is

13  that the former Bunkerville?

14       A.    Yes, the Bundy ranch.

15       Q.    Okay.  How about same line of questions?  I'm

16  just trying to get a sense of the number for range

17  improvements in what the government characterizes as new

18  trespass lands.

19       A.    I have none.

20       Q.    None?  Okay.

21       A.    Let me clarify some things that have happened

22  there that I've had something to do with.  For example, if

23  there's a waterline broke or a water not getting into the

24  water trough, if I go there, I fix that waterline and put

25  it in the trough if I can do it.  There's been a couple of

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 13 of 20

 1  occasions where I've done that kind of improvement or

 2  maintenance, either way you want to call it; and I do that

 3  for two purposes.  I do it for more than two purposes.

 4          One, I do it because it does benefit any

 5  livestock or wildlife that's in the area.  It's a safety

 6  thing for a human to come along there with a broken car or

 7  something and needs a drink, and it's a waste of a resource

 8  if I can do some kind of improvement.  I'll move a rock or

 9  two or build a dam or put a pipeline together all the time,

10  even if it's on new trespass land.

11      Q.   I understand.  Then the waterlines that you're

12  referring to, are sometimes those waterlines in pipes?

13      A.   Yes.

14      Q.   And you've repaired pipes that were burst or

15  broken or cracked out there in the new trespass land?

16      A.   Maybe one or two in the sense of fixing it,

17  putting it into the trough and making sure the water is not

18  wasted. No type of major maintenance on a waterline have I

19  ever done in the new trespass lands.

20      Q.   Do you have any understanding as to who placed

21  the water trough or the water pipeline?

22      A.   Only that the prior ranch owners did that.

23      Q.   Do you have any understanding about whether or

24  not the pipeline or water troughs that you have come across

25  in the new trespass lands were placed there initially for

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 14 of 20

 1  livestock purposes or for any other purpose?  Do you have

 2  any sense of that?

 3       A.    It was for livestock and wildlife.

 4       Q.    I'm not doubting you when I ask this.  What's the

 5  basis for your understanding that it was placed there

 6  initially for those purposes?

 7       A.    The benefit of wildlife and cattle.

 8       Q.    I'm asking how it is that you know that?  Is it

 9  because the person who placed it there told it to you, for

10  example, or is it just common sense that tells you that out

11  here in the middle of nowhere it's got to be for that

12  reason?

13       A.    No.  Your question is partly yes.  That's part of

14  the reason, but the other part is that I've witnessed

15  livestock and wildlife using those things, and I know that

16  they've been improved by man, which I assume the rancher is

17  the man that improved that.  The new trespass land mainly

18  talks about the Gold Butte area now, not Gold Butte area

19  but Gold Butte.

20            We're talking about one hundred plus years of

21  range improvements on that that are still existing.

22  They're still there, and so the pipelines, the head houses,

23  the troughs, the trails -- all those things still exist

24  upon that land even though there's not a rancher there.

25       Q.    Okay.  Do you have any authorization from BLM or

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 15 of 20

 1  from NPS for any range improvements since the year 2000 out

 2  in the former Bunkerville Allotment?

 3      A.   No.

 4      Q.   How about same question since the year 2000, but

 5  in this instance for the new trespass lands?

 6      A.   No.  I could back up a little bit.

 7      Q.   If you need to, please do.

 8      A.   Just on temporary use of say trails, say

 9  temporary trails, the Park Service has okayed that type of

10  action, and I really don't have anything in writing, but

11  they've provided me with a lock and key to get into their

12  property and to do those kind of things.  And we have put

13  up a temporary trail and fences and then basically took

14  them down when they're through.  So in other words, I have

15  done some of that kind of work on that land.

16      Q.   Have you placed salt licks on the new trespass

17  land?

18      A.   Yes.

19      Q.   How about placing hay on the new trespass land?

20      A.   Only for trapping.

21      Q.   Trapping --

22      A.   Trapping cattle.  In other words, try to gather

23  those cattle off that land.

24      Q.   Have you -- I think you answered this earlier so

25  I apologize if I'm being redundant.  In the new trespass

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 16 of 20

 1  help orient you, I'm going to show you a map that's a USGS

 2  map, and it says BLM 2005 Nevada, Lake Mead, and the scale

 3  is 1 to 100,000.

 4        And what I'm going to do is show you a place on

 5  this map that's marked as Mockingbird Spring.  You see

 6  that, sir?

 7        A.   Okay.

 8        Q.   And then in conjunction with where that's

 9  located, if you can then take a look at Exhibit 4 and get

10  an idea roughly from comparing the two maps where

11  Mockingbird Spring would be --

12        A.   This is what we call headquarters right here.

13        Q.   Yes, sir.

14        A.   And Mockingbird Spring -- I don't know where it

15  is so show me.

16        Q.   It's right here, sir.  It's to the west of what

17  you called headquarters, Mockingbird Spring.

18        Do you see the entry here on the USGS map?

19        A.   Okay.  I can see it.  I never know that was

20  Mockingbird Spring, but now Quail is a little more

21  familiar.

22        Q.   Quail Spring, yes.

23        A.   Okay.  Ask me what you want to know.

24        Q.   Well, the question I had was whether or not you

25  have used a corral at the Mockingbird Spring site?

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 17 of 20

 1        A.    Definitely, no.  If somebody's used a corral,

 2   then it must be somebody stealing my cows.

 3        Q.    Do you know if -- and I phrased the question in

 4   the context of you using a corral.  Do you know if there's

 5   a corral there even if you haven't used it?

 6        A.    No, I don't believe -- in my way of looking at

 7   this map, there's no corral there.  Let me see.  Well,

 8   Quail, Spring Quail Wash.  I know where that is.  Quail

 9   Spring.

10             You know, I don't know -- if that's Mockingbird

11   in the way I'm looking at this, I might have to take that

12   statement back.  I don't know what the name of it was, but

13   yes, I have trapped some cattle or attempted to trap cattle

14   there.  And if I'm looking at this at Quail Spring Wash, I

15   know where that is, and I know there's a good corral there.

16   So I would assume that that's probably a corral that I have

17   used. I mean, I think I probably used it one time and in

18   the last say several years to try to trap some cattle

19   there.

20        Q.    And so there, as you think further, that perhaps

21   indeed there is a corral there that was used?

22        A.    Yeah, I think so.  Yes.

23        Q.    Any idea who put that corral there in the first

24   place?

25        A.    Well, it's prior ranchers.  I don't know whether

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 18 of 20

1          Now, let's go back to the question.  Let's assume

2   the federal authorities have the authorization to present

3   themselves on land, whether you call it your ranch or the

4   former Bunkerville Allotment, or for that matter the new

5   trespass lands, and they've got the authorization in hand

6   to remove cattle that belongs to you and they literally,

7   physically, take the steps necessary to accomplish that

8   right there and you're standing by.

9          Are you going to undertake any effort to

10  physically stop that?

11      A.   Yes.

12      Q.   What efforts would that be?

13      A.   Whatever it takes.

14      Q.   Okay.  Would that include -- when you say

15  "whatever it takes," would that include the soliciting, the

16  assistance of neighbors, friends, family, supporters of

17  yours to do whatever it takes in the scenario I just

18  described?

19      A.   Yes.

20      Q.   Whatever it takes -- well, no.  Okay.

21          Sir, as you know, there was an earlier

22  proceeding, an earlier case, that the United States brought

23  against you back in the late '90s, 1998, 1999.

24          Do you recall that the Court issued an order for

25  you to remove your cattle that the Court determined were

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 19 of 20

```
 1  trespassing on the lands that we call the former

 2  Bunkerville Allotment and which you now call the Bundy

 3  ranch?  Do you recall that?

 4       A.   Yes.

 5       Q.   You never removed your cattle, did you?

 6       A.   Right.

 7       Q.   Sir, one last question here and we'll let you and

 8  your wife get on with your day.  After that topic, whatever

 9  it takes, this is going to be a tame ending.

10            If you would take a look at the answer that you

11  filed in this case -- and I don't think I have it marked as

12  an exhibit, and I'll do that right now and we'll mark it as

13  Exhibit 12.  It's the answer that you filed in this case.

14            (Whereupon, Exhibit 12 was marked for

15  identification.)

16            BY MR. PETRIE:

17       Q.   Sir, does that document look familiar to you?

18       A.   Yes, I'm familiar with it.

19       Q.   It's the answer that you filed in this Court in

20  response to the Government's complaint, and your answer was

21  filed on June 4, 2012.

22            Sir, on page 3, if you would, if you'd take a

23  look at that on page 3, and this touches on something that

24  at least tangentially we addressed earlier, but there's

25  another phrase in here I wanted to ask you about.
```

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 20 of 20