IGNACIA S. MORENO
Assistant Attorney General
TERRY M. PETRIE, Attorney
STEPHEN R. TERRELL, Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: (303) 844-1369
Facsimile: (303) 844-1350
Terry.Petrie@usdoj.gov
Stephen.Terrell@usdoj.gov

DANIEL G. BOGDEN
United States Attorney
NADIA AHMED
Special Assistant United States Attorney
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV 89101
Telephone: (702) 388-6336
Facsimile: (702) 388-6698

ATTORNEYS FOR THE UNITED STATES

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

      Plaintiff,

                        No. 2:12-cv-804-LDG-GWF

      v.

CLIVEN BUNDY,               **DECLARATION OF**
                              **LAUREN BROWN**

      Defendant.

## DECLARATION OF LAUREN BROWN

I, Lauren Brown, do declare as follows:

1

I have personal knowledge of the matters set forth in this Declaration.

### Experience/Background

1. I have worked for the United States Department of the Interior's Bureau of Land Management (BLM) Southern Nevada District Office (SNDO) for approximately six years as a restoration specialist and I have a total of over 8 years experience in the field of restoration ecology.

2. From 2008 – 2009, I also worked at the BLM's Elko District Office as a Range Technician, so I am familiar with the BLM's grazing program, monitoring standards, and regulations.

3. As part of my duties, I conduct vegetation monitoring and resource damage assessments on the public lands. My duties also include work on invasive weed controls and emergency stabilization and rehabilitation after wildfire or flood events. I have been working on projects in the Gold Butte area since 2004, so I am very familiar with the native and invasive vegetation, the terrain, soil types, wildlife, cultural resources, hydrology, recreational opportunities, and other resources in this area. I have implemented a variety of restoration projects in this area and have seen first-hand the damage that the trespass livestock are causing. For the past two years, I have also been assigned as the SNDO lead and Project Manager for the cattle trespass in the Gold Butte area.

### Comprehensive Trespass Documentation

4. In early 2011, the SNDO District Manager, Mary Jo Rugwell, directed me to plan, organize and execute a comprehensive trespass inventory that would allow the BLM to better document the actual extent and scope of the trespass grazing within the Gold Butte area, and to determine who owned the trespass cattle. In total, I have conducted four trespass inventories in: March 2011, August 2011, February 2012, and March 2012 as more fully discussed below.

5. In order to ensure a complete and accurate count in the March 2011 inventory, I determined that we needed to have both an aerial and ground component. The purpose of the aerial component was to identify the locations of the cattle, given the large size of the area to be covered, as well as the topography and inaccessibility of many areas that makes it difficult to know whether cattle are present on-the-ground. The purpose of the ground component was to determine ownership of the cattle that were located through the aerial reconnaissance.

6. The District Manager assigned a total of approximately 27 staff and law enforcement officials to work as my team on the trespass cattle count. I identified these individuals for

the trespass count based on their familiarity with the areas to be investigated, their familiarity with livestock and livestock identification, experience working in remote or backcountry areas, and experience with off-road vehicles, use of GPS units, maps, spotting scopes, and other field gear that would be used during the operation.

7. Prior to initiating the trespass count, I prepared a training session for all of the individuals participating in the count. The training covered topics such as livestock identification, brand and earmark identification, documentation and data collection techniques, use of GPS units and two-way radios, and safety protocols. I also provided participants with a packet of materials including maps of the area to be covered, radio protocols, sample livestock identification sheets, excerpts from the brand book for brand identification, contact lists, daily schedules, gear checklists, etc. This training ensured that the information collected by the teams would be in a standard format and provide reliable information on any trespass grazing observed.

8. I specifically trained the participants to document cattle ownership in one of three ways based on a visual inspection of each cow, bull, heifer, steer, or calf (the term "cow" will be used to refer to any such individual animal) that might be encountered. First, if the observer saw a brand or earmark, then the observer would record that information for that cow so that ownership could be determined. Second, if the observer did not see any brand or earmark, but could not view the cow from all sides to confirm that no brand or earmark was present anywhere on the cow, then that cow was identified as ownership unknown, since it could possibly have ownership markings that were not observed. Finally, if the observer did not see any brand or earmark and was able to view the cow from all sides to confirm that no brand or earmark was present anywhere on the cow, then that cow was identified as having no ownership information.

9. Prior to the aerial flight, I developed a flight plan to ensure visual coverage of the entire area, including drainages and other areas that would not be visible from the ground. I flew in the helicopter for the aerial component of the flight, which is also described in the report I prepared summarizing the March 2011 Gold Butte Trespass Cattle Inventory (Attachment A). I used a GPS to obtain the coordinates for all cows or groups of cattle that I observed from the air. I took the GPS point and my colleague, Krystal Johnson, recorded the waypoint number as well as the number of cattle that I observed. That information was then relayed via two-way radio to a dispatcher, who would then send a ground team to that location to determine ownership of the cattle. These ground teams were spread throughout the area that we were flying during that fuel cycle. We had four teams in 4-wheel drive trucks and one team on a Razor (an all-terrain vehicle), which was used for the least accessible areas.

10. After receiving the radio call from the dispatcher, along with the GPS coordinates and number of cattle observed aerially, the ground team would set off for that location. To avoid duplicate counts of the same cattle, the dispatcher would assign a unique site number to each location. The ground team would attempt to approach the cattle in a manner that would not startle or spook the cattle so that ownership markings could be observed.

11. In some cases, the ground team would be unable to approach the cattle because of topography or inaccessibility of the area, or because the cattle ran away. In those situations, the team would use a spotting scope to collect any information that could be obtained visually and recorded that information consistent with the directions received during their training. The team would also take a GPS location from where they observed the cattle and put the assigned site number into their GPS. I used the recorded site number to match up the GPS location of where the cattle were located, and from where the team observed the cattle. Then the team would fill out the documentation forms indicating the site number, how many cattle they observed, any brands or earmarks observed, and any other relevant information.

12. If the team could approach nearer to the cattle, then the team would take a GPS point of the cattle's location and put the assigned site number into the GPS. They would then put the site number, team number, and date onto a white board, take a photo of that white board, and then take photographs of cattle they observed. Then they would fill out the documentation forms indicating the site number, how many cattle they observed, any brands or earmarks observed, and any other relevant information.

13. This approach was used to cover all of the areas where cattle might be located – both on the BLM-managed lands and the Lake Mead National Recreation Area (managed by the National Park Service (NPS)) within the broader Gold Butte area. The March 2011 count covered all areas where cattle could potentially be located, skipping only those areas so mountainous or steep as to be inaccessible to cattle.

14. When the field investigation concluded, I collected all the data sheets from the ground crews, all the photographs, and all the data from the GPS units in order to compile and analyze the information. I spent several days comparing data from the helicopter to data from the ground and matching up site numbers. I then developed a GIS database into which I inputted data from the ground teams, such as the total number of cattle at a site, how many had brands or earmarks, how many were unknown, how many had no marks, how many had calves, what team collected the data, etc.

15. Once everything was entered into the GIS database, I was able to analyze the information we had compiled. This information showed that there were a total of 903 cattle on the federal lands and confirmed that the only branded livestock observed were all owned by Mr. Bundy, with the exception of one bull found near the Arizona border. The count also

4

revealed that trespass livestock were spread out over almost 500,000 acres within the Gold Butte Area (approximately 55 miles north to south), and were present on public lands within the former Bunkerville allotment and other public lands also closed to grazing, as well as within the Lake Mead National Recreation Area. See March Report (Attachment A). The total cost of the March 21-25, 2011 trespass investigation was approximately $124,000.

16. Of the 903 cattle that were observed, a total of 352 head were on federal lands within the former Bunkerville allotment. Of those cattle, a total of 122 head had brands or earmarks that identified them as belonging to Cliven Bundy, while the remaining 230 head had no brands or earmarks, or ownership could not be conclusively determined. There were no cattle bearing brands or earmarks that were not registered to Cliven Bundy within the former Bunkerville allotment. Of the 903 cattle that were observed, a total of 551 were on federal lands in the Gold Butte area outside the former Bunkerville allotment[i]. Of those cattle, a total of 110 head had brands or earmarks that identified them as belonging to Cliven Bundy, while the remaining 441 head had no brands or earmarks, or ownership could not be conclusively determined. There was only one bull bearing a brand that was not registered to Cliven Bundy. This bull was found near the Arizona border and the brand could not be found as a registered brand in either Nevada or Arizona.

*August 2011 Trespass Investigation*

17. In August 2011, I was tasked with determining whether Mr. Bundy had removed his livestock from the federal lands as directed in a June 8, 2011 Trespass Notice and July 26, 2011 Notice of Intent to Impound. I therefore planned, organized and implemented a follow-up cattle count from August 15-19, 2011 using a helicopter and on-the-ground crews.

18. We had fewer on-the-ground crew members, but covered the same areas that had been flown in March 2011. We also used the same methodologies developed for the March count during the August count. This trespass investigation was carried out at a total cost of approximately $91,000.

19. The August 2011 trespass investigation revealed that Mr. Bundy had not removed his livestock from the federal lands following the BLM's June 8, 2011 Trespass Notice and July 26, 2011 Notice of Intent to Impound. A total of 729 cows were observed by air and confirmed to the extent accessible on-the-ground during that count. The trespass cattle were spread out over the Gold Butte area, as was observed during the March count, but were distributed differently, due to the difference in the time of year.

20. During the August count, livestock were more concentrated along the edges of Lake Mead and the Virgin River, due to hotter temperatures relative to March. See August Report

(Attachment B).  Because these riparian zones where livestock are more likely to congregate during warmer temperatures contain more dense vegetative growth, such as salt cedar, quail bush, willow, cottonwood, etc., it is more difficult to observe cattle from the air, and more difficult to access cattle in those areas on-the-ground.  Although fewer cattle were observed in August, relative to March, due to the location of the cattle and the greater difficulties in observing cattle through vegetative growth, it is my professional opinion that we likely under-counted the actual number of cattle present on the federal lands in the August count, and that the March count was a more accurate count due to better visuals.

21. Of the 729 cattle that were observed, ground crews were able to reach a total of 278 head, but 136 of those could not be approached closely enough to determine ownership.  Of the 142 that could be approached, 47 had no brands or earmarks, 42 had earmarks registered to Cliven Bundy and 14 had brands registered to Cliven Bundy.  A total of 477 head of cattle were on federal lands within the former Bunkerville allotment, while another 252 head (13 with brands or earmarks) were on federal lands in the Gold Butte area outside the Bunkerville allotment. Many of the 252 cattle outside the former Bunkerville allotment were inaccessible by ground, and we were therefore, unable to determine if they had brands or earmarks.

*February 2012 Trespass Investigation*

22. In February 2012, the District Manager asked me to conduct another over-flight to ascertain whether Cliven Bundy had complied with a September 20, 2011 Order to Remove.  This investigation was solely an aerial investigation to determine whether cattle remained on the federal land.

23. I conducted the over-flight investigation over a three-day period from February 1-3, 2012. During this investigation, I used the same flight pattern and methodology as for the prior March and August aerial components, but did not have ground crews available to do an on-the-ground check of brands or earmarks.  The total cost of this aerial trespass investigation was around $40,000.

24. Over a three-day period, I documented 652 cattle spread out over the Gold Butte area in a pattern similar to that observed in March of 2011, rather than concentrated at the riparian areas as in the August 2011 count.  The cattle were located on federal lands both within and outside the former Bunkerville allotment, and cattle found outside the former Bunkerville allotment were located on federal lands administered by the BLM and by NPS.  Of the 652 trespass cattle documented, a total of 264 of these were located outside the former Bunkerville allotment. See February 2012 Cattle Location Map (Attachment C).

25. During this over-flight, I also took a GPS point at each range improvement I could locate from the air. See map of Range Improvement locations (Attachment D).

26. Based on the lower numbers of cattle that I observed in February 2012 relative to March and August 2011 count it appeared that some cattle had been removed from the west side of the Overton Arm in Lake Mead National Recreation Area.

## *March 2012 Trespass Investigation*

27. In March 2012, I organized and participated in another trespass investigation over-flight. The primary purpose of this flight was to determine locations of cattle for a planned impoundment that was subsequently cancelled. This two-day over-flight on March 28th and March 30th, 2012 again covered the entire area where trespass cattle had been previously observed, but the transects were not as narrow as in the prior counts (and therefore were less comprehensive). Due to mechanical issues with the helicopter, we were also not able to fly a fuel cycle that we were intending to fly on the last day, and subsequently were unable to cover a small section of land that was flown in the previous investigations. The total cost of this over-flight was approximately $32,000.

28. As with the February 2012 count, this was only an aerial count with no ground crews. However, I followed the same methodology as for the aerial component in all the prior counts.

29. Over the two day flight, I observed 737 cattle in total, which included over 100 newborn calves. The cows were distributed in a similar pattern to what I had observed in February and were located on federal lands both within and outside of the former Bunkerville allotment on lands managed by the BLM and the NPS. It was clear from this flight, that cattle had not been removed from the federal lands, and that their numbers on the federal lands had actually increased due to spring calving. A total of 171 of the observed cows and calves were located on public lands in the Gold Butte area outside the former Bunkerville allotment. See March 2012 Cattle Location Map (Attachment E).

## *More Recent Trespass Observations on BLM Lands*

30. Since initiation of the lawsuit in United States v. Bundy, Case No. 2:12-cv-00804, I was asked to determine whether Cliven Bundy's cattle still remain on the federal lands at issue in this litigation that fall outside the former Bunkerville allotment. Due to limited budgetary resources, I was unable to conduct another comprehensive aerial and ground investigation. Instead, I purchased three motion sensor cameras. Based on the information I had collected during the prior cattle counts indicating locations outside the former Bunkerville allotment where cattle appear to graze year-round and based on my knowledge of areas where there are natural resources being adversely impacted by trespass grazing, I

7

chose three separate areas on the public lands managed by the BLM for installation of the cameras. See Camera Location Map (Attachment F). The three cameras were installed at my direction by BLM law enforcement staff on or around July 17, 2012.

31. All three of the areas where the cameras have been placed are at springs with important riparian resources.

32. The cameras take photographs both during the day and at night (using infra-red), when set off by movement in the vicinity. All data is stored on a card in the camera. The cards are collected from the cameras every few weeks by a Law Enforcement Ranger and a Great Basin Institute Research Associate, who also separately record any personal observations. I receive the camera data which becomes part of the BLM's official trespass records.

33. The photographic evidence collected from the motion sensor cameras that I have reviewed, confirm that cattle bearing Cliven Bundy's brand and/or earmarks remain on the public lands at issue in this litigation. I have been able to confirm ownership on many of cattle that were photographed using the two functioning cameras (one camera was damaged by wildlife). Between July 17, 2012 and September 12, 2012, the photographs taken with these cameras confirm that cattle with Cliven Bundy's earmark or brand are grazing on the public lands. See example photographs from the camera at Mockingbird Spring that clearly show the Bundy brand and/or earmark (Attachment G). The two remaining cameras are still in place and new data continues to come in periodically.

34. The photographs I have reviewed from the wildlife cameras confirm that Bundy cattle are adversely impacting the sensitive riparian areas where they have been grazing. See sample photographs from Aqua Chiquita Spring and from Mockingbird Spring (Attachment H). The photographs clearly show that those areas in the vicinity of the cameras have been trampled and converted to a denuded muddy area. This means that any topsoil or biological soil crusts and vegetation have been compromised and likely lost. This increases the risk of soil erosion, invasive and noxious weed infestations, and affects the health of the vegetative community. The deteriorated state of this area adversely affects wildlife and other special status species that rely on these important riparian communities as habitat.

*Impacts of Trespass Grazing on the Public Lands*

35. In addition to allowing livestock to freely roam on the public lands, my work in the Gold Butte area has revealed that Mr. Bundy has been placing various unauthorized structures, such as corrals, tanks to store water, pipelines, and water troughs on the public lands for use by the trespass livestock. During the March 2011 count, ground crews and the helicopter crew (including myself) were able to observe the range improvements and evidence of natural resource damage resulting from trespass grazing on the public lands at

those locations. From the air, I could clearly see rings around the range improvements where there was little to no vegetation remaining. Due to my observations of damage to the rangeland resources in the vicinity of such improvements, I coordinated with a botanist and a wildlife biologist in our office, who conducted vegetation resource damage assessments around a sampling of range improvements. They confirmed on the ground what I had seen from the air, that there was a zone around each development that was heavily disturbed due to a concentration of cattle. They assessed the damage around four unauthorized developments – all on public lands within the former Bunkerville allotment. This investigation resulted in a Natural Resource Damage Assessment that described and quantified the damage caused by trespass livestock at the four trespass water development sites (Attachment I). The total cost of resource damage was determined to be $37,350. This figure is only for the resource damage around the four sites that were analyzed. There are many more trespass development sites on the BLM managed land. By extrapolating the cost of damage of the four sites to the many other sites on the ground, it would result in extremely costly damage to natural resources.

36. During the March 2011 trespass investigation, ground crews reported to me that they had observed archeological resource damage attributable to livestock, in addition to Site Steward's reports that reported similar damage. Our team therefore requested that the District's archeologist conduct an Archeological Damage Assessment. This investigation revealed that the unauthorized livestock within the former Bunkerville allotment and on adjoining public lands have damaged irreplaceable archeological resources, including Native American petroglyphs, and other culturally significant sites, by bedding down and rubbing against these irreplaceable archeological resources.

37. In the course of my normal field duties and work related to the trespass grazing, I have personally observed areas within the former Bunkerville allotment as well as on public lands in other parts of the Gold Butte area, that appear to be severely overgrazed and where there is evidence that the public land resources are being impacted and damaged by trespass grazing. The zone surrounding many of the water and range developments appear to be particularly overgrazed, trampled, and damaged. In many of these areas, there is a distinct ring where little to no native vegetation can be found. Examples of this type of damage to the public lands in the Gold Butte area are shown in Attachment J.

38. I have also personally observed high concentrations of invasive grasses in denuded areas surrounding range developments, evidence that the trespass grazing is leading to the degradation of the rangelands by contributing to the spread of noxious weeds in the Gold Butte ACECs. Many invasive plants thrive in disturbed soil, and make it difficult for native plants to grow. Additionally, the seeds for many invasive species found in the area have features that allow them to easily catch on to humans, livestock, and other animals as

they pass through. This dispersal mechanism allows the weeds to spread over distances that native vegetation may not be able to as a result of livestock grazing.

39. The cattle also pose a significant risk to public safety. I have personally had a near collision with cattle in the middle of the road on one occasion. I was driving out of the Gold Butte area after a day of field work and it was near dusk. I was driving along the Gold Butte Backcountry Byway, and had just come over a hill just past Cliven Bundy's residence, so visibility was limited. I saw approximately four cattle in the middle of the road on the public lands and had to swerve of the side of the road to miss hitting them. Had I not reacted as quickly as I did, I would have collided with them.

40. The restoration of sensitive watersheds and landscapes is a Department of the Interior (DOI) priority and the Gold Butte area, and the Virgin and Muddy Rivers have been identified as high priority habitat due to the presence of multiple federally listed species, state listed endangered species, BLM sensitive species, designated critical habitat, riparian resource values, presence of biological soil crusts, extensive cultural resources, and other sensitive resource values.

41. Because of their high priority status, the BLM has invested significant financial and other resources into restoration efforts within the Gold Butte, Virgin River and Muddy River areas. These restoration efforts are necessary to remove and replace invasive vegetation with native plants that provide better habitat for a number of species that are federally listed or at risk. Intensive restoration efforts have been taking place for over ten years including native revegetation, seeding, earthwork, installation of protective fences, and invasive species removal. These restoration efforts, however, can only be successful if revegetated species and seedings are left undisturbed and are able to take root and establish themselves over a period of a minimum of two to three years.

42. Based on my personal experience in overseeing restoration work in the Gold Butte area and supervising restoration team members, it is clear that restoration actions conducted within these priority areas have been unsuccessful because unauthorized livestock are present and roam without any controls or constraints on these public lands. Revegetation efforts, including the planting of native saplings and shrubs, have been destroyed by unauthorized livestock grazing, as these young green plants offer a preferred food source for the cattle to graze on.

43. In late September 2012, I was informed by a wildlife biologist with the U.S. Fish and Wildlife Service (FWS), that cattle had breached the fencing around a 20-acre restoration site on public lands along the Virgin River that had recently been planted with native riparian species to create nesting habitat for the Southwestern Willow Flycatcher (SWFL), which was listed as an endangered species under the Endangered Species Act in 1995. Most of the restoration site falls within the former Bunkerville allotment, but a portion of

the site is just outside of the allotment boundaries. On October 16, 2012 I travelled to the restoration site, where I personally observed a group of Mr. Bundy's trespass cattle within the restoration site.

44. These cattle were grazing on the native vegetation that had been planted specifically for the benefit of SWFL and the cattle had significantly trampled the restoration site. It appeared that the cattle were moving in and out of the fenced area, so the number of cattle inside the fence could change from day to day. On that day, myself, the FWS biologist and a BLM Research Associate found 3 cattle inside the fenced site as well as approximately 20 cattle just on the other side of the fence grazing along the Virgin River. The photographs in Attachment K were taken by the FWS biologist at the site in September and confirm that some of the cattle bear Mr. Bundy's earmarks.

45. In order to drive the cattle out of the site to protect what was left of the planted native trees and shrubs, we had to cut a hole in the fence. After the cattle were driven outside the fenced area, we repaired the hole that we created, as well as several sections of fence that had been damaged or knocked down by the cattle. The damage I observed to the restoration and native vegetation was severe. See Attachment L for photos. Approximately 75% of the 400 transplanted native saplings had been grazed on by the cattle. Luckily, many of these saplings had protective cones around their bases, so if the cattle are removed for a significant period of time, the plants may recover. However, any new growth that occurred over the growing season was lost due to the grazing. In addition to the damage to the transplanted saplings, I also observed significant damage to much of the naturally growing native vegetation as well. In particular, the cattle grazed a large portion of the population of a native riparian rush, *Juncus balticus*, down to stubs. I also observed cattle trailing and soil disturbance from cattle inside the restoration site. There were increased levels of invasive *Tamarix spc.* (Salt cedar) seedlings coming up in these disturbed areas.

46. In 2012, the BLM had identified $600,000 in funding from a restoration account associated with the Southern Nevada Public Lands Management Act, to be used in FY 2013-2014 for native vegetation restoration activities on the Virgin River. The main goal of this project was to try to improve and expand nesting habitat for the endangered SWFL, whose habitat is rapidly diminishing. I was involved in the planning for this project because at the time I was serving as the Restoration Program Manager for the SNDO, and I was the assigned as the Program Lead for the account where the funding was coming from. By working with our wildlife biologists, I found out that initiating this project, would have allowed the BLM to access matching funds in the amount of $400,000 from the Walton Family Foundation for SWFL habitat restoration, increasing the budget for SWFL restoration to $1,000,000. This $1,000,000 restoration project for the Virgin River Area of Critical Environmental Concern would have allowed large scale restoration of riparian SWFL habitat. Prior to this, budgetary constraints had only allowed the BLM to

do small scale projects of around 20 acres or less. Doing a large landscape scale project like this would have provided innumerable benefits to the species as a whole. This is considered a high priority for the SNDO because there has been rapid SWFL habitat decline due to the Tamarix beetle. Additionally, there are very limited riparian resources in the district and they contain multiple listed species and BLM sensitive species.

47. The implementation of this $1,000,000 restoration project in FY 2013/2014 was dependent on the removal of all unauthorized livestock from the Virgin River ACEC and adjoining areas within the Gold Butte ACECs. Smaller restoration pilot projects have shown that even when an area has been fenced to keep the cattle out of a site, the cattle still get in and destroy the restoration work. For this reason, the BLM and other outside partners are not able to invest this kind of money on a restoration project that has a high probability of being damaged or destroyed by cattle. Because of the continuing presence of trespass cattle on the public lands, this funding was reallocated to lower priority restoration areas that do not benefit the endangered SWFL, and where unauthorized livestock grazing is not an impediment to restoration activities. Those lower priority project sites will not be eligible for the Walton foundation matching funds since none of those areas are within SWFL habitat and therefore do not directly benefit the endangered SWFL.

48. In addition to the large-scale priority restoration project that was planned for the Virgin River ACEC in 2013/2014, because of the presence of trespass cattle many other restoration efforts have had to be redirected to lesser priority areas in the district outside the Gold Butte area and that benefit lesser priority species. This is problematic because the Gold Butte area has multiple federally listed species and BLM sensitive species, and the habitat is degraded. Restoration in this area is needed urgently, but neither the federal government or conservation groups are willing to expend financial resources and manpower on restoration work that will be damaged or destroyed by unauthorized cattle grazing.

49. Restoration work has also been ongoing to try to expand the habitat for a candidate species for listing, the relict leopard frog. Restoration for one site called Quail Spring was completed in 2007 and the frogs have been introduced into the area. Shortly after the restoration was completed, one of the restoration technicians who reports directly to me, informed me that the trespass cattle have been getting into the area and trampling through, and defecating in, the spring and the frog habitat. Water quality has been declining, which may cause the frog population to decline.

50. Another site, Horse Spring (on public lands outside the former Bunkerville allotment) has had restoration work done in preparation for the addition of the frogs, and there are plans to release the frogs in late 2012 or early 2013. However, this site is frequently used as a watering hole by the trespass cattle. Based on reports from a BLM restoration technician

that I directly supervise and a BLM wildlife biologist, I have concerns that the water quality may have declined too much as a result of the cattle impacts to those springs and that it may not be possible to have a successful restoration under those conditions. I have also received reports from my restoration crews that they have seen supplemental feed (mostly hay) placed at Horse Spring, which draws even more cattle into the sensitive riparian habitat. The supplemental feed also has the potential to exacerbate invasive weed issues at the spring, since most hay – unless it is certified weed-free hay purchased at a premium -- contains weed seeds, which in the moist soil surrounding the springs, would spread rapidly.

51. The areas in need of restoration within the Gold Butte, Virgin River, and Muddy River areas are so large that it would be prohibitively costly to fence all of the needed restoration sites in order to protect them from trespass cattle, even if it was possible for such fencing to withstand cattle pressures. My experience with smaller fenced areas has been that the trespass cattle find ways to break through the fencing to graze the newly planted vegetation, thereby destroying all of the restoration investments that have been made. The removal of trespass livestock from these areas is therefore critical to the BLM's ability to protect and restore high priority habitat for a wide range of species, including federally listed, candidate, and state listed sensitive species.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Signed this 17th day of December, 2012 in Las Vegas, Nevada.

Lauren Brown

---

[1] While there are a small number (40 or less) of permitted cattle in the Lower Mormon Mesa allotment, we did not fly over the area where the permitted cattle are typically found within that allotment, which is up by the highway and towards the center and western portions of the allotment. We did fly areas in the Lower Mormon Mesa allotment where the permitted cattle are not typically found, and in those areas we did find cattle with Bundy brands or earmarks and cattle with no brands and earmarks. We did not find any cattle with the brand or earmark registered to the permittee of the Lower Mormon Mesa allotment.

# ATTACHMENT A

BUREAU OF LAND MANAGEMENT
SOUTHERN NEVADA DISTRICT OFFICE
(702) 515-5000

# Gold Butte Trespass Cattle Inventory

Survey of number, distribution, and ownership of trespass livestock in the Gold Butte Area.

**Prepared By: Lauren Brown, Project Manager**
**5/5/2011**



This document details the background, planning, methods, and results of a comprehensive livestock inventory of the Gold Butte Area conducted March 21-25, 2011.

Introduction

The Gold Butte Area of Critical Environmental Concern (ACEC) includes designated critical habitat for desert tortoise, a federally listed species under the Endangered Species Act.  During the early 1990s, BLM developed management plans for the desert tortoise and its habitat, which imposed time constraints and other restrictions on grazing for allotments within the Southern Nevada District.   One of those allotments was the Bunkerville Allotment grazed by Cliven Bundy (Bundy), under an ephemeral grazing permit.[1]  Bundy was authorized to graze between 30 to 152 head of livestock annually during the 1970's, 1980's and early 1990's.  Bundy's last authorization to graze the Bunkerville Allotment ended on February 28, 1993, but he continued to graze cattle on the Bunkerville Allotment while refusing to apply for annual grazing authorizations, pay grazing fees, or otherwise follow federal laws and regulations.  In the late 90s, Clark County purchased all of the grazing rights in the Gold Butte area (including the Bunkerville Allotment) and retired those rights as a mitigation measure that was required under the Clark County Multiple Species Habitat Conservation Plan and associated Incidental Take Permit.

After taking a series of administrative actions (including cancellation of Bundy's grazing preference) that were unsuccessful in resolving Bundy's trespass grazing, the United States filed a complaint against Bundy in the U.S. District Court for the District of Nevada, which resulted in the Court permanently enjoining Bundy from grazing his livestock on the Bunkerville Allotment.

Over the years, BLM staff has documented livestock on public lands in the Gold Butte area grazing without authorization, some of which were confirmed to have ear marks or brands registered to Cliven Bundy.  BLM has also found evidence that cancelled range improvements are being maintained and that new range improvements have been constructed to facilitate livestock grazing on closed lands.  Range improvements include salt licks, water catchments, and supplemental feeding stations. A BLM aerial overflight in 2009 identified a total of 344 cows and 26 wild burros on public lands in the Gold Butte Area and extending into the Lake Mead National Recreation Area managed by the United States National Park Service (NPS).  While the presumption was that most, if not all of these livestock were likely owned by Cliven Bundy, the resources were not available at the time to carry out ground identification to confirm the ownership of the trespass livestock observed in that overflight.

On December 2, 2010, Las Vegas City Life published an article on Cliven Bundy in which he admitted that he is currently grazing livestock on the federal lands.  On January 21, 2011, BLM sent Mr. Bundy a letter in which he was reminded of the Court Order enjoining his grazing of the public lands and notified that he is in violation of federal law.  BLM also warned Bundy that the failure to resolve the trespass would result in further action to protect the interests of the United States.

---

[1] "Ephemeral rangelands" are "areas of the Hot Desert Biome (Region) that do not consistently produce enough forage to sustain a livestock operation but may briefly produce unusual volumes of forage to accommodate livestock grazing" 43 C.F.R. 4100.0-5. Special rules apply to ephemeral rangelands; permittees must apply for annual grazing authorizations which may be granted "whenever forage exists or climatic conditions indicate the probability of an ephemeral forage crop"

Ex. 8 - Brown Dec. Att. A - Page 2 of 13

In a February 4, 2011 Nevada Board of Wildlife Commissioners' Meeting, Mr. Bundy again acknowledged that he has livestock in the Gold Butte Area notwithstanding having been directed to remove those livestock.

Purpose of Cattle Compliance Inspection and Inventory

The purpose of the aerial and ground inventory conducted from March 21-25, 2011, was to determine the number, distribution and ownership of trespass livestock grazing on federal lands within the Gold Butte Area[2]. This information is necessary for purposes of documenting trespass grazing on the federal lands, the number of cattle, and the ownership of livestock in trespass, and to determine how to best resolve the continuing trespass grazing on these lands.

Preparations for Inventory

BLM selected team members for the aerial and ground inventory based on their familiarity with the Gold Butte Area, prior experience observing livestock within the area, ability to identify livestock ownership markings, experience driving on rugged 4-wheel drive roads, and familiarity with GPS equipment, spotting scopes and other field gear.  One team comprised of two spotters, a pilot, and a radio technician worked from the helicopter.   A total of four BLM teams and one NPS team performed the ground work.  Each of the ground teams was made up of two resource staff members and one law enforcement ranger in a separate vehicle (Team 3 had one additional spotter; Team 5 had one additional LEO). Four of the five ground teams were in four-wheel drive vehicles and one team was on an all-terrain vehicle accompanied by a motorcycle.  BLM established an Incident Command Post (ICP) that coordinated the air-to-ground communications.  Two additional Law Enforcement Officers were assigned as floaters to respond in the event of any problems. See Attachment 1: Names and Functions of the Team Members

All of the ground team members received a training packet and a two-hour training session on livestock identification based on brands and earmarks, GPS use, and on how to document trespass livestock, including handouts of common brands registered in the area. See Attachment 2: Picture of Cow with Bundy Earmarks and Brand.  The Incident Command system developed for wildland fire was used for this operation, including safety and radio transmission protocols.

Inventory Methodology

The methodology for the inventory was developed to result in the most accurate and comprehensive livestock and burro count that could be achieved in the Gold Butte Area.  BLM developed a flight plan for the areas that would be flown starting from the north to south.  The helicopter flew in one-quarter mile to one half mile (0.25 – 0.50) wide transects to ensures visual coverage of the entire area where livestock might be found.  Transects were widened slightly in areas where there is no historical evidence

---

[2] In this report, the Gold Butte Area refers to all areas where there are known trespass livestock, including the Gold Butte ACEC parts A,B, and C; Mormon Mesa, Lake Mead National Recreation Area, and the Virgin River.

of livestock. The only areas not flown within Gold Butte were extremely mountainous and rugged terrain that would be inaccessible to livestock or burros. See Attachment 3: Map of Helicopter Flight Path.

All of the ground crews were supplied with grid maps of the area broken out by Universal Transverse Mercator units (UTMs). The helicopter team's role was to locate individual groups of livestock that would be inspected by a ground crew. As the helicopter flew in a grid pattern, the helicopter spotters would call out when they spotted an individual or group of cattle. The pilot would then circle the group to allow the spotters to count the number of cows and calves and to GPS their location. The location was then communicated by the radio technician to the ICP, which determined whether that location would be accessible to a ground team. If the area was inaccessible, the count was noted but no team was dispatched. If the location was accessible, the information on the location was communicated to a ground team that was dispatched to gather ownership information.

The ground team would travel to the GPS site identified by the helicopter and would attempt to get as close to the cows as possible without spooking the cattle or having them leave the location. The team would take a UTM point with GPS equipment at the location so that the data from the helicopter could be cross-checked against the data from the ground. If the ground team could not get close enough to the cattle to determine ownership information, they would count and record the number and type of livestock to verify information communicated from the helicopter. If the ground team could get close enough to the cattle, the team would do a visual inspection, either with or without a spotting scope and binoculars, to determine whether the cattle displayed any earmarks or brands. The teams documented their observations on a Cattle Identification Form for each location and group of cattle. See Attachment 4: Cattle Identification Form. This form noted whether any earmarks were observed as well as any brand and the brand location. If the cattle were too far to determine whether a brand was present, or if only one side of the cattle could be observed, the observer would note that the presence of a brand was unknown. The Cattle Identification Form also includes information on the total number of livestock at that location, broken down by cow, bull, heifer, steer, and cow/calf pair. The form also notes whether any photographs of the cattle were taken. As a form of quality control to reduce the possibility of double-counting, the team also took a photograph of a white board with the team number and location information for each site, to ensure that the forms, photographs and GPS data could be matched.

If, in the course of accessing a location called out by the helicopter team, the ground team spotted additional cattle in another location, the team recorded the identification information for that group, but clearly noted that this was an "incidental" sighting, rather than an assigned site matching a helicopter call. This was done to ensure such incidental sightings would not be double-counted when the data from helicopter assigned sites were reviewed.

This process was used over a four-day period, working from the Mormon Mesa area to the southern tip of Gold Butte ACEC. The inventory team met every morning of the operation and every evening to address any issues that needed to be discussed. This process helped improve the accuracy of the inventory count.

At the conclusion of the four-day inventory count, Project Manager Lauren Brown compiled all of the helicopter and ground team inventory data, cross-checking to match helicopter and ground location data and to ensure that cattle were not inadvertently double-counted. After this process was completed, a total tally of observed livestock was compiled.

<u>Results of Inventory Count</u>

A total of 903 individual cattle (adults and calves[3]) were counted over the four day inventory period. These livestock ranged in location from the northern Morman Mesa Area to past Echo Bay within the Lake Mead National Recreation Area. See Attachment 5: Map of March 2011 Cattle Inventory, Gold Butte. Of the 903 cattle that were spotted by helicopter (or incidental sightings by the ground team), 564 were accessible to the ground teams for visual ownership identification. Of the 564 cattle that could be accessed, a total of 239 cattle had no ownership identification either in the form of earmarks or brands even after being observed from all sides. A total of 92 out of the 564 cattle had no earmarks and could not be approached sufficiently closely to observe both sides of the cow. Of the 233 cattle for which ownership information was identified, all but one had earmarks and/or brands registered to Cliven Bundy.[4] A total of 164 of the 232 cattle owned by Cliven Bundy had earmarks, and a total of 68 of these had brands (either in addition to earmarks or instead of earmarks). Figures of the breakdown of the inventory count are shown below:

**Figure 1. Breakdown of Adults vs. Calves**



---

[3] Of the 903 cattle, 110 of these were calves of unknown age.

[4] The cow that had a brand not registered to Cliven Bundy was found near the Arizona border. The brand is could not be matched to any registered in Nevada or the BLM Arizona Strip District and the bull's ownership is currently being investigated by BLM.

Figure 2. Breakdown of Livestock that was accessible by ground crews



Figure 3. Breakdown of Ownership Information Identified



Discussion:

Cliven Bundy's registered brand and ear marks were seen on cattle throughout the entire range surveyed. However, the further south the groups of cattle were located, the fewer identification marks

were seen. Many of these cattle found in the southern extent of the range are likely feral and not being managed.

Reports from resource specialists familiar with the area state that the cattle distribution changes with the seasons. When the weather is warmer during spring and summer months, more cattle can be found on NPS land near the shore of Lake Mead. In the cooler months of fall and winter, the cattle are more concentrated on BLM land and can be found around springs and range improvements.

This cattle inventory was very comprehensive. The entire area of known cattle occupancy was surveyed, and transects were narrow enough to visually cover the entire area. But it is possible that there were a small number of cattle missed, if they were hidden from view by vegetation or landforms. However, the count is likely fairly accurate. There is also a possibility that some cattle could have been double-counted by the helicopter and the ground crews. However, significant measures to avoid this were put in place and the data was cross checked several times to get the most accurate totals possible.

Report Prepared By:

_____     5/12/11

Lauren Brown, *Project Manager and Natural Resource Specialist*          Date

Reviewed by:

_____     5/12/11

Mary Jo Rugwell, *Southern Nevada District Manager*          Date

Attachment 1. Names and Functions of Team Members

| Team | Name | Agency | Title | Role in Operation |
|---|---|---|---|---|
| | | | | |
| 1 | Marc Maynard | BOR | Natural Resource Specialist | Spotter |
| | Jessica Stegmeier | BLM | Wildlife Biologist | Spotter |
| | David Stolts | BLM | Law Enforcement Officer | Law Enforcement Officer |
| | | | | |
| 2 | Amelia Savage | BLM | Wildlife Biologist | Spotter |
| | Jimmy Linares | GBI | Research Associate | Spotter |
| | Shane Nalen | BLM | Law Enforcement Officer | Law Enforcement Officer |
| | | | | |
| 3 | Mark Sanchez | BLM | Recreation Planner | Spotter |
| | Lisa Christianson | BLM | Environmental Protection Specialist | Spotter |
| | Charles Jenkiewicz | FS | TEAMS contractor | Spotter |
| | George Pavia | BLM | Law Enforcement Officer | Law Enforcement Officer |
| | | | | |
| 4 | Sendi Kalcic | BLM | Wilderness Planner | Spotter |
| | Sedona Maniak | GBI | Research Associate | Spotter |
| | Robert Dockery | BLM | Law Enforcement Officer | Law Enforcement Officer |
| | | | | |
| 5 | Eric Cotto | NPS | Natural Resource Specialist | Spotter |
| | Chris Roberts | NPS | Grazing Biotech | Spotter |
| | Brian Wollenburg | NPS | Law Enforcement Officer | Law Enforcement Officer |
| | Greg Morse | NPS | Law Enforcement Officer | Law Enforcement Officer |
| | | | | |
| Helicopter | Lauren Brown | BLM | Natural Resource Specialist / Project Manager | Spotter |
| | Krystal Johnson | BLM | Wild Horse and Burro Specialist | Spotter |
| | Cliff White | BLM | Helitack Manager | Radio Technician |
| | Pilot | Cont. | Pilot | Pilot |

| | | | | |
|---|---|---|---|---|
| Floating LEO | Deborah Sullivan | BLM | Law Enforcement Officer | Law Enforcement Officer |
| | Antonio Boone | BLM | Law Enforcement Officer | Law Enforcement Officer |
| | | | | |
| Incident Command Post | Erika Schumacher | BLM | Chief Law Enforcement Officer | Incident Commander |
| | Kevin Oliver | BLM | Fire Management Officer | Logistics |
| | Chris Delaney | BLM | Assistant Fire Management Officer | Operations |
| | Alice Corrine Newton | NPS | Vegetation Manager | Assistant |

Attachment 2. Picture of Cow with Bundy registered Earmarks and Brand and Bundy registered marks from the Nevada State Brand Book.





Attachment 3.  Map of Flight Path



March 2011
Cattle Inventory
Flight Path

Attachment 4 .Sample Livestock Identification Form

## Cattle Identification Form

| Allotment | | | | | | | | | Date: 3/22/11 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Pasture | | | | | | | | | | |
| Examiner  Savage / Linares | | | | Brand Location Legend: | | | | RB-rib   S-shoulder   H-hip   L-left   R-right   N-none | | |
| Ear Marks | Tag Color | Tag # | Brand Location | Cow | Bull | Heifer | Steer | Brand symbol, location GPS / T-R-S, and other information | Photos ? |
| (ear mark) | | | | 2 | | | | | } 3 |
| (ear mark) | | | LH | 3 | 1 | | | 8 | |
| (ear mark) | | | | | | | 3 | | ) |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | 4062484.85 N    751540.86 E | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | E X A M P L E | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |
| (ear mark) | | | | | | | | | |

| Comments:   9 total | | | | | | | | | | |
| Heli Site # 8 | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Signature:  ✓ | | | | | | | | | Date: 3/22/11 | |

Attachment 5. Map of March 2011 Cattle Inventory, Gold Butte



# ATTACHMENT B

**BUREAU OF LAND MANAGEMENT**
**SOUTHERN NEVADA DISTRICT OFFICE**
**(702) 515-5000**

# Gold Butte Trespass Follow-up Cattle Inventory

## Survey of number, distribution, and ownership of trespass livestock in the Gold Butte Area. August 2011

**Prepared By: Lauren Brown, Project Manager**

**9/8/2011**



This document details the background, planning, methods, and results of a comprehensive livestock inventory of the Gold Butte Area conducted August 15-19, 2011.

Ex. 8 - Brown Dec. Att. B - Page 1 of 11

## Introduction

The Gold Butte Areas of Critical Environmental Concern (ACEC's) includes designated critical habitat for desert tortoise, a federally listed species under the Endangered Species Act.  During the early 1990s, BLM developed management plans for the desert tortoise and its habitat, which imposed time constraints and other restrictions on grazing for allotments within the Southern Nevada District.  One of those allotments was the Bunkerville Allotment grazed by Cliven Bundy (Bundy), under an ephemeral grazing permit.[1]  Bundy was authorized to graze between 30 to 152 head of livestock annually during the 1970's, 1980's and early 1990's.  Bundy's last authorization to graze the Bunkerville Allotment ended on February 28, 1993, but he continued to graze cattle on the Bunkerville Allotment while refusing to apply for annual grazing authorizations, pay grazing fees, or otherwise follow federal laws and regulations.  In the late 90s, Clark County purchased all of the grazing rights in the Gold Butte area (including the Bunkerville Allotment) and retired those rights as a mitigation measure that was required under the Clark County Multiple Species Habitat Conservation Plan and associated Incidental Take Permit.

In 1998, after taking a series of administrative actions (including cancellation of Bundy's grazing preference) that were unsuccessful in resolving Bundy's trespass grazing, the United States filed a complaint against Bundy in the U.S. District Court for the District of Nevada, which resulted in the Court permanently enjoining Bundy from grazing his livestock on the Bunkerville Allotment.

Over the years, BLM staff has documented livestock on public lands in the Gold Butte area grazing without authorization, some of which were confirmed to have ear marks or brands registered to Cliven Bundy.  BLM has also found evidence that cancelled range improvements are being maintained and that new range improvements have been constructed to facilitate livestock grazing on closed lands.  Range improvements include salt licks, water catchments, and supplemental feeding stations.

A BLM aerial overflight in 2009 identified a total of 344 cows and 26 wild burros on public lands in the Gold Butte Area and extending into the Lake Mead National Recreation Area managed by the United States National Park Service (NPS).  While the presumption was that most, if not all of these livestock were likely owned by Cliven Bundy, the resources were not available at the time to carry out ground identification to confirm the ownership of the trespass livestock observed in that overflight.

In March 2011, BLM conducted a comprehensive aerial and ground cattle census of the entire Gold Butte Area. A helicopter with two spotters was used to locate groups of cattle and get a GPS coordinate, and then a ground team was dispatched to try to get close enough to the cattle to discern any identifying marks. A total of 903 cattle were located during the March 2011 count, of which 233 cattle

---

[1] "Ephemeral rangelands" are "areas of the Hot Desert Biome (Region) that do not consistently produce enough forage to sustain a livestock operation but may briefly produce unusual volumes of forage to accommodate livestock grazing" 43 C.F.R. 4100.0-5. Special rules apply to ephemeral rangelands; permittees must apply for annual grazing authorizations which may be granted "whenever forage exists or climatic conditions indicate the probability of an ephemeral forage crop"

were confirmed to have Cliven Bundy's brand or earmark. (See Gold Butte Trespass Cattle Inventory March 2011 report for further details).

After the March 2011 cattle inventory, BLM issued Mr. Bundy a Trespass Notice and subsequently, a Notice of Intent to Impound. BLM received a brief response from Mr. Bundy to the Trespass Notice, which did not include any indication that he planned to remove his cattle from the federal land.

**Purpose of Cattle Compliance Inspection and Inventory**

The purpose of the aerial and ground inventory conducted from August 15-19, 2011, was to determine whether or not Mr. Bundy has complied with the Trespass Notice, Orders to Cease and Desist, or Notices of Intent to Impound that BLM has sent him over the past several months. BLM collected information on the number, distribution and ownership of trespass livestock grazing on federal lands within the Gold Butte Area[2]. This information is necessary for purposes of documenting trespass grazing on the federal lands, the number of cattle, and the ownership of livestock in trespass, and to determine how to best resolve the continuing trespass grazing on these lands. This information will also be used to issue a Final Trespass Decision and a Demand for Payment which will assess trespass fees and damages for the cattle found on public lands.

**Preparations for Inventory**

The August 2011 Cattle Inventory employed methods of data collection very similar to the March 2011 Inventory. BLM selected team members for the aerial and ground inventory based on their familiarity with the Gold Butte Area, prior experience observing livestock within the area, ability to identify livestock ownership markings, experience driving on rugged 4-wheel drive roads, and familiarity with GPS equipment, spotting scopes and other field gear. Many of the team members were selected because they had already participated in the previous count, and were comfortable with the methodology and process used.

An air team comprised of two spotters, a pilot, and a radio technician working from a helicopter. A total of two BLM ground teams performed the ground work. Each of the ground teams was made up of two resource staff members and one law enforcement ranger in a separate vehicle (Team 1 had only one spotter and one law enforcement ranger; An additional NPS team was used on Day 2). One of the ground teams was on an all-terrain vehicle accompanied by a motorcycle, and the other ground team was on two motorcycles. BLM established an Incident Command Post (ICP) that coordinated the air-to-ground communications. Two additional Law Enforcement Officers were assigned as floaters to respond in the event of any problems. (See Attachment 1: Names and Functions of the Team Members ).

All of the ground team members received a training packet and a two-hour training session on livestock identification based on brands and earmarks, GPS use, and on how to document trespass livestock, including handouts of common brands registered in the area. (See Attachment 2: Picture of Cow with

---

[2] In this report, the Gold Butte Area refers to all areas where there are known trespass livestock, including the Gold Butte ACEC parts A,B, and C; Mormon Mesa, Lake Mead National Recreation Area, and the Virgin River.

Bundy Earmarks and Brand).  Due to potential risks during the operation, the Incident Command system developed for wildland fire was used, including safety and radio transmission protocols.

**Inventory Methodology**

The methodology for the inventory was developed to result in the most accurate and comprehensive livestock count that could be achieved in the Gold Butte Area. BLM utilized the same methodology used in the March Count, and made a few minor adjustments to improve the efficiency of the process through lessons learned during the March Inventory. As a result of the March Inventory, the BLM project manager developed a more streamlined numbering  and recording system.

 BLM developed a flight plan for the areas that would be flown starting from the south to the north.  The helicopter flew in one-quarter mile to one half mile (0.25 – 0.50) wide transects to ensures visual coverage of the entire area where livestock might be found.  Transects were widened slightly in areas where there is no historical evidence of livestock. The only areas not flown within Gold Butte were extremely mountainous and rugged terrain that would be inaccessible to livestock.

The ground crews were supplied with grid maps of the area broken out by Universal Transverse Mercator units (UTMs).  The helicopter team's role was to locate individual groups of livestock that would be inspected by a ground crew.  As the helicopter flew in a grid pattern, the helicopter spotters would call out when they spotted an individual or group of cattle.  The pilot would then circle the group to allow the spotters to count the number of adults and calves and to GPS their location.  The location was then communicated by the radio technician to the ICP, which determined whether that location would be accessed by a ground team.  If the area was inaccessible, the count was noted but no team was dispatched.  If the location was accessible, the information on the location was communicated to a ground team that was dispatched to gather ownership information.

The ground team would travel to the GPS location identified by the helicopter and would attempt to get as close to the cattle as possible without spooking them or having them leave the location.  The team would take a UTM point with GPS equipment at the location so that the data from the helicopter could be cross-checked against the data from the ground.  If the ground team could not get close enough to the cattle to determine ownership information, they would count and record the number and type of livestock to verify information communicated from the helicopter. If the ground team could get close enough to the cattle, the team would do a visual inspection, either with or without a spotting scope and binoculars, to determine whether the cattle displayed any earmarks or brands.  The teams documented their observations on a Cattle Identification Form for each location and group of cattle.  This form noted whether any earmarks were observed as well as any brand and the brand location.  If the cattle were too far to determine whether a brand was present, or if only one side of the animal could be observed, the observer would note that the presence of a brand was unknown.  The Cattle Identification Form also included information on the total number of livestock at that location, broken down by cow, bull, heifer, steer, and cow/calf pair.  The form also notes whether any photographs of the cattle were taken.  As a form of quality control to reduce the possibility of double-counting, the team also took a photograph of

a white board with the team number and location information for each site, to ensure that the forms, photographs and GPS data could be matched.

If, in the course of accessing a location called out by the helicopter team, the ground team spotted additional cattle in another location, the team recorded the identification information for that group, but clearly noted that this was an "incidental" sighting, rather than an assigned site matching a helicopter call. This was done to ensure such incidental sightings would not be double-counted when the data from helicopter assigned sites were reviewed.

This process was used over a four-day period, working from the southern tip of the Gold Butte ACEC up to the Mormon Mesa area. The inventory team met every morning and every evening during the operation to address any issues that needed to be discussed. This process helped improve the accuracy of the inventory count and keep the teams safe.

At the conclusion of the four-day inventory count, Project Manager Lauren Brown compiled all of the helicopter and ground team inventory data, cross-checking to match helicopter and ground location data and to ensure that cattle were not inadvertently double-counted. After this process was completed, a total tally of observed livestock was compiled.

## Results of Inventory Count

A total of 729 individual cattle (adults and calves) were counted over the four day inventory period. These livestock ranged in location from the Virgin River down to Echo Bay within the Lake Mead National Recreation Area. (See Attachment 3: Map of March 2011 Cattle Inventory, Gold Butte). Of the 729 cattle that were spotted by helicopter (or incidental sightings by the ground team), 278 were accessible to the ground teams for visual ownership identification. Of the 278 cattle that could be accessed, a total of 47 cattle had no ownership identification either in the form of earmarks or brands even after being observed from all sides. A total of 136 out of the 278 cattle had no earmarks and could not be approached to observe both sides of the animal. Of the 56 cattle for which ownership information was identified, all had earmarks and/or brands registered to Cliven Bundy. A total of 42 of the 56 cattle owned by Cliven Bundy had earmarks, and a total of 14 of these had brands (either in addition to earmarks or instead of earmarks). Figures of the breakdown of the inventory count are shown below:

**Figure 1. Breakdown of Livestock that was accessible by ground crews**



**Figure 2. Breakdown of Ownership Information Identified**



**Comparison of Results: March 2011 Count vs. August 2011 Count**

The distribution of cattle differed from the March count to the August Count. While the cattle still occupied the same distribution from north to south, the cattle in August were more condensed around Lake Mead, the Virgin River, and other water sources. In the March 2011 count, the cattle were more

Ex. 8 - Brown Dec. Att. B - Page 6 of 11

spread out through the entire range. This data confirms what has been suspected for some time by BLM resource specialists that the cattle migrate to the lake and river during periods of excessive heat.

Fewer cattle were accessible by ground in August when compared to March. This is because the cattle tend to migrate towards the lake edge in hot weather, where there are very few roads and very thick vegetation. For the same reason, it is likely that more cattle were missed during this count as compared to the March count because the cattle are difficult to see when they are in the tall vegetation around the lake and river edge. This could partially account for the smaller number of cattle found during the August count (729 in August as opposed to 903 in March).

Even though a smaller number of cattle could be viewed from a close enough position to discern ownership markings, the comparative percentages of brands and earmarks found were similar in the March count and the August count. In March, 29% of the accessible cattle were found to have Bundy's registered earmarks. In August, the percentage was 22% with Bundy earmarks. In March, 12% of the cattle displayed Bundy's registered brand. In August, the percentage was 9% with Bundy brands. Therefore, in March, 41% of the accessible cattle had Cliven Bundy ownership information. In August, 31% of the accessible cattle had Cliven Bundy ownership information. The difference in percentages is likely due to the fact that less cattle were accessible from a close enough position to be viewed during the August count.


**Discussion:**

Cliven Bundy's registered brand and ear marks were seen on cattle throughout the entire range surveyed. However, the further south the groups of cattle were located, the fewer identification marks were seen. Many of these cattle found in the southern extent of the range are likely feral and not being managed.

This cattle inventory was comprehensive in that it was performed in the same manner as the previous count. However, the results are expected to be less accurate due to the limited visibility of the cattle as discussed in the previous section.  The entire range of known cattle occupancy was surveyed, and transects were narrow enough to visually cover the entire area. But it is possible that there were cattle missed, if they were hidden from view by vegetation or landforms. It is likely that the possible missed number of cattle, and the summer heat fatalities, account for the difference in total number of cattle from March to August. There is no evidence that Bundy has removed any cattle as a result of the Order to Cease and Desist and the Notice of Intent to Impound. The teams found no evidence of trapping or use of the corals and range improvements for gather purposes.

As a result of this information and the determination that Cliven Bundy has not complied with the Trespass Notice, Order to Cease and Desist, or Notice of Intent to Impound, BLM will proceed with issuing a Trespass Decision and Demand for Payment. A follow-up flight is recommended after issuing this document to determine if Cliven Bundy has complied with orders to remove his livestock from the federal land.

Report Prepared By:

_Lauren Brown, Project Manager and Natural Resource Specialist_          3/23/12

                                                                          Date

Reviewed by:

_MaryJo Rugwell, Southern Nevada District Manager_          3/22/12

                                                            Date

**Attachment 1. Names and Functions of Team Members**

| Team | Name | Agency | Title | Role in Operation |
|---|---|---|---|---|
| | | | | |
| 1 | David McMullen | BLM | Park Ranger | Spotter |
| | David Stolts | BLM | Law Enforcement Officer | Law Enforcement Officer |
| | | | | |
| 2 | Boris Poff | BLM | Wildlife Biologist | Spotter |
| | Jimmy Linares | GBI | Research Associate | Spotter |
| | Jarrod Vigness | BLM | Law Enforcement Officer | Law Enforcement Officer |
| | | | | |
| Helicopter | Lauren Brown | BLM | Project Manager | Spotter |
| | Jessica Stegmeier | BLM | Wildlife Biologist | Spotter |
| | Cliff White | BLM | Helitack Manager | Radio Technician |
| | Pilot | Contractor | Pilot | Pilot |
| | | | | |
| Floating LEO | Deborah Sullivan | BLM | Law Enforcement Officer | Law Enforcement Officer |
| | Chris Allen | BLM | Special Agent | Special Agent |
| | | | | |
| Incident Command Post | Erika Schumacher | BLM | Chief Law Enforcement Officer | Incident Commander |
| | Mike Bolinger | BLM | Special Agent | Incident Commander |
| | Hal Winlow | BLM | Fire Fighter | Operations |
| | Kevin Moss | BLM | Fire Fighter | Assistant |

**Attachment 2. Picture of Cow with Bundy registered Earmarks and Brand and Bundy registered marks from the Nevada State Brand Book.**





**Attachment 3. Map of August 2011 Cattle Inventory, Gold Butte**



# ATTACHMENT C



February 2012
Cattle Inventory
Gold Butte

Legend

**February 2012 Cattle Sitings**
**Total_Head**
- 1 - 3
- 4 - 7
- 8 - 13
- 14 - 18
- 19 - 24
▲ Range Improvements
— River
Lake Mead

Bunkerville Allotment
Bureau of Indian Affairs
Bureau of Land Management
Bureau of Reclamation
City of Las Vegas
Clark County, NV
Department of Defense
Department of Energy
Fish and Wildlife Service
Forest Service
National Park Service
Nevada State
Private

0    5    10    20 Miles

NATIONAL
SYSTEM OF
PUBLIC LANDS

No warranty is made by the Bureau of Land Management
as to the accuracy, reliability, or completeness of these data
for individual or aggregate use with other data.  Original data
were compiled from various sources.  This information may
not meet National Map Accuracy Standards.  This product
was developed through digital means and may be updated
without notification

Ex. 8 - Brown Dec. Att. C - Page 1 of 1

# ATTACHMENT D



# Bundy Cattle
## Trespass Overview

**Legend**

- ▲ Range improvement
- ▢ Former Bunkerville Grazing Allotment
- ▢ New Trespass Land
- ■ City Location
- —— NHD Hydrology

**Major Road**
- —— Interstate
- —— US Highway
- —— State Highway
- —— County Highway
- —— Arterial
- —— Collector
- —— Local
- — · — Back Country Byway
- — — Resource
- · · · Restricted

**Land Status**
- Bureau of Indian Affairs
- Bureau of Land Management
- Bureau of Reclamation
- City of Las Vegas
- Clark County, NV
- Department of Defense
- Department of Energy
- Fish and Wildlife Service
- Forest Service
- National Park Service
- Nevada State
- Private
- Lake Mead

Prepared for
United States of America
v. Bundy
No. 12-cv-804
Not intended for any other use

0   2.5   5        10 Miles

NATIONAL SYSTEM OF PUBLIC LANDS

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT