IGNACIA S. MORENO
Assistant Attorney General
TERRY M. PETRIE, Attorney
STEPHEN R. TERRELL, Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone:     (303) 844-1369
Facsimile:      (303) 844-1350
Terry.Petrie@usdoj.gov
Stephen.Terrell@usdoj.gov

DANIEL G. BOGDEN
United States Attorney
NADIA AHMED
Special Assistant United States Attorney
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV 89101
Telephone:     (702) 388-6336
Facsimile:      (702) 388-6698

ATTORNEYS FOR THE UNITED STATES

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

---

UNITED STATES OF AMERICA,

     Plaintiff,

        v.

CLIVEN BUNDY,

     Defendant.

No. 2:12-cv-804-LDG-GWF

**DECLARATION OF
AMY LUEDERS**

---

## DECLARATION OF AMY LUEDERS

I, Amy Lueders, do declare as follows:

1.    I am the State Director for the Bureau of Land Management (BLM), Nevada State Office.
In this position, I am responsible for management of approximately 48 million acres of

public lands. These management responsibilities include oversight of 6 District and 14 Field Offices in the State of Nevada.

2.    Over 80% of all lands within the State of Nevada are owned by the United States. The majority of those federal lands are public lands managed by the BLM Nevada State Office. In carrying out our duties and responsibilities for the management of those lands, the BLM Nevada State Office works closely with State and local governments on a wide range of issues that require coordinated and cooperative interactions.

3.    As the BLM State Director, I therefore consistently reach out to my counterparts in State Government on issues of mutual relevance and concern. For example, under BLM's regulations, BLM may impound trespass cattle from the public lands if certain notice and other regulatory provisions at 43 C.F.R. Subpart 4150.4 are followed. However, the State Brand Inspectors play an important role under State livestock statutes in registering brands and in issuing the brand inspection certificates needed to transport or sell livestock in the State of Nevada, among other responsibilities.

4.    Prior to 2005, the BLM had a Memorandum of Understanding (MOU) with the Nevada Department of Agriculture that stated that the State Brand Inspectors would issue brand inspection certificates to the BLM for any cattle impounded on the federal lands if BLM demonstrated that it had complied with all the notice and other regulatory provisions for impoundment.

5.    In 2005, the State of Nevada enacted a new statute that now prohibits the State Brand Inspector from issuing a brand inspection certificate without a court order approving the federal government's seizure of cattle. Specifically, the statute (Nevada Revised Statute (NRS) § 565.125) states that:

> [I]f a governmental entity seizes any privately owned animals subject to brand inspection pursuant to this chapter, the Department or its authorized inspector shall not issue brand inspection clearance certificates or permits to remove the animals from a brand inspection district or for the transfer of ownership of the animals by sale or otherwise unless:
>
> (a) Before the seizure, the governmental entity obtains approval for the seizure from a court of competent jurisdiction; and
>
> (b) The governmental entity submits a copy of the order approving the seizure to the Department or its authorized inspector.

6.    After NRS § 565.125 was enacted, the Nevada Department of Agriculture terminated its MOU with the BLM that allowed for issuance of brand inspection certificates so long as BLM had complied with its regulatory requirements for impoundments.

7.    Although BLM has the legal authority to impound trespass livestock under federal law (following notice and other regulatory requirements), as a practical matter, in order to

2

transport or sell such livestock to private parties – which occurs if the impounded livestock are not redeemed by the owner – a brand inspection certificate is needed to transfer legal ownership of the cattle. In other words, no rancher will want to purchase impounded livestock if there is no brand inspection certificate that permits transportation or the transfer of ownership for that animal.

8.    In March 2011, the BLM conducted a trespass investigation for federal lands within the Gold Butte area that revealed the scope and extent of trespass by cattle owned by Mr. Cliven Bundy. When renewed efforts to elicit Mr. Bundy's voluntary removal of those trespass livestock from the public lands were unsuccessful, the BLM Southern Nevada District Office issued Mr. Bundy a Notice of Intent to Impound pursuant to 43 C.F.R. § 4150.4-1. As BLM was considering an impoundment of Mr. Bundy's trespass livestock, and as cooperation by the State Brand Inspector is required for a successful impoundment, I reached out to the State to elicit their cooperation in such impoundment.

9.    Towards that end, I sent a letter to the Nevada State Attorney General's Office explaining that Mr. Bundy was permanently enjoined from grazing the federal lands in the Bunkerville Allotment, that his cattle had been found on the federal lands in direct violation of such injunction, and that the United States was providing the Permanent Injunction Order in satisfaction of the provisions of the NRS § 565.125 that require a court order authorizing the seizure of livestock to be presented to the Department of Agriculture. See Attachment A: BLM Letter dated November 3, 2011. I also sent a follow-up letter on March 14, 2012 seeking a response from the State as to whether the Permanent Injunction Order would allow the State Brand Inspector to issue brand clearance certificates under the State statute. See Attachment B: BLM Letter dated March 14, 2012.

10.   In a letter dated March 23, 2012, the State Attorney General's Office informed me that in the State's view, the Permanent Injunction Order issued by the District Court for the Bunkerville Allotment did not constitute a court order "approving" the seizure under NRS 565.125. See Attachment C: State Attorney General Letter dated March 23, 2012.

11.   In the event that the United States obtains relief from the District Court in the form of a permanent injunction that requires Mr. Bundy to remove his livestock from the federal lands, and in the event that Mr. Bundy fails to comply with such Order (as occurred with respect to the 1998 Permanent Injunction issued by the District Court for the Bunkerville Allotment) such that BLM determines that it needs to impound the livestock under its regulations, then BLM would have to present an Order to the Nevada Department of Agriculture that authorizes the United States to seize Mr. Bundy's trespass livestock, before the State Brand Inspector could cooperate in such impoundment by issuing brand clearance certificates for any impounded livestock.

12.   A Court Order that explicitly authorizes the United States to impound (i.e., seize) any trespass cattle that remain on the federal lands within the Gold Butte area would therefore facilitate the BLM's coordination with the State and allow the State Nevada Department of Agriculture to cooperate in such impoundment by issuing brand inspection certificates,

3

since the State's cooperation, as a practical matter, is necessary for a successful impoundment operation on the public lands.

13.     The Clark County Sheriff, whose cooperation would also be vital should an impoundment be necessary, has also indicated that he would require a court order authorizing such impoundment for purposes of cooperation with the United States.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Signed this 17th day of December, 2012, in Reno, Nevada.

Amy Lueders

# ATTACHMENT A



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Nevada State Office
1340 Financial Boulevard
Reno, Nevada  89502-7147
http://www.blm.gov/nv

**NOV 0 3 2011**

In Reply Refer To:
4150 (NVS0052)

Brian Stockton, Deputy Attorney General
Nevada State Attorney General's Office
100 North Carson Street
Carson City, Nevada 89701

Subject:   Continuing Trespass on Federal Lands in Violation of Court Order and Request for State
           Brand Inspector Cooperation

Dear Mr. Stockton:

I am writing to notify the State of Nevada that the United States intends to impound trespass
livestock on federal lands in the Bunkerville Allotment (Allotment), and to request the cooperation of
the State brand inspector.  The United States has documented a significant level of trespass grazing
on federal lands that include critical desert tortoise habitat, archeological resources, and a National
Recreation Area.  Some of the trespass cattle bear brands that are registered to Mr. Cliven Bundy
(Bundy), while others have no identifying marks and exhibit feral behavior.

In 1998, the United States District Court in the District of Nevada issued an order that permanently
enjoined Bundy from placing any livestock on federal lands in the allotment.  This permanent
injunction constitutes an "order" from a "court of competent jurisdiction" that meets the requirements
of Nevada Revised Statute (NRS) § 565.125.  Thus, if Bundy fails to remove his livestock from the
allotment and the United States impounds them pursuant to 43 CFR 4150. 4-2, I am requesting
Nevada's cooperation in issuing any necessary brand inspection clearance certificates, and movement
and transfer of ownership permits for the impounded livestock.  I am also requesting that the State
gather and remove estray or feral cattle from federal lands, or in the alternative, that it be prepared to
receive any such livestock that the United States or its contractors gathers from federal lands.

## I.   BACKGROUND

The Bunkerville Allotment consists of approximately 158,666 acres of federal lands, of which
148,180 acres are public lands managed by BLM and 10,486 acres are National Park Service lands.
There is currently no authorized grazing within the Bunkerville Allotment as all grazing rights were
purchased by Clark County and were retired for the benefit and protection of desert tortoise.

In 1998 the United States initiated legal proceedings seeking injunctive relief from Bundy's trespass grazing on the Bunkerville Allotment. On November 4, 1998, the United States District Court for the District of Nevada permanently enjoined Bundy from grazing his livestock within the Allotment (see Enclosure #1). Bundy appealed the District Court's decision to the Ninth Circuit, which affirmed the permanent injunction and order to remove livestock from the Bunkerville Allotment (see Enclosure #2). Bundy did not comply with the permanent injunction and the United States moved to enforce the court's order. On September 17, 1999, the District Court granted the United States' motion to enforce, and also imposed monetary damages (see Enclosure #3).

Despite the permanent injunction issued by the District Court and the Court's order to enforce the injunction, Bundy has continued to place or allow his livestock to graze within the Allotment. On March 21-25, 2011, the BLM conducted a comprehensive count of trespass livestock, and documented that Bundy's cattle are grazing in the Bunkerville Allotment as well as within other parts of the Gold Butte Area of Critical Environmental Concern, including Lake Mead National Recreational Area. The BLM documented over 900 cattle grazing in trespass on federal lands, of which 233 were positively identified as bearing earmarks and/or brands registered to Cliven Bundy, while another 239 appear to be feral or estray cattle with no identifying marks observed.[1] Another inspection on August 16-19, 2011, and observations by BLM staff since that time, confirms that Bundy's livestock remain on the federal lands. The grazing trespass is occurring within critical desert tortoise habitat and has damaged vegetative resources, National Park lands, and archeological resources.

## II.    RESOLUTION OF CONTINUING TRESPASS

The BLM's efforts to resolve Bundy's trespass grazing on federal lands through informal mechanisms, administrative decisions, and civil litigation have been unsuccessful. The BLM's only remaining option to protect the federal lands and public safety is to impound the trespass livestock.

Federal regulations at 43 C.F.R. Subpart 4150 address unauthorized grazing on public lands and include provisions for impoundment of trespass livestock. The first step in the impoundment process requires the BLM to issue a written notice and order to remove trespassing livestock to the livestock owner by certified mail or personal delivery. 43 C.F.R. § 4150.2(a). The U.S. Court of Federal Claims has held that the BLM's impoundment regulations and procedures are constitutional and comport with due process because they create procedural safeguards which result in the owner of livestock receiving written notice several times prior to impoundment and sale. Wayne Klump v. United States, 38 Fed. Cl. 243, 246 (1997).

Consistent with BLM regulations and to provide Bundy with ample opportunity to voluntarily remove his livestock from the federal lands, BLM issued Bundy a Notice of Trespass and Order to Cease and Desist on June 8, 2011; issued a Notice of Intent to Impound on July 26, 2011; and issued an Order to Remove trespassing livestock on September 20, 2011, all of which were sent to Bundy by certified mail and were received by Bundy. Despite these notices and repeated opportunities to remove his livestock, Bundy has not removed his trespass livestock from the federal lands.

Before the State brand inspector can issue a brand inspection clearance certificate or permit to remove the animals from a brand inspection district, Nevada state law requires that the governmental

---

[1] The remaining cattle could either not be accessed for identification or could not be sufficiently inspected to determine ownership.

agency that impounds the livestock "obtain[ ] approval for the seizure from a court of competent jurisdiction" and "submit[ ] a copy of the order approving the seizure to the Department or its authorized inspector."  NRS § 565.125.  In the case of Bundy's trespass grazing on the Bunkerville Allotment, Bundy had full opportunity to challenge the United States' trespass allegations for the Bunkerville Allotment when the United States brought suit in the U.S. District Court seeking injunctive relief.

In the enclosed Court Order (Enclosure #1), the U.S. District Court held that, "The United States owns the Allotment where Bundy is grazing his livestock.  Bundy is therefore trespassing upon United States property."   Order at 9.  The District Court went on to find that:

> The BLM is also authorized to impound and dispose of the unauthorized livestock after written notice of intent to impound.  43 C.F.R. §§ 4150.2, 4150.4, 4150.4-1, 4150.4-2; *see also Klump v. United States*, 38 Fed. Cl. 243 (1997) (government had not violated takings clause in impounding cattle as sanction for unauthorized grazing on federal lands).  The government alleges that the BLM has not impounded Bundy's livestock due to its anticipation that the action could result in physical confrontation.  *See* Mot. Summ. Jud., #11, pp. 11-12.  For over five years, Bundy has been trespassing on public lands and his livestock have consumed forage.  The government has shown commendable restraint in allowing this trespass to continue for so long without impounding Bundy's livestock.

Id. at 10-11.

The permanent injunction issued by the Court on November 8, 1998, meets the requirements of NRS § 565.125.  The court's ruling imposing a permanent injunction, and the court's recognition of the BLM's authority to impound Bundy's trespass livestock, constitute the requisite "approval" from "a court of competent jurisdiction" for an impoundment of any Bundy livestock within the Bunkerville Allotment.  Bundy was given a full opportunity to defend against charges of trespass and was permanently prohibited from placing livestock on the Bunkerville Allotment following rulings by the U.S. District Court and the Ninth Circuit.  Bundy's continued trespass grazing within the Bunkerville Allotment constitutes a violation of that permanent injunction, and the Permanent Injunction Order, combined with the Court's explicit recognition of the BLM's authority to impound the trespass livestock, meets the requirement under NRS § 565.125 that "the governmental entity obtains approval for the seizure from a court of competent jurisdiction" as a pre-condition to the State brand inspector's issuance of a brand inspection clearance certificate or permit to remove cattle.  BLM therefore requests the cooperation of the State brand inspector in issuing the necessary brand certificates or permits following any impoundment of Mr. Bundy's livestock within the Bunkerville Allotment.

## III.    ESTRAY AND/OR FERAL LIVESTOCK

The March 2011 inventory of trespass livestock revealed that a significant number of cattle (possibly up to half) are unbranded/unmarked feral or estray cattle.  These feral or estray cattle pose a particular threat to public safety.  The provisions of NRS § 565.125 are not applicable to "estrays" or "feral livestock."  NRS §§ 565.125.2(a) and (b).  The BLM therefore requests that the State either collect and remove these cattle from the federal lands, or, if the State is unable to remove such cattle, that the State be prepared to receive any estray or feral livestock gathered by the United States from federal lands.  The United States is also prepared to discuss any other approaches that may be appropriate for removal of these feral livestock from federal lands.

## IV. CONCLUSION

Enclosed is a copy of the permanent injunction which enjoins Bundy from allowing any livestock to graze in the Bunkerville Allotment. This permanent injunction constitutes an order from a court of competent jurisdiction approving the impoundment, as required under NRS § 565.125. The BLM therefore requests the State's cooperation in issuing brand certificates for any of Bundy's livestock that are impounded from the Bunkerville Allotment. The BLM further requests the State's cooperation in either removing estray/feral livestock off all federal lands within the Gold Butte area, or in receiving any estray/feral livestock that may be gathered by the United States from the federal lands.

Sincerely,

Amy Lueders
State Director, Nevada

Concurrence:

_Daniel H. Shillito_  Date: 11-3-2011
Daniel G. Shillito
Regional Solicitor
Pacific Southwest Region
Solicitor's Office, USDOI

Enclosures (3)

cc:     Mary Jo Rugwell, Southern Nevada District Manager
        Bureau of Land Management, SNDO
        4701 N Torrey Pines Dr.
        Las Vegas, NV 89130

        Blayne Northrop
        Division of Livestock Identification, Agricultural Enforcement Unit
        4780 E Idaho Street
        Elko, Nevada  89801

        Blaine Welsh, Chief of the Civil Division
        U.S. Attorney's Office, District of Nevada
        333 Las Vegas Blvd. South
        Las Vegas, NV 89101

        Bill Dickinson, Superintendent
        National Park Service, Lake Mead NRA
        601 Nevada Way
        Boulder City, Nevada  89005

Nancy Zahedi, Assistant Regional Solicitor
Office of the Solicitor
2800 Cottage Way, Room E-1712
Sacramento, CA 95825

Greg Lind
Office of the Solicitor
333 Bush Street, Suite 775
San Francisco, California  94104

Scott Florence
BLM Arizona Strip District Office
345 East Riverside Drive
St. George, Utah  89790

Ken Visser
State Lead Rangeland Management
BLM Nevada State Office, LLNV930000
1340 Financial Boulevard
Reno, Nevada  89502

FYI
SWM

RECEIVED
U.S. ATTORNEYS

1193V00532
BTW

**AO 450 (Rev. 5/85) Judgment in a Civil Case ⊕

# UNITED STATES DISTRICT COURT

NOV 4 4 36 FN '98

*****_____ DISTRICT OF____NEVADA

LAS

UNITED STATES OF AMERICA,

                    JUDGMENT IN A CIVIL CASE

        Plaintiff,

            V.

                                  CV-S-98-531-JBR(RJJ)
CLIVEN BUNDY,


        Defendant._____/


___ **Jury Verdict.** This action came before the jury for a trial by
the Court. The issues have been tried and the jury has rendered
it's verdict.

_X_ **Decision by Court.** This action came to trial before the Court.
    The issues have been tried and a decision has been rendered.


    IT IS ORDERED AND ADJUDGED that Permanent Injunction is entered
in favor of Plaintiff and against Defendant.



November 4, 1998
        Date



ENTERED ~
SERVED

NOV 4 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY _____ DEPUTY

LANCE S. WILSON
        Clerk

(By)Deputy Clerk,



FILED

NOV 4 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY _____ DEPUTY

20



1993V00532
BTW USAO

U.S. ATTORNEYS RECEIVED

Nov 4  4 30 PM '98

LAS VEGAS, NEV.

RECEIVED
Nov 3  4 30 PM '98
LANCE S. WILSON
BY _____

ENTERED AND SERVED

NOV 4 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CV-S-98-531-JBR (RJJ) |
|     Plaintiff, | |
| v. | **ORDER** |
| CLIVEN BUNDY, | |
|     Defendant. | |

    This matter comes before the Court on Defendant Cliven Bundy's ("Bundy") Motion to Dismiss (#4), Plaintiff's Motion for Summary Judgment (#11), and on Bundy's Motion to Strike Motion for Summary Judgment (#14). Oppositions and Replies were filed for all motions.

## I. BACKGROUND

    The United States filed a Complaint (#1) on March 27, 1998 for injunctive relief to prevent Bundy's alleged unauthorized and unlawful grazing of livestock on property owned by the United States and administered by the Secretary of the Interior, Bureau of Land Management ("BLM"), and for trespass damages.

    Beginning about 1954, Bundy or his father or both have grazed livestock on public lands owned by the United States and administered by the BLM. For several years, Bundy or his father applied to the BLM to use the Bunkerville Allotment ("Allotment") for livestock grazing and paid the BLM for the use of the Allotment. Beginning in March 1993, Bundy refused to pay the grazing bills or apply for use of the Allotment.

19

00000670
Ex. 14 - Lueders Dec. Att. A - Page 7 of 23

1    From 1973 or before until 1993, the BLM issued to Bundy's father and Bundy, as his

2   father's representative, ephemeral grazing permits to graze livestock on the Allotment.  Regions

3   classed as ephemeral do not consistently produce forage, but periodically provide annual

4   vegetation suitable for livestock grazing. 33 FED. REG. 18245.  Before grazing on an ephemeral

5   range, a person must submit an application to the BLM.  The BLM will determine if adequate

6   forage is available and that the use is consistent with all of the terms and conditions of the permit.

7    The last grazing fees paid by Bundy to the BLM was for the period of December 1, 1992 to

8   February 28, 1993: *See* Exhibit 7 to #11, Mot. Summ. Jud.  The last grazing application was for

9   the same period. *See* Exhibit 8 to #11.  The government contends Bundy did not have

10  authorization to graze livestock on the Allotment after February 28, 1993.

11    On February 26, 1993, Bundy sent an Administrative Notice of Intent to the BLM, which

12  stated his intent to graze cattle "pursuant to my vested grazing rights." *See* Exhibit 10 to #11.

13  Bundy sent several more Administrative Notice[s] of Intent in the months that followed.  On June

14  16, 1993, the BLM sent Bundy a letter informing him that his application had not been received to

15  graze livestock for the June 15, 1993 to August 31, 1993 period.  The BLM included another

16  application for Bundy to fill out and return. *See* Exhibit 12 to #11.  Bundy responded to the BLM

17  letter with another Administrative Notice and Intent, stating, among other things, that the BLM has

18  produced no documents showing it had jurisdiction over the public lands. *See* Exhibit 13 to #11.

19  The BLM began trespass detection efforts at the end of June 1993.

20    On July 13, 1993, the BLM sent Bundy a Trespass Notice and Order to Remove and gave

21  him ten days to respond.  As requested by Bundy, the BLM informed Bundy in a July 27, 1993

22  letter that it would extend the response time to 30 days.  On August 19, 1993, Bundy sent another

23  Administrative Notice and Intent, stating the BLM lacked proof that it had jurisdiction. *See*

24  Exhibit 16 to #11.

25    On January 24, 1994, the BLM delivered a Proposed Decision Order to Remove and

26  Demand for Payment to Bundy by placing it on the dashboard of Bundy's vehicle while he was in

2

1   the vehicle. BLM officials allege that Bundy became agitated, walked out of his truck and accused

2   the BLM of harassing him. He then returned to his truck, threw the decision out of the window

3   and drove away. One of Bundy's sons then picked up the decision, tore it into pieces and threw it

4   on the ground.

5          On February 17, 1994, the BLM issued a final decision canceling Bundy's ephemeral range

6   grazing permit. On March 3, 1994, Bundy sent a check for $1,961.47 to Clark County for grazing

7   fees. The BLM calculated that this amount is equal to the amount Bundy would pay to graze 85

8   cattle on the Allotment for a 12-month period if the fees were paid to the BLM in advance. Clark

9   County returned the check to Bundy since it did not have jurisdiction over the Allotment.

10         In March and April of 1994, the BLM sent letters to Bundy requesting that he pay past due

11  bills for grazing fees. Bundy responded by sending more administrative notices. In December

12  1994, Bundy or his agents served a Constructive Notice on a contractor hired by the BLM to gather

13  wild horses and burros.   In August 1995, the BLM sent Bundy another Trespass Notice and Order

14  to Remove. Bundy responded by sending a Constructive Notice and Order to Stop, in which he

15  again questioned the United States' authority to manage the Allotment. See Exhibit 28 to #11.

16         In September 1997, the BLM tried to set up a meeting with Bundy to resolve the trespasses,

17  but Bundy declined to meet with the BLM.

18         The government contends it could have impounded Bundy's livestock, but it took no action

19  because any action could have resulted in physical confrontation. Since the trespass detection

20  efforts began in late June of 1993, the BLM has kept a record of observed livestock grazing on the

21  Allotment.

22         On April 17, 1998, Bundy, a pro se defendant, filed his Answer and Motion to Dismiss

23  (#4). Bundy alleged that this Court lacks jurisdiction to hear the case. On July 22, 1998, the

24  United States filed a Motion for Summary Judgment (#11) requesting injunctive relief and

25  damages.

26

3

## II. DISCUSSION

A.   Subject Matter Jurisdiction

Bundy appears to argue in his Motion to Dismiss (#4) that the Complaint (#1) should be dismissed because this Court lacks jurisdiction since Article IV of the Constitution cannot be imposed upon him. Bundy claims that he is a citizen of Nevada and not a citizen of a territory of the United States, and he also quotes religious texts. Bundy also brings in the Property Clause, the Commerce Clause and International Treaty laws. None of these statutes, laws or other citations is relevant to the jurisdictional issue.

Bundy is correct that federal courts have limited jurisdiction. However, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345. Section 1331 provides that: "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *Duncan v. Stuetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996). Section 1345 provides that: "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States ..." 28 U.S.C. § 1345; *United States v. State of Hawaii*, 832 F.2d 1116, 1117 (9th Cir. 1987).

This Court thus has subject matter jurisdiction under  28 U.S.C. § 1345 because this civil suit was commenced by the United States.

Federal laws regulating and managing federal public lands are involved in this case where the government alleges Bundy is grazing livestock on federal lands without authority and without paying the required fees. Congress enacted the Taylor Grazing Act ("TGA"), 48 Stat. 1269, as amended, 43 U.S.C. § 315(f), in 1934 to regulate and preserve the federal lands. *Public Lands Council v. Babbitt*, No. 96-80831998 WL 559362, at *1 (10th Cir. Sept. 1, 1998). Recognizing that the TGA had not adequately protected the federal lands, Congress in 1976 enacted the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785. *Id.* at *2. The FLPMA provides that "the Attorney General may institute a civil action in any United States district court for an injunction or other appropriate order to prevent any person from utilizing public lands in

4

1    violation of regulations issued by the Secretary under this Act." 43 U.S.C. § 1733(b). This Court

2    therefore has jurisdiction under the FLPMA.

3         In his Reply (#7), Bundy explains this action started in 1992 when he received a "Full

4    Force and Effect Decision Bunkerville Allotment" from the BLM. Reply (#7), p. 5. The letter to

5    which Bundy refers is in fact dated January 28, 1993. Bundy claims this "decision concerning the

6    Desert Tortoise, if fully implemented, would lead to the end of ranching in Clark County," and his

7    ranching days would be over. Reply (#7), p. 5. The decision from the BLM does not inform

8    Bundy he can no longer graze livestock due to the protection of the Desert Tortoise, but instead

9    reminds Bundy that his grazing permit would end at the end of the next month, February 1993, and

10   the new permit application was attached to the decision. The decision informed Bundy the BLM

11   would issue him a new ten-year federal grazing permit for the Bunkerville Allotment. Mot. Dism.

12   (#4), Exh. E. The terms and conditions for the new federal grazing permit allowed for livestock

13   grazing with some restrictions to be determined by the BLM. For example, if tortoises were found

14   to be active in the early spring in a specific area, then grazing would not be allowed until the

15   amount of spring ephemeral forage had grown to a sufficient amount.

16        Bundy alleges the BLM does not have "Constitutional authority" to make the full force and

17   effect decision. The Property Clause of the United States Constitution gives Congress the power

18   "to dispose of and make all needful Rules and Regulations respecting the Territory or other

19   Property belonging to the United States." *United States v. Gardner* ("*Gardner II*"), 107 F.3d

20   1314, 1318 (9th Cir. 1997); U.S. CONST. art. IV, § 3, cl.2. This Congressional power over the

21   public lands is without limitations. *Gardner II*, 107 F.3d at 1318. Congress enacted the FLPMA,

22   which instructs the Secretary of the Interior to manage through the BLM the public lands under the

23   principles of multiple use and sustained yield. 43 U.S.C. § 1732(a). "Multiple use" requires

24   managing the public lands and their resources so that they "best meet the present and future needs

25   of the American people," and taking into account the long-term needs of future generations for

26   renewable and nonrenewable resources, including recreation, timber, wildlife and fish and

5

1   scientific values. 43 U.S.C. § 1702(c). "Sustained yield" is defined as "the achievement and

2   maintenance in perpetuity of a high-level annual or regular periodic output of the various

3   renewable resources of the public lands consistent with multiple use." *Id.* § 1702(h).

4          The FLPMA provides the Secretary of the Interior with the authority to regulate grazing

5   and issue grazing permits that require permittees to adhere to the terms and conditions of such

6   permits. *Id.* § 1752(a). The Allotment is administered by the Secretary of the Interior through the

7   BLM, thus the BLM had authority to issue the full force and effect decision. The Allotment where

8   Bundy and his father before him have been grazing livestock is classed as an ephemeral region,

9   which does not consistently produce forage. The BLM has authority under the FLPMA to place

10  restrictions on grazing when the forage declines to a level that would defeat the goals of multiple

11  use and sustained yield.

12  B.   Summary Judgment

13         Summary judgment may be granted when, viewed in the light most favorable to the

14  nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);

15  *Intel Corp. v. Hartford Acc. and Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991), "the pleadings,

16  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

17  show that there is no genuine issue as to any material facts and that the moving party is entitled to

18  judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

19  (1986). Summary judgment shall be entered "against a party who fails to make a showing

20  sufficient to establish the existence of an element essential to that party's case, and on which that

21  party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Summary judgment shall

22  not be granted if a reasonable jury could return a verdict for the nonmoving party. *Anderson v.*

23  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

24         The moving party bears the initial burden of showing the absence of a genuine issue of

25  material fact. *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party to set forth

26  specific facts demonstrating a genuine factual issue for trial. *Matsushita*, 475 U.S. at 588-87; Fed.

6

1   R. Civ. P. 56(e).  The nonmoving party may not rest upon the mere allegations or denials of his or

2   her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials

3   provided by Rule 56(e), showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 256; Fed.

4   R. Civ. P. 56(e).  The evidence of the nonmoving party is to be believed, and all justifiable

5   inferences are to be drawn in the nonmoving party's favor. *Anderson*, 477 U.S. at 255; Fed. R.

6   Civ. P. 56(e).

7          Bundy argues in his Opposition to Motion for Summary Judgment (#14) that the Court

8   should strike the government's Motion for Summary Judgment (#11) because his Motion to

9   Dismiss (#4) has not been ruled upon and thus the government's motion is "premature and

10  unnecessary."  Bundy's argument is unpersuasive.  The plaintiff may move for summary judgment

11  at any time more than twenty days after the commencement of the action.  Fed. R. Civ. P. 56(a); *G*

12  *& G Fire Sprinklers, Inc. v. Bradshaw*, Nos. 95-56639, 96-55194, 1998 WL 596442, at *9 (9th

13  Cir. September 10, 1998).  The government filed the Complaint (#1) on March 27, 1998, and it

14  filed its Motion for Summary Judgment (#11) on July 22, 1998, almost four months later.

15         Bundy argues since this Court does not have jurisdiction, it must deny the Motion for

16  Summary Judgment (#11).  Bundy's argument fails again.  Bundy's citation of *Steel Co. v.*

17  *Citizens for a Better Environment*, 118 S. Ct. 1003 (1998), does not help his case.  The Supreme

18  Court in *Steel* stated: "Without jurisdiction the court cannot proceed at all in any cause." *Id.* at

19  1012.  The Steel Court frowned upon "hypothetical jurisdiction" where courts assume jurisdiction

20  for the purpose of deciding the merits of cases. *Id.*  However, this Court is not assuming

21  jurisdiction where none exist; this Court has federal question jurisdiction and the United States is a

22  party.  Therefore, Bundy's jurisdictional argument must fail.

23  C.   Federal Lands

24         Bundy argues the federal government cannot have authority over lands "inside an admitted

25  state." *See* Motion to Dismiss (#4), p. 10.  That argument must fail because federal lands located

26  within states are federal territories under federal jurisdiction.  The FLPMA provides:

7

> The term "public lands" means any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership, except –
>
> (1) lands located on the Outer Continental Shelf; and
> (2) lands held for the benefit of Indians, Aleuts, and Eskimos.

43 U.S.C. § 1702(e).  The Bunkerville Allotment where Bundy is grazing his livestock falls within the definition of "public lands" administered by the Secretary of the Interior through the BLM.

An examination of the history of the lands in question further establishes federal ownership. On May 13, 1846, the United States declared war on Mexico.  The Treaty of Guadalupe Hidalgo ("Treaty"), 9 Stat. 922 (1848), which ended the war, was signed by the United States Congress on February 2, 1848 and ratified by the Mexican Congress on May 25, 1848.

In the Treaty, Mexico ceded land to the United States, including land that is now Nevada. *Gardner II*, 107 F.3d at 1317.  Where Mexico before the Treaty included land that is now California, Nevada, Arizona, New Mexico, Colorado, Texas and Utah, the Treaty drew the new boundary line starting at the Gulf of Mexico, opposite the mouth of the Rio Grande, following the river until the southern boundary of New Mexico, then westward until it touches the first branch of the River Gila River, then westward until it empties into the Colorado River, then to the Pacific Ocean. 9 Stat. 922, 926, Article V; *see also* Encyclopedia Britannica, Micropedia, 15th ed., vol. 5 at 528.  The public lands in Nevada are the property of the United States because the United States has held title to those public lands since 1848, when Mexico ceded the land to the United States. *Gardner II*, 107 F.3d at 1318.

Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Bundy has failed to make such a showing.  He has set forth no specific facts showing a genuine factual issue for trial. *See Matsushita*, 475 U.S. at 588-87; Fed. R. Civ. P. 56(e).  Although courts construe liberally

8

1   pleadings of pro se litigants such as Bundy in their favor, pro se litigants are still bound by the

2   rules of procedure. *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995); *King v. Atiyeh*, 814 F.2d

3   565, 567 (9th Cir. 1987). As the nonmoving party, Bundy may not rest upon the mere allegations

4   or denials of his pleadings, but he must produce specific facts, by affidavit or other evidentiary

5   materials, showing there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256; Fed. R. Civ.

6   P. 56(e). Bundy has produced no specific facts, but instead has argued that this Court has no

7   jurisdiction. Bundy's failure to produce specific facts showing a genuine issue for trial gives the

8   Court sufficient grounds to grant the Motion for Summary Judgment (#11).

9   D.   Injunctive Relief

10        Injunctive relief is appropriate when the moving party shows irreparable injury will result

11   and remedies at law are inadequate. *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998). The

12   moving party must show actual success on the merits and the balance of equities favors injunctive

13   relief. *Id.* As stated above, the United States owns the Allotment where Bundy is grazing his

14   livestock. Bundy is therefore trespassing upon United States property. Trespass is defined as

15   entering the real property of another without the owner's permission or invitation. *United States v.*

16   *Gardner* ("*Gardner I*"), 903 F. Supp. 1394, 1402 (D. Nev. 1995) (citing RESTATEMENT SECOND

17   OF TORTS, §§ 158-59). The Restatement of Torts provides that:

18
     One is subject to liability to another for trespass... if he intentionally
19
     (a) enters land in the possession of the other, or causes a thing ... to do so, or
20   (b) remains on the land, or
     (c) fails to remove from the land a thing which he is under a duty to remove.
21

22   RESTATEMENT SECOND OF TORTS, §§ 158-59. Grazing on federal public lands without a permit is

23   a grazing trespass. *Holland Livestock Ranch v. United States*, 655 F.2d 1002, 1005 (9th Cir.

24   1981).

25        *Gardner I* had facts similar to this case, where the defendants grazed livestock without

26   authority. A permanent injunction was entered against the defendants; they were ordered to

9

1   remove the livestock, and pay the owed grazing fees. *Gardner I*, 903 F. Supp. at 1403. As in

2   *Gardner I*, the United States prevails in this case on the merits since Bundy is trespassing. The

3   other component of the test requiring a showing of irreparable injury and inadequate remedies at

4   law has also been met by the United States. Bundy has been grazing his livestock on the

5   Allotment without a permit since March 1993, and he has informed the BLM in several

6   "administrative notices" that he intends to graze cattle "pursuant to my vested grazing rights." *See*

7   Exhibit 10 to #11. Despite numerous trespass notices and demands for payment from the BLM,

8   Bundy has grazed livestock on the Allotment. Irreparable harm is established in cases of

9   continuing trespasses. *See, e.g., Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 892 (1st Cir. 1988)(a

10  continuing trespass on real property can properly be enjoined); *New York State Nat'l Org. for*

11  *Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989)(defendants' stated intent to continue illegal

12  actions showed harm was of a continuing nature and permanent injunction properly issued).

13          Section 4140.1 of the Code of Federal Regulations prohibits unauthorized grazing of

14  livestock on public lands. 43 C.F.R. § 4140.1(b)(1)(i) (1998). Any person who violates the

15  grazing regulations as set forth under 43 C.F.R. § 4140.1(b) is subject to civil and criminal

16  penalties. 43 C.F.R. §§ 4140.1(b), 4170.1, 4170.2. The regulations provide that the settlement for

17  repeated willful violations is three times the value of the forage consumed by the livestock as

18  determined by the average monthly rate per AUM (animal unit month)[1]. 43 C.F.R. § 4150.3. The

19  BLM is also authorized to impound and dispose of the unauthorized livestock after written notice

20  of intent to impound. 43 C.F.R. §§ 4150.2, 4150.4, 4150.4-1, 4150.4-2; *see also Klump v. United*

21  *States*, 38 Fed. Cl. 243 (1997)(government had not violated takings clause in impounding cattle as

22  sanction for unauthorized grazing on federal lands). The government alleges that the BLM has not

23  impounded Bundy's livestock due to its anticipation the action could result in physical

24  confrontation. *See* Mot. Summ. Jud., #11, pp. 11-12. For over five years, Bundy has been

25  _____

26  [1] An animal unit month is the amount of forage necessary for the sustenance of one cow for one month.

10

1  trespassing on public lands and his livestock have consumed forage. The government has shown
2  commendable restraint in allowing this trespass to continue for so long without impounding
3  Bundy's livestock.
4
5                              **III. CONCLUSION**
6       This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1345. The United
7  States owns the Allotment where Bundy is grazing livestock without authority. Since Bundy is in
8  trespass on public lands,
9       IT IS ORDERED that Defendant's Motion to Dismiss (#4) is DENIED.
10      IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (#11) is
11  GRANTED as to the permanent injunction.
12      IT IS FURTHER ORDERED that Bundy is permanently enjoined from grazing his
13  livestock within the Bunkerville Allotment and shall remove his livestock from this allotment on
14  or before November 30, 1998.
15      IT IS FURTHER ORDERED that Plaintiff United States shall be entitled to trespass
16  damages from Bundy in the amount of $200.00 per day per head for any livestock belonging to
17  Bundy remaining on the Bunkerville Allotment after November 30, 1998.
18      IT IS FURTHER ORDERED that Defendant's Motion to Strike Motion for Summary
19  Judgment (#14) is DENIED.
20      The Clerk shall enter judgment accordingly.
21      DATED this 3rd day of November, 1998.
22
23
24                              Johnnie B. Rawlinson
25                              JOHNNIE B. RAWLINSON
                                United States District Judge
26

                              11

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**F I L E D**

MAY 1 4 1999

CATHY A. CATTERSON
CLERK, U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 98-17293 |
| Plaintiff-Appellee, | D.C. No. CV-98-531-JBR |
| v. | |
| CLIVEN D. BUNDY, | MEMORANDUM[1] |
| Defendant-Appellant. | |

**F I L E D**

JUL 2 2 1999

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
DEPUTY

Appeal from the United States District Court
for the District of Nevada
Johnnie B. Rawlinson, District Judge, Presiding

Submitted May 10, 1999[2]

Before:   REINHARDT, TROTT, and MCKEOWN, Circuit Judges.

Cliven D. Bundy appeals pro se from the district court's entry of summary

judgment for the United States in its action for trespass and to enjoin Bundy from

grazing his livestock on land administered Bureau of Land Management.  We have

---

[1]   This disposition is not appropriate for publication and may not be cited to or by the courts
of this circuit except as may be provided by 9th Cir. R. 36-3.

[2]   The panel unanimously finds this case suitable for decision without oral argument. *See*
Fed. R. App. P. 34(a)(2).

jurisdiction under 28 U.S.C. § 1291.  We review de novo the district court's entry

of summary judgment, *see United States v. Gardner*, 107 F.3d 1314, 1317 (9th

Cir. 1997), and we affirm.

Bundy contends that the district court erred by exercising jurisdiction over

the action.  For the reasons stated by the district court in its November 4, 1998

order, we reject Bundy's contention.

**AFFIRMED.**

A TRUE COPY
ATTEST
JUL - 7 1999
CATHY A. CATTERSON
Clerk of Court

Deputy Clerk

2

RECEIVED
U.S. ATTORNEY'S

**AO 450 (Rev. 5/85)  Judgment in a Civil Case @          SEP 17  4 44 PM '99

# UNITED STATES DISTRICT COURT
LAS VEGAS, NV

*****        DISTRICT OF    NEVADA

JUDGMENT IN A CIVIL CASE

CLIVEN BUNDY,

    Plaintiff,

v.

CLIVEN BUNDY,

    Defendant. /



CV-S-98-531-JBR (RJJ)

FILED

SEP 1 7 1999

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA

BY _____ D'

___ Jury Verdict. This action came before the jury for a trial by
the Court.  The issues have been tried and the jury has rendered
it's verdict.

_X Decision by Court. This action came to be considered by the
Court.  The issues have been considered and a decision has been
rendered.

IT IS ORDERED AND ADJUDGED that Plaintiff's Motion to Enforce
Injunction is GRANTED with modifications.  Defendant shall remove
his livestock from the allotment as previously ordered by the Court
in the Order entered on November 4, 1998. Defendant shall pay to
the Plaintiff $1,377.00 as willful repeated trespass damages for 51
cattle from December 1, 1998 through December 31, 1998. Defendant
shall pay to Plaintiff $45.90 per day for each day Defendant's
livestock remains on the allotment, commencing January 1, 1999.
Defendant shall pay to Plaintiff $4,123.06 for the expense incurred
by the BLM for the December 15, 1998 trespass detection flight.

September 17, 1999
Date

LANCE S. WILSON
Clerk

(SEAL)

Katry Yasick
(By) Deputy Clerk,

ENTERED AND
SERVED

SEP 1 7 1999

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA

BY _kls_   DE _Fax 9.21-99 Pannoli~lcc N Fitzgerald_

46

00000817
Ex. 14 - Lueders Dec. Att. A - Page 20 of 23

ENTERED AND SERVED
SEP 17 1999
CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY _____ DEPUTY

FILED
SEP 17 1999
CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CV-S-98-531-JBR (RJJ) |
| Plaintiff, |  |
| v. |  |
| CLIVEN BUNDY, | **ORDER** |
| Defendant. |  |

SEP 17  4 43 PM '99
LAS VEGAS, NV
RECEIVED
U.S. ATTORNEY'S

   This matter comes before the Court on United States' Motion to Enforce Injunction (#36).
Defendant did not file an opposition, and the United States filed a Reply (#37).

## I. BACKGROUND

   The United States filed a Complaint (#1) on March 27, 1998 for injunctive relief to prevent
Bundy's alleged unauthorized and unlawful grazing of livestock on property owned by the United
States and administered by the Secretary of the Interior, Bureau of Land Management ("BLM"),
and for trespass damages.

   On April 17, 1998, Bundy, a pro se defendant, filed his Answer and Motion to Dismiss (#4).
On July 22, 1998, the United States filed a Motion for Summary Judgment (#11) requesting
injunctive relief and damages.

45

1    This Court ruled on the above motions in an Order entered on November 4, 1998.

2  Defendant's Motion to Dismiss (#4) was denied, and Plaintiffs' Motion for Summary Judgment

3  (#11) was granted as to the permanent injunction.  Bundy was ordered to remove his livestock

4  from the Bunkerville Allotment on or before November 30, 1998 and was permanently enjoined

5  from grazing his livestock within the Bunkerville Allotment.  The Court further ordered that the

6  United States shall be entitled to trespass damages from Bundy in the amount of $200.00 per day

7  per head for any livestock belonging to Bundy remaining on the Bunkerville Allotment after

8  November 30, 1998.  On July 22, 1999, the Ninth Circuit Court of Appeals affirmed the order

9  dated November 4, 1998.

10    On January 27, 1999, the United States filed this motion to enforce injunction alleging that

11  Bundy continues to trespass on public lands despite this Court's order.  The United States provides

12  evidence from Robert Stager, Lead Rangeland Management Specialist of the Department of the

13  Interior ("DOI"), that he detected Bundy's livestock on the Allotment on December 15, 1998.

14

15                                    II. DISCUSSION

16    Bundy has not shown why he should not or could not comply with the Court's Order (#19)

17  entered on November 4, 1998.  The United States has submitted evidence that Bundy's cattle were

18  detected by Robert Stager, a specialist with the DOI on December 15, 1998.  Accordingly,

19    IT IS **ORDERED** that the United States' Motion to Enforce Injunction (#36) is

20  GRANTED with modifications.

21    IT IS FURTHER **ORDERED** that Bundy shall remove his livestock from this allotment as

22  previously ordered by the Court in the Order (#19) entered on November 4, 1998.

23    IT IS FURTHER **ORDERED** that Bundy shall pay to the United States $1,377.00 as

24  willful repeated trespass damages for 51 cattle from December 1, 1998 through December 31,

25  1998.

26

                                         2

1        IT IS FURTHER **ORDERED** that Bundy shall pay to the United States $45.90 per day for

2    each day Bundy's livestock remains on the allotment, commencing January 1, 1999.

3        IT IS FURTHER **ORDERED** that Bundy shall pay to the United States $4,123.06 for the

4    expense incurred by the BLM for the December 15, 1998 trespass detection flight.

5        The Clerk shall enter judgment accordingly.

6        DATED this 17th day of September, 1999.

7

8

9    JOHNNIE B. RAWLINSON

10   United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

3

ATTACHMENT B




# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Nevada State Office
1340 Financial Boulevard
Reno, Nevada  89502-7147
http://www.blm.gov/nv
**MAR 1 4 2012**

In Reply Refer To:
4150 (NVS0052)

Keith Monroe, Senior Deputy Attorney General
Nevada State Attorney General's Office
100 North Carson Street
Carson City, Nevada 89701

James Barbee
Director, Nevada Department of Agriculture
Nevada Department of Agriculture
405 South 21st Street
Sparks, NV 89431

Re:   Letter dated November 3, 2011, Requesting State Brand Inspector Cooperation for Impoundment
      of Livestock Consistent with Existing Court Order

Dear Keith Monroe and James Barbee:

On November 3, 2011, I wrote to notify the State of Nevada that the United States intends to impound
trespass livestock on federal lands in the Bunkerville Allotment (Allotment), and to request the
cooperation of the State Brand Inspector.  In my letter, I explained that the United States has documented
a significant level of trespass grazing on federal lands that include critical desert tortoise habitat,
archeological resources, and a National Recreation Area.  Some of the trespass cattle bear brands that are
registered to Mr. Cliven Bundy (Bundy), while others have no identifying marks and exhibit feral
behavior.

In 1998, the United States District Court in the District of Nevada issued an order that permanently
enjoined Bundy from placing any livestock on federal lands in the allotment and that explicitly confirmed
that the BLM has the authority to impound trespass cattle.  This permanent injunction constitutes an
"order" from a "court of competent jurisdiction" that meets the requirements of Nevada Revised Statute
(NRS) § 565.125.  I therefore requested Nevada's cooperation in issuing any necessary brand inspection
clearance certificates for the impounded livestock.

At a meeting with the Nevada Department of Agriculture (NDOA) on December 13, 2011, NDOA
verbally confirmed that it would cooperate with the United States based on the Permanent Injunction
issued by the District Court.  NDOA also confirmed that it would take possession of any estray or feral
cattle gathered from federal lands, which the State would dispose of consistent with state regulations.

In a follow-up meeting with NDOA on February 28, 2012, BLM and NDOA had further discussions
relating to the logistics and implementation of the upcoming impound.  However, subsequent to that
meeting, legal counsel for NDOA requested to meet with legal counsel for the BLM.  During the course

of that conversation, it was communicated to BLM's legal counsel that NDOA might not accept the Permanent Injunction as satisfying the requirements of NRS § 565.125 for a court order from a court of competent jurisdiction. However, we have received no confirmation or further clarification of whether or not the State Brand Inspector will issue brand certificates for livestock that are impounded in the upcoming operation.

Because information on this matter is vital as BLM moves forward with its plans, I am requesting that NDOA confirm in writing its position on issuing brand certificates for any branded livestock that are impounded *within the boundaries* of the Bunkerville Allotment. As noted in my November 2011 letter, the U.S. District Court permanently enjoined Bundy from "grazing his livestock within the Bunkerville Allotment," Order at 11 (Enclosed). The District Court specifically held that, "The United States owns the Allotment where Bundy is grazing his livestock. Bundy is therefore trespassing upon United States property." District Court Order at 9. The District Court also held that:

> The BLM is also authorized to impound and dispose of the unauthorized livestock after written notice of intent to impound. [citations omitted].

Order at 10.

The permanent injunction issued by the Court on November 8, 1998, meets the requirements of NRS § 565.125. The court's ruling imposing a permanent injunction, and the court's recognition of the BLM's authority to impound Bundy's trespass livestock, constitute the requisite "approval" from "a court of competent jurisdiction" for an impoundment of any Bundy livestock within the Bunkerville Allotment. Bundy was given a full opportunity to defend against charges of trespass and was permanently prohibited from placing livestock on the Bunkerville Allotment following rulings by the U.S. District Court and the Ninth Circuit. After a livestock trespass count in March 2011 revealed over 900 livestock grazing in trespass on the federal lands, BLM issued Bundy a Notice of Trespass and Order to Cease and Desist on June 8, 2011. This was followed by a "written notice of intent to impound" when BLM issued Bundy a Notice of Intent to Impound on July 26, 2011.[1] Inspections of the Bunkerville Allotment and surrounding areas in August 2011 and most recently in early February 2012, confirm that Bundy has not removed his livestock from the federal lands despite repeated requests and many opportunities to do so over the past year.

Bundy's continued trespass grazing within the Bunkerville Allotment constitutes a violation of the permanent injunction, and the Permanent Injunction Order, combined with the Court's explicit recognition of the BLM's authority to impound the trespass livestock, meets the requirement under NRS § 565.125 that "the governmental entity obtains approval for the seizure from a court of competent jurisdiction" as a pre-condition to the State brand inspector's issuance of a brand inspection clearance certificate or permit to remove cattle.

I am requesting that NDOA confirm in writing, whether the State Brand Inspector will accept the Permanent Injunction Order as sufficient under NRS § 565.125 to demonstrate that the United States has a court order approving the seizure of any Bundy's trespass livestock that are found within the Bunkerville Allotment. If it is NDOA's view that the Permanent Injunction Order does not meet the requirements of NRS § 565.125, it would be helpful if NDOA could provide BLM with the explicit language that would it would need in a court order to satisfy the requirements of NRS § 565.125. That would assist the BLM in presenting, to a federal court, what NDOA believes the state statute requires for purposes of obtaining a state brand certificate for branded livestock.

---

[1] The Notice of Intent to Impound was also published for five days in the Las Vegas Review-Journal and/or Las Vegas Sun and in the Mesquite Local NEWS. It was also posted at the local Post Office.

Given the short timeframe before the impoundment is scheduled to begin and the need for BLM to make its plans in an informed manner based on fact, rather than speculation with respect to whether the Brand Inspector will be in a position to issue brand certificates, I would greatly appreciate a written response to my letter no later than March 20, 2012.

Thank you for your willingness to work with BLM in our attempt to resolve a long-standing trespass situation that has negatively impacted public land resources, National Park resources, and State Park resources.

Sincerely,

/s/ Rex McKnight

Amy Lueders
State Director

Enclosure

cc:     Blayne Northrop
        Division of Livestock Identification, Agricultural Enforcement Unit
        4780 E Idaho Street
        Elko, Nevada 89801

        Dennis Belcourt
        Nevada State Attorney General's Office
        100 North Carson Street
        Carson City, Nevada 89701

cc (via email):
        Nancy Zahedi, Office of the Solicitor, Sacramento, CA
        Greg Lind, Office of the Solicitor, San Francisco, CA
        Mary Jo Rugwell, BLM SNDO, Las Vegas, NV

# ATTACHMENT C



STATE OF NEVADA

OFFICE OF THE ATTORNEY GENERAL

100 North Carson Street
Carson City, Nevada 89701-4717

**CATHERINE CORTEZ MASTO**
*Attorney General*

**KEITH G. MUNRO**
*Assistant Attorney General*

**GREGORY M. SMITH**
*Chief of Staff*

March 23, 2012

Amy Lueders
Bureau of Land Management
Nevada State Office
1340 Financial Boulevard
Reno, Nevada 89502-7147

> **Re:** *Your Letter Dated March 14, 2012 concerning State Brand inspector Cooperation for Impoundment of Livestock, Ref. 4150(NVS0052)*

Dear Ms. Lueders:

Thank you for the above referenced letter, in which you requested a confirmation in writing whether the Nevada Department of Agriculture ("the Department") would accept an order dated November 4, 1998 entered in the matter of United States of America v. Cliven Bundy, CV-S-98-531, in the United States District Court, District of Nevada ("the Permanent Injunction Order"), as constituting an order approving the seizure of Mr. Bundy's cattle as contemplated by NRS 565.125.

NRS 565.125 limits the authority of the Department and its brand inspectors as follows:

> 1. Notwithstanding any provision of this chapter to the contrary, if a governmental entity seizes any privately owned animals subject to brand inspection pursuant to this chapter, the Department or its authorized inspector shall not issue brand inspection clearance certificates or permits to remove the animals from a brand inspection district or for the transfer of ownership of the animals by sale or otherwise unless:
> (a) Before the seizure, the governmental entity obtains approval for the seizure from a court of competent jurisdiction; and

Amy Leuders
March 23, 2012
Page 2

> (b) The governmental entity submits a copy of the order
> approving the seizure to the Department or its authorized
> inspector.
> 2. The provisions of this section do not apply to:
> (a) An estray, as defined in NRS 569.0075;
> (b) Feral livestock, as defined in NRS 569.008;
> (c) A wild horse or burro, as defined in 16 U.S.C. § 1332;
> (d) An animal that is impounded or sold by the Department
> pursuant to NRS 575.060; or
> (e) An animal that is seized by a governmental entity to
> protect the health and safety of the public or to prevent
> cruelty to animals.

BLM has requested that the Department make available its brand inspectors in connection with a proposed roundup of cattle in the Bunkerville Allotment and other BLM administered lands in the vicinity thereof in which cattle have been observed grazing without permission.  Some of those cattle have been identified as having Mr. Bundy's brand, while others are likely estray.  BLM intends to seize Mr. Bundy's cattle that are found unlawfully grazing on said lands and further contemplates causing them to be moved outside the brand inspection district for sale or other disposition.

The Permanent Injunction Order permanently enjoins Mr. Bundy from grazing his livestock within the Bunkerville Allotment and requires him to remove his livestock from the allotment on or before November 30, 1998, and awards damages to the United States in the amount of $200 per day per head for "any livestock belonging to Bundy remaining on the Bunkerville Allotment after November 30, 1998."  In its explanation of the order, the District Court cited to numerous provisions of the Code of Federal Regulations, including provisions that authorize impoundment and disposal of unauthorized livestock after written notice of intent to impound.

In determining whether the Permanent Injunction Order fulfills the requirements of NRS 565.125, we are required to look first to the terms of the statute, and effect must be given to the plain meaning of statutes.  *Orion Portfolio Services 2 LLC v. County of Clark ex rel. University Medical Center of Southern Nevada*, 245 P.3d 527, 532 126 Nev. Adv. Op. 39 (2010).  The terms of the statute are clear in requiring that before a clearance certificate or permit to remove animals from an inspect district may issue on seizure of branded livestock by a government entity, the government entity must have obtained and must provide a court order approving the seizure.

Black's Law Dictionary, Fifth Edition (1979) defines "approval" as "(t)he act of confirming, ratifying, assenting, sanctioning, or consenting to some act or thing done by another."

Amy Leuders
March 23, 2012
Page 3


We do not see anything in the Permanent Injunction Order approving seizure of Mr. Bundy's cattle.  First, it does not appear from the order that the United States was even requesting approval of seizure of Mr. Bundy's cattle.  Second, the relief granted by the order is limited by its terms to requiring Mr. Bundy to remove his cattle on pain of damages on failure to remove.

Your letter attaches significance to the portions of the discussion portion of Permanent Injunction citing to Federal regulations authorizing impoundment and removal of livestock found without authorization on BLM administered land. Respectfully, this attachment of significance is misplaced.  These references do not constitute an "order approving" seizure of cattle but are included only to support the terms of the injunction, which merely require Mr. Bundy to remove his cattle or face damages.

Based on the clear language of NRS 565.125, the Department and its brand inspectors may not issue clearance certificates or permits to remove any cattle seized by BLM on allegations of trespassing without presenting to the Department a court order that by its terms confirms, assents to or sanctions seizure of the cattle, obtained prior to seizure thereof.  The Permanent Injunction Order does not satisfy the requirement of NRS 565.125.

Sincerely,

CATHERINE CORTEZ MASTO
Attorney General


By:  *Keith G. Munro*
     KEITH G. MUNRO
     Assistant Attorney General


DLB:KGM:mas

Amy Leuders
March 23, 2012
Page 4

Cc:  Sheriff Doug Gillespie