

**CLIVEN D. BUNDY,** *Pro se*
**3315 Gold Butte Road**
**Bunkerville, NV 98007**
**PH (702) 346.5564**

2013 JAN 11  P 3: 35

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                          Case No. CV 2:12-cv-00804-LDG-GWF

CLIVEN D. BUNDY, *Pro se*

Defendant.

---

### BUNDY'S OPPOSITION TO UNITED STATES' MOTION
### FOR SUMMARY JUDGMENT AND MOTION TO DISMISS

**This document is timely filed.**

**COMES NOW, Cliven D. Bundy, Defendant** and objects to the UNITED STATES' MOTION FOR SUMMARY JUDGMENT for the following reasons listed herein below and asks that this Honorable Court should not grant the relief requested by the Plaintiff. Moreover, Defendant asks that this Honorable Court grant Defendant's Motion to Dismiss incorporated herein.

Defendant's Objection and Motion are supported herein below in the Memorandum of Points and Authorities. The Plaintiff has failed to meet the standard of proof as set forth in their own Motion which alleges in part, "Bundy has continued to graze his cattle since 2000 on property owned by the United States without any authority to do so." (Plaintiff's Motion @ pg-2, Ln 1-2). Defendant denies he grazes any cattle on land owned by the United States and denies

1

that the Plaintiff has failed to prove the origin of the cattle, which may or may not be grazing in an area of Clark County Nevada and therefore all the Real Parties in Interest have not been named by Plaintiff. In all of the reams of exhibits presented by Plaintiff they have failed to prove that Defendant has **NOT** already gathered all his cattle starting back in the 1990's.

Plaintiff has also in times past, fraudulently enforced land management decisions in the area in question, which belong to the State of Nevada, based on International Treaty Law wherein the critter or the plant was not engaged in the proper foreign commerce to trigger federal jurisdiction. In addition thereto, this Honorable Court is lacking jurisdiction to decide this matter because Plaintiff has failed to establish a federal question of controversy. The Plaintiff has even admitted that it needs this Court to grant them an order so that they can then sell cattle pursuant to the brand laws of the Sovereign State of Nevada. However, Nevada has made it unlawful for any impounded cattle to be sold by any regulatory agency until first there has been a proper order for such relief obtained from a competent court of proper jurisdiction, which this Court is not as will be shown herein below.

Plaintiff's request should be denied and Defendant's Motion to Dismiss should be granted.

DATED this __11__ day of January, 2013

**RESPECTFULL SUBMITTED**

**CLIVEN D. BUNDY,** *Pro se*
**3315 Gold Butte Road**
**Bunkerville, NV 98007**
**PH (702) 346.5564**

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

I respectfully request that the Honorable Court take judicial notice of the fact that I am not an attorney and that my pleadings before the Honorable Court in this matter can be held to less stringent standards than the formal pleadings of a lawyer.  Haines v. Kerner, 405 US 519 (1972).

Defendant seeks relief on the grounds that this Court lacks proper jurisdiction in this matter because he does not graze any cattle on any lands owned by the United States.  Now the counter argument to Defendant's assertion here is that all the questions of who owns the lands in question has long been settled, when in fact it will be shown that that is not true.  Plaintiff tries to establish foundation that the question of the public lands ownership was settled in U.S. v. NYE COUNTY, NEV. 920 F. Supp. 1108 (1996), however it will be shown that that case actually did not settle the land ownership matter as the Plaintiff would like us to believe.  The Sovereign State of Nevada spoke and acted back in 1979 (NRS 321.596-599 et seq (effective July 1, 1979)) and settled the public lands ownership matter within the boundaries of the State and this Court said in Nye that it did in fact take such an act that does establish a controversy.  This Court however, did not conclude a complete judicial determination on that matter back then as the then Nevada Attorney General intervened and filed a stipulation that the United States owned the public lands which was in defiance of the Act.  Defendant contends that the Nevada AG did not have that unilateral power to make such a determination and waive the sovereignty on some 93% of the land surface of the State of Nevada.  This Court then followed the wishes of the Nevada AG when it stated in its opinion in part as follows:

3

[N]evada concedes that, by statutes enacted in 1979, it claims ownership of some of the lands in question. Nevada's enactment of statutes claiming ownership is sufficient to create an adverse legal interest to the United States' assertion of ownership. See United States v. Oregon, 295 U.S. 1, 26, 55 S.Ct. 610, 620, 79 L.Ed. 1267 (1935). This is particularly true where, as in the present matter, a political subdivision of Nevada has relied upon that adverse legal position to take actions opposing the United States' asserted title. While Nevada now concedes that its statutory claim is legally untenable, that concession does not moot the question of whether it claims ownership of the public lands. **Rather, the concession is tantamount to a consent that judgment should be entered in favor of the United States**. Id @ 1113-14. (Emphasis added).

The above language of this very Court is very clear that no proper adjudication of the public lands ownership happened in that matter. Plaintiff tries to run with that from that point forward stating it was again settled in several cases thereafter dealing with this same issue. Only the assumption of ownership has been there in all of the cases dealing with public lands disputes from time in memorial. A Sovereign State has not ever stood to defend their ownership claim in the court of original jurisdiction the Supreme Court of the United States.

## II.    Nevada Appropriated the Public Lands in 1979

NRS 321.596-599 *et seq* (effective July 1, 1979) and its Legislative Findings therewith did what congress failed to complete in its promise in the Enabling Act admitting Nevada into the Union in 1864. Defendant stipulates that the United States acquired the public domain making up Nevada by and through the Treaty of Guadalupe Hidalgo in 1848. It is what happened in 1864 that instructed Congress to honor certain terms and conditions to have another new State of the Union join in. The common challenge to Defendant's claim herein is the disclaimer clause in the Enabling Act which states as follows:

Section 1. Authorization for formation of state. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the inhabitants of that portion of the territory of Nevada included in the boundaries hereinafter designated be, and they are hereby, authorized to form for themselves, out of

4

said territory, a state government, with the name aforesaid, which said state, when formed, **shall be admitted into the Union upon an equal footing with the original states, in all respects whatsoever**. (Emphasis Added).

Sec. 4. Authorization to form constitution and state government; limitations. *And be it further enacted,*

Third. That the people inhabiting said territory do agree and declare that they **forever disclaim all right and title to the unappropriated public lands lying within said territory, and that the same shall be and remain at the sole and entire disposition of the United States**; and that the lands belonging to citizens of the United States residing without the said state shall never be taxed higher than the land belonging to the residents thereof; and that no taxes shall be imposed by said state on lands or property therein belonging to, or which may hereafter be purchased by, the United States.  (Emphasis Added).

Sec. 10. Five percent of subsequent sales of public lands by United States to be paid to state for public roads and irrigation. *And be it further enacted,* That five percentum of the proceeds of **the sales of all public lands lying within said state, which shall be sold by the United States subsequent to the admission of said state into the Union**, after deducting all the expenses incident to the same, shall be paid to the said state for the purpose of making and improving public roads, constructing ditches or canals, to effect a general system of irrigation of the agricultural land in the state, as the legislature shall direct. (Emphasis Added).

It appears in the Third part of Sec-4 of the Act that the People of the new State have disclaimed all rights, title claim etc. forever to the United States.  Upon clear examination of Section 1 and 10 all that the disclaimer is a Quit Claim Deed to the United States by the Inhabitants putting a condition on the new State that when the United States disposed of the public lands that the State would not have any claim to cloud title to the new owners.  When coupling all of these Sections together, which includes the Equal Footing status guaranteed to Nevada by Congress, we see the United States was only appointed the sole real-estate agent for Nevada, the same as Ohio did to settle the Revolutionary War debt with the sale proceeds of the public lands in that State.  The school sections granted prior to statehood was an appropriation prior to statehood, not a waiver as some would claim.  Once statehood happened, that was instant and Nevada was on an Equal Footing with all her Sister States of the Union.

## Fig-1 LAND MASS IN NEVADA CLAIMED BY FEDERAL GOVERNMENT



Sec-10 made it clear that Congress agreed to dispose of the public lands when it was agreed by the parties that; the sales of all public lands lying within said state, … shall be sold by the United States subsequent to the admission of said state into the Union. The above map (Fig-1) clearly shows that Congress did not keep that promise and then unilaterally withdrew all disposals in 1976 with the enactment of the *Federal Land Policy and Management Act*, or *FLPMA* (Pub.L. 94-579), which is well known that was the Act that fueled the Sagebrush

Rebellion and hence NRS 321.596-599 *et seq.* Let us examine history and what Congress said about these enabling acts and the intention set forth by the Congressional House Public Lands Committee stating in part as follows:

> "When these States stipulated not to tax the lands of the United States until they were sold, they rested upon the implied engagement of Congress to cause them to be sold, within a reasonable time. No just equivalent has been given those States for a surrender of an attribute of sovereignty so important to their welfare, and to an equal standing with the original States. ... A remedy for such great evils may be found in carrying into effect the spirit of the Federal Constitution, which knows of no inequality in the powers and rights of the several States." 20th U.S. Congress, Public Lands Committee Report, February 5, 1828.

> Delaying the transfer of public lands "would not only contravene the spirit of the several acts of cession which have been adverted to, but would be inconsistent with the several compacts between the general government and the new States on their admission." And would "have been pronounced on all hands a violation of the compact, and a most revolting breach of good faith on the part of the United States?" 23rd U.S. Congress, Public Lands Committee Report, December 27, 1833.

The evidence is overwhelming that Congress has ever been duty-bound to transfer title to the public lands within a reasonable time from the new states being admitted into the Union. Congress itself said so in this Committee. So did the formerly "western states" of Illinois, Florida, Missouri, Louisiana, and many others during those prior years in the early 1800's and we see Congress then did dispose of the public lands within those new States and they were on a **full** Equal Footing with the Original 13 Sovereign States. The disposals stopped at the Colorado border and west. More of the record from the House Committee dealing with the matter:

> Illinois "cannot resist impressing in on the serous attention of the Congress of the Union how injurious must be the operation of such a retarded disposition of the vast bodies of public land lying within this State, and how inevitably it must check its increase and population, and consequent improvement and resources, proving highly detrimental to the State, in point of revenue, by withholding from taxation such vast proportions of its soil." (Supplementing the original record).

7

Delaying the disposal of the public lands "operates as a virtual infraction of the compact."  (Supplementing the original record)

"From the terms of that compact, and upon the supposition that the same is obligatory upon the parties to it, any act on the part of the government to delay the sales of the land in a reasonable period, whether accomplished by a positive refusal to sell, or by demanding for it a sum greatly beyond its value, by which the sales would be defeated, in a great measure, if not wholly so, would doubtless be an infraction of the compact itself."

"Should the present oppressive system continue, and no amelioration take place, it will not be denied that this question is susceptible of being presented in so grave an aspect as to involve considerations of the deepest magnitude, and demand the most serious and enlightened reflection of those charged with the interests of the confederacy." 20th Congress, 2nd Session, February 2, 1829.



**Fig-2 Federal lands within the United States**

Fig-2 shows further that Congress withheld their side of the obligation to dispose of the public lands starting at the Colorado border and then to the west. The Equal Footing doctrine has been ruled to be nothing more than political equality and not meant to be in the truest sense of the words. But if that be the case the courts have a conflict in these rulings and that needs to be corrected. Notice in Fig-1 that the only lands that are the State of Nevada are the white spots which are hardly distinguishable; the black portions are federally claimed lands and still remain in territorial status. Note what Plaintiff rightly puts forth in its motion as to what the status of their claimed lands are:

> [T]he United States retains and manages these federal lands pursuant to its powers under the Constitution, primarily the Property Clause, which gives the Congress the "power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The Supreme Court has consistently interpreted this power to be expansive, repeatedly observing that "the power over the public land thus entrusted to Congress is **without limitations**." United States v. City & County of S.F., 310 U.S. 16, 29 (1940). See also Kleppe v. New Mexico, 426 U.S. 529, 539 (1976); Alabama v. Texas, 347 U.S. 272, 273 (1954); United States v. California, 332 U.S. 19, 27 (1947); Gibson v. Choteau, 80 U.S. 92, 99 (1871); United States v. Gratiot, 39 U.S. 526, 537 (1840). The Supreme Court has emphasized that Congress properly exercises "the powers of both a proprietor and of a legislature over the public domain." Kleppe, 426 U.S. at 540; Alabama, 347 U.S. at 273. (Plaintiff's Motion @ pg-22, Ln 26-28 and pg-23, Ln 1-9) (Emphasis Added).

Defendant concedes that the case law holding that the United States, as Plaintiff contends in this matter does have the unlimited powers over federally owned lands "<u>without limitations</u>". The implication of that is that on the black portions of the lands in Fig-1 clearly means there are no rights protected under the Constitution. Defendant has no water rights; Nevada water law does not apply to allow him to graze his cattle. All water rights that were developed over several generations of adjudications under state law are extinguished and taken without the due process of eminent domain or just compensation, i.e. no constitutional protections for property owned by

9

the Defendant.  This was never the intent of the Inhabitants of the Territory of Nevada or the Citizens of the new State of Nevada.  The "western states" of 1828 (Illinois, Indiana, Missouri, Arkansas, Louisiana, Alabama, and Florida) struggled with the same issues we face today from the federal government failing to transfer title to their public lands (i.e., poor education funding, stifled economy, restricted access to abundant resources, etc.).  Those 1828 "western states" succeeded in compelling the federal government to transfer title to their public lands.  Nevada has done the same through its Sovereign Legislature through NRS 321.596-599 *et seq* and the Legislative Findings therewith.

Moreover, Defendant has operated under and relied upon the authority in NRS 321.596-599 *et seq* wherein the Sovereign State of Nevada by and through its Legislature laid claim to the lands in question in the *Bundy I* matter and the lands named in this pending matter.  The State of Nevada laid claim to all lands within its borders retroactively to its coming into the Union.  Defendant asserts that the arguments offered herein with respect to the proper reading of the Enabling Act for Nevada is a matter of first impression as is the element that the **"without limitations"** powers of the United States cannot be allowed to thrive within a Sovereign State of the Union.  That in and of itself violates those holdings of the courts that the Equal Footing Doctrine only applies to political equality with sister states.

Such power is a full governing power unbridled by the limits of the Constitution.  Pursuant to such power the Congress is authorized to establish an executive, a legislature, and courts and not the Republican form of government guaranteed by Art. VI; indeed, a territorial act is itself a constitution.  We see such governing power clearly ceases immediately on Nevada's statehood.  American Insurance v. 356 Bales of Cotton, 26 U.S. 511 (1828); Brenner v. Porter, 50 U.S. 234 (1850).

10

"The Constitution deals with states, their people and their representatives. The sole object of the territorial clause was to transfer to the new government the Northwest Territory and to give power to apply that territory to the objects dictated by the states. The Constitution does not extend to territories of its own force. Congress has power over territory it does not possess in the States". <u>Downes v. Bidwell</u>, page 773.

The clear implication of this holding is that the powers authorized to Congress pursuant to Article IV, Section 3, Clause 2, can **exist only outside the boundaries of states admitted into the union**. It is irrational to assert that such full powers of governance covering 93% of the land surface (see Fig-1) of a Sovereign State of the Union and at the same time assert that such state has been admitted to the Union on an equal footing with the original states in every respect whatsoever.

The well settled law of how important the terms and instructions of the Enabling Act are is cemented in <u>HAWAII ET AL. v. OFFICE OF HAWAIIAN AFFAIRS ET AL.</u> 556 U. S. ____ (2009) wherein the Court stated in part; ...("[T]he consequences of admission are instantaneous, and it ignores the uniquely sovereign character of that event ... to suggest that subsequent events somehow can diminish what has already been bestowed"). "And that proposition applies *a fortiori* where virtually all of the State's public lands ... are at stake." Id @ ____.

Defendant contends that this language is instructive that the long held interpretation of the Disclaimer Clause in the Enabling Act is inappropriate because Section-10, the five percentum clause in the Act dictates in no obfuscation that the United States shall be the real-estate agent for the new just admitted State of Nevada and shall dispose of all of the public lands in that new State in a timely manner and when the Congress defaulted on its promise and obligates the State of Nevada exercising its sovereign powers within its borders did dispose of all the public lands to itself.

To allow this type of inequality to continue where Nevada is not on an Equal Footing with the original 13 States and the others east of Colorado perpetuates the "separate but equal" doctrine held early on in this nation's jurisprudence which was properly overturned in <u>Brown v Board of Education</u> 347 U.S. 483 (1954).

### III.    This Court Lacks Original Jurisdiction Over the Lands Ownership Issue

Pursuant to Article III, Section 2 of the Constitution, the US Supreme Court has original jurisdiction over cases involving disputes between the states.  Currently, the US Supreme Court only exercises original jurisdiction in disputes between two States.  Then Congress says in 28 USC § 1251 (b) *The Supreme Court shall have original but not exclusive jurisdiction of: (2) All controversies between the United States and a State.*  This unilateral act by Congress is an over-reach of their power that limits the sovereignty of the State of Nevada.  Nevada in enacting NRS 321.596-599 *et seq* was a sovereign act of a Sovereign State which is directly related to land boundaries within the State and along its borders with its sister States.  Nevada never ceded its sovereignty to a court below the US Supreme Court.  In <u>Rhode Island v. Massachusetts,</u> 37 U.S. 12 Pet. 657 657 (1838) instruction as to what the sovereign states yielded to as follows; "[T]he several states of the United States, in their highest sovereign capacity, in the convention of the people thereof, on whom, by the Revolution, the prerogative of the Crown and the transcendent power of Parliament devolved in a plenitude unimpaired by any act and controllable by no authority, adopted the Constitution, by which they respectively made to the United States a grant of judicial power over controversies between two or more states. By the Constitution, it was ordained that this judicial power, in cases where a state was a party, should be exercised by the Supreme Court as one of original jurisdiction. The States waived their exemption from judicial

power as sovereigns by original and inherent right by their own grant of its exercise over themselves in such cases, but which they would not grant to any inferior tribunal." Id @ 657.

While it can be argued that Rhode Island dealt with a matter between two states, certainly the lands ownership controversy established by Nevada enacting NRS 321.596-599 *et seq* did not reduce it to a level wherein the United States is larger than the Sovereign Nation State that created it, and then is barred from the original jurisdiction of the Court it created in the Constitution by and through the acts of her Sister Nation States at the creation of the Constitution.

Defendant respectfully offers that this Court does not have the jurisdiction to determine the ownership of the public lands in a manner that is counter to that position established in NRS 321.596-599 *et seq* by and through the Sovereign act of the State of Nevada and is requested by Defendant to deny Plaintiff's Motion for Summary Judgment and Grant Defendant's Motion to Dismiss.

## IV.   Endangered Species Act Does Not Apply

Plaintiff alleges Defendant violated the Endangered Species Act (ESA) way back in the 1990's and has continued the same violations to this day. Plaintiff offers that a determination by the Agency was made based upon a biological opinion and all cattle in basically Clark County Nevada are to be removed. At the time there were 52 Permittees running cattle in the questioned area claimed by the United States and everyone was ordered to remove their cattle. Defendant took a civil disobedient stand and said no. More on that stand later.

The then and now entire authority claimed by Plaintiff at that time was pursuant to the *Endangered Species Act of 1973* (ESA; 7 U.S.C. § 136, 16 U.S.C. § 1531 et seq.) establishing the so called "Desert Tortoise", and now plants etc., in Southern Nevada "threatened and

13

endangered" pursuant to said Act. However, the particular "Desert Tortoise" and the plants they

used were never proven to meet the criteria of the Act wherein the critter and the plants had to be

engaged in "foreign commerce" pursuant to the originating Treaties; see these sections of the Act

which state in part as follows:

> ### (a) Findings
>
> The Congress finds and declares that—
> (1) various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;
> (2) other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction;
> (3) these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;
> (4) the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to—
> (A) migratory bird treaties with Canada and Mexico;
> (B) the Migratory and Endangered Bird Treaty with Japan;
> (C) the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;
> (D) the International Convention for the Northwest Atlantic Fisheries;
> (E) the International Convention for the High Seas Fisheries of the North Pacific Ocean;
> (F) the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and
> (G) other international agreements; and
>
> ### (b) Purposes
>
> The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

And then a final definition of what the critter and the plants need to be engaged in:

> (9) The term "foreign commerce" includes, among other things, any transaction—
> (A) between persons within one foreign country;
> (B) between persons in two or more foreign countries;

*(C) between a person within the United States and a person in a foreign country; or*
*(D) between persons within the United States, where the fish and wildlife in question are moving in any country or countries outside the United States.*

The linchpin being used by Plaintiff for the authority to gather and impound Defendant's cattle is the Endangered Species Act of 1973. The effect that they wanted to bring about appears to be the removal of only Defendant's property (cattle) from the range for the Desert Tortoise and plants etc., all listed under the Act. The Act was passed pursuant to the Convention on International Trade in Endangered Species of Wild Fauna and Flora (1973). Moreover, the Act derives its sole authority from international agreements. Sec. 2(a)(4)(A-G) of the Act.

The purpose of the Act is all predicated on achieving the purposes of treaties and conventions which are international in nature. Sec 2(b) of the Act. The commercial activity, which has to be foreign commerce, referred to in the Act only involves individuals that are not described or defined persons such as the Defendant or the type of business Defendant is not now nor ever have been engaged in. Sec 3(1) & (6) (A-D) of the Act.

The following line of cases that deal with International Treaty Law show lack of standing on the part of Plaintiff should it pursue such a scheme to impose International Treaty Law upon Defendant's property. The following cases state in part;

Santovincenzo v. Egan,284 U.S. 30, 40, 52 S.Ct. 81 (1931):

> "The treaty-making power is broad enough to cover all subjects that properly pertain to our foreign relations, and agreement with respect to the rights and privileges of citizens of the United States in foreign countries, and of the nationals of such countries within the United States, and the disposition of the property of aliens dying within the territory of the respective parties, is within the scope of that power."

In re Reid, 6 F. Supp. 800, 803 (D. Ore., 1934):

15

"For, although the treaty making power extends to all subjects which are proper for negotiation between nations, 'it would not be contended that it extends so far as to authorize what the Constitution forbids."

Rev. on other grounds, 73 F.2d 153 (9th Cir., 1934).

Skiriotes v. State of Florida, 313 U.S. 69, 72, 73, 61 S.Ct. 924, 927 (1941):

"International law is a part of our law and as such is the law of all States of the Union..., but it is a part of our law for application of its own principles, and these are concerned with International rights and duties and not with domestic rights and duties."

Spies v. McGhee, 316 Mich. 614, 25 N.W.2d 638, 644 (1947):

"We do not understand it to be a principle of law that a treaty between sovereign nations is applicable to the contractual rights between citizens of the United States when a determination of these rights is sought in State courts."

Antosz v. State Comp. Comm., 43 S.E.2d 397 (W.Va. App., 1947): (Workmen's comp case with NRAs claiming benefits):

"But such construction should not be extended so as to infringe upon the Constitution of the United States, or to invade the province of the states of the Union in matters inherently local, or to restrict the various states in the exercise of their sovereign powers, " Id., at 399, 400.

Seery v. United States, 127 F. Supp. 601, 606 (Ct. Cl., 1955):

"{A}n executive agreement, not being a transaction which is even mentioned in the Constitution, cannot impair Constitutional rights."

Pierre v. Eastern Air Lines, Inc., 152 F. Supp. 486 (D.N.J., 1957): (Baggage lost on international flight):

"The Warsaw Convention regulates and applies to all international transportation of persons, baggage, or goods performed by aircraft for hire," Id., at 487.

"It is well settled that no article or term of a treaty may nullify any guarantee of a right preserved by constitutional provision to our citizens. No treaty may authorize what the Constitution forbids," Id., at 488.

Powell v. Zuckert, 366 F. 2d 634, 640 (D.C. Cir., 1966): (Discharge of Airman in Japan, government asserted treaty as authority):

16

> "[N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.  Reid v. Covert, 354 U.S. 1, 16, 77 S.Ct. 1222, 12430…"

Hjelle v. Brooks,  377 F. Supp. 430, 438 (D. Alaska, 1974):  (Crab fisherman sued state to enjoin fish regulations):

> "As to the treaties, plaintiffs lack standing to invoke them on their behalf, for plaintiffs are 'not in a position to invoke the rights of other governments or of the nationals of other countries.'"

Soucheray v. Corps of Engineers of U.S. Army, 483 F. Supp. 352, 357 (W. D. Wis., 1979):  (Landowners sued for damages for water level of Lake Superior rising):

> "The Court is in full agreement with plaintiffs that a treaty may not violate the constitutional rights of American citizens."

And, even the United Nations Charter, Art. 2, par. 7:

> "Nothing contained in the present charter shall authorize the United Nations to interfere in matters which are essentially within the domestic jurisdiction of any state…"

Based on the authorities cited above, the Plaintiff and this Court cannot impose the power of International Treaty Law against Defendant and his property in this instant matter and this Court must dismiss this action.  In addition, if this entire matter is based on a false and fraudulent premise for its authority when it was conceived, then it is even unto this day fruit of the poisonous tree and all actions for enforcement of it that have been implemented are indeed *void ab initio* and do not attach to Defendant or his property.

Plaintiff may assert that the Act and all authority therefrom operate against Defendant and his property via the Commerce Clause.  For the answer on that we need to examine what the Supreme Court has stated in part in the following cases;

A.L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837 1935):

17

"If the commerce clause were construed to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people, and the authority of the state over its domestic concerns would exist only by sufferance of the federal government. Indeed, on such a theory, even the development of the state's commercial facilities would be subject to federal control," Id., at 546.

United States v. Lopez, --- US --- (1995) citing from the slip opinion @ 18-19

"In Jones & Laughlin Steel, 301 U. S., at 37, we held that the question of congressional power under the Commerce Clause "is necessarily one of degree." To the same effect is the concurring opinion of Justice Cardozo in Schecter Poultry:"

'There is a view of causation that would obliterate the distinction of what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.'" 295 U. S., at 554 (quoting United States v. A.L.A. Schecter Poultry Corp. 76 F. 2d 617, 624 (CA2 1935) (L. Hand, J., concurring)).'

"These are not precise formulations, and in the nature of things they cannot be. But we think they point the way to a correct decision of this case. The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce."

"To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. See supra, at 8. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, cf. Gibbons v. Ogden, supra, at 195, and that there never will be a distinction between what is truly national and what is truly local, cf. Jones & Laughlin Steel, supra, at 30. This we are unwilling to do."

"For the foregoing reasons the judgment of the Court of Appeals is Affirmed."

Lopez: Justice Thomas, concurring.  Citing that slip opinion @ 13-14

"There is a much better interpretation of the "affect[s]" language: because the Court had earlier noted that the commerce power did not extend to wholly intrastate commerce, the Court was acknowledging that although the line between intrastate and interstate/foreign commerce would be difficult to draw, federal authority could not be construed to cover purely intrastate commerce.  Commerce that did not affect another State could never be said to be commerce "among the several States."

"But even if one were to adopt the dissent's reading, the "affect[s]" language, at most, permits Congress to regulate only intrastate commerce that substantially affects interstate and foreign commerce.  There is no reason to believe that Chief Justice Marshall was asserting that Congress could regulate all activities that affect interstate commerce."  See Ibid.

"The second source of confusion stems from the Court's praise for the Constitution's division of power between the States and the Federal Government:"

'The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government.'  Id., at 195.

"In this passage, the Court merely was making the well understood point that the Constitution commits matters of "national" concern to Congress and leaves "local" matters to the States.  The Court was **not** saying that whatever Congress believes is a national matter becomes an object of federal control.  The matters of national concern are enumerated in the Constitution: war, taxes, patents, and copyrights, uniform rules of naturalization and bankruptcy, types of commerce, and so on.  See generally U. S. Const., Art I, Sec. 8.  Gibbons' emphatic statements that Congress could not regulate many matters that affect commerce confirm that the Court did not read the Commerce Clause as granting Congress control over matters that "affect the States generally.'  Gibbons simply cannot be construed as the principal dissent would have it." (Emphasis in original) Lopez @ ---.

"I am aware of no cases prior to the New Deal that characterized the power flowing from the Commerce Clause as sweepingly as does our

substantial effects test.  My review of the case law indicates that the substantial effects test is but an innovation of the 20th century." Lopez @ ---.

The above authority clearly denies Plaintiff and this Court the ability to assert Commerce Clause jurisdiction over the Defendant and his property with respect to the ESA authority by and/or through International Treaty Law jurisdiction or any other attempted combination of schemes to impose any such authority.

Also, throughout all these several years, no one from the Plaintiff's side has asserted, brought forth or entered any evidence that any of the Desert Tortoises or plants etc., in and around the lands in question of Clark County, Nevada area is migrating internationally and/or engaged in interstate migrations or foreign commerce.  It would have to be proven that the very Tortoises, plants, etc., in and around the area are such migratory types involved in foreign commerce and have engaged in that specific manner to trigger any type of Commerce Clause jurisdiction.  This Court must dismiss this action because there is no Commerce Clause jurisdiction available to the Plaintiff and/or this Court to proceed against Defendant and his property.

**V.    Defendant is in compliance with all State and Local Laws and is not a danger**

Defendant throughout the years has followed all State and Local laws and nothing to the contrary has been presented.  Plaintiff asserts they need an order from this Court to be able to gather and impound Defendant's cattle and property to enable them to sell any possible seized cattle.  Defendant has been defamed by Plaintiff when it tries to twist out of context Defendant's words that he will do "Whatever it takes" to protect his property, when even their record over the years shows Defendant never been violent and has been very vocal in the public speaking arena, exercising his 1st Amendment Right to free speech and the ability to exercise civil protest

20

against the government.  Defendant has been singled out by Plaintiff as the only person in Clark County, Nevada that has cattle in Trespass.  This segregating out Defendant from all other possible alleged violators in that area is discriminatory and an attack upon Defendant's political views making him the same as a political enemy of the government that needs destroyed.

Moreover, under the laws of the State this is an open range law state and it is the burden of the property owner to "fence out" unwanted livestock.  If the State of Nevada does not want livestock (cattle) grazing in the area in question, then the burden is upon the State to comply with the fence out law.

**VI.** **Plaintiff has failed to include all Real Parties in Interest nor has it proven the origin of the livestock allegedly in Trespass thereby failing to meet the Standard for Injunctive Relief sought set forth in Rule 56**

If all the arguments herein above are rejected by this Court then Defendant asks this Court to take judicial notice of the fact that Plaintiff has overlooked the obvious when alleging that Defendant, Cliven Bundy, is the only person in the world that has cattle in Trespass on what they claim to be their lands.  Plaintiff has failed to offer into evidence any DNA that goes back to the original time in the 1990's when all Permittees then were ordered to remove their cattle from the area.

It has been well established that many of the 52 Permittees just walked off and left their cattle back then as the entire area there in Clark County, Nevada had been grazed in common for several generations.  The burden is upon the Plaintiff to make certain that the cattle in the area are all livestock belonging to Defendant.  They cannot just point to an area and see a cow and charge that it is Defendant's cow.  It is very conceivable that since Defendant has admittedly operated every year thereafter for over the twenty year span that he has indeed gathered all of what was his herd that grazed there in common.  If Defendant over the years stuck a brand on a

wild cow now and then that is just that, branding a wild cow that has been running wild. The length of time that has passed from the first order to remove all cattle has been two decades or more. Certainly Plaintiff cannot submit evidence now as to whose cows are whose. Therefore, Plaintiff has failed to list all the real parties in interest in this matter and probably never can.

If some of the wild cattle over the years have been branded by Defendant, those cattle's origins are still unknown. It is well known in the area that even some domestic cattle held in fenced areas on private lands have jumped those fences and gone wild (as well as their subsequent offspring) and could be mixed within this wild herd and do not belong to the Defendant. Not to mention strays from Lincoln County, NV, Utah and the Arizona Strip.

This Court cannot grant Plaintiff the relief sought against Defendant on such subjective and weak evidence; which, using what they have put forth, is no evidence at all. Moreover, Plaintiff, using such weak evidence wants to use Defendant as a political example and this Court to give them an order to create a several million dollar round up and then go after Defendant for all the costs calling them Trespass penalties. That is no different than an agency doing a roundup of wild Horses or Burros on a Rancher's ranch and then suing him for the costs of said round up. Therefore, as stated herein above, this matter must be dismissed.

## CONCLUSION

**WHEREFORE,** Defendant respectfully submits his **OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS** and for all the foregoing reasons argued herein above respectfully requests that Plaintiff's request for relief be denied because they have not stated a claim upon which relief can be granted and Defendant hereby respectfully requests that his Motion to Dismiss be Granted and for such relief as this Court deems just and proper.

DATED this ___/ /___ day of January, 2013

Respectfully submitted,

**CLIVEN D. BUNDY,** *Pro se*
3315 Gold Butte Road
Bunkerville, NV 98007
PH (702) 346.5564

## PROOF OF SERVICE

I, **Cliven D. Bundy,** certify that this document entitled **BUNDY'S OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS** was served upon Plaintiff on this date by the below identification method of service:

**US MAIL**

> **IGNACIA S. MORENO**
> **Assistant Attorney General**
> **TERRY M. PETRIE, Attorney**
> **STEPHEN R. TERRELL, Attorney**
> **United States Department of Justice**
> **Environment and Natural Resources Division**
> **Natural Resources Section**
> **999 18th Street, South Terrace, Suite 370**
> **Denver CO 80202**
>
> **DANIEL G. BOGDEN**
> **United States Attorney**
> **NADIA AHMED**
> **Special Assistant United States Attorney**
> **333 Las Vegas Blvd, South, Suite 5000**
> **Las Vegas NV 89101**

Dated this ___/ /___ day of January, 2013.

Cliven D. Bundy

23