1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEVADA

2

3   -------------------------------x
                                   :
4   UNITED STATES OF AMERICA,      :
                                   :
5           Plaintiff,             :
                                   :
6           v.                     :   Case No.
                                   :   2:12-CV-804-LDG-GWF
7   CLIVEN D. BUNDY,               :
                                   :
8           Defendant             :
                                   :
9   -------------------------------x

10

11                  333 Las Vegas Boulevard, South
                    Las Vegas, Nevada

12

13                  Tuesday, October 23, 2011

14   Deposition of:

15                  CLIVEN D. BUNDY

16   a witness, called for examination by counsel for the

17   Plaintiff, pursuant to notice and agreement as to time and

18   place, at the United States Attorney's Office, Las Vegas,

19   Nevada, before Sandy A. Dahlheimer, a Notary Public, where

20   were present on behalf of the respective parties:

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 1 of 29

1                          A P P E A R A N C E S

2

On Behalf of the Plaintiff:

3

TERRY M. PETRIE, ESQ.
4     United States Department of Justice
Environment and Natural Resources Division
5     Natural Resources Section
999 18th Street, South Terrace
6     Suite 370
Denver, Colorado  80202

7

NANCY C. ZAHEDI, ESQ.
8     GREGORY LIND, ESQ.
Department of the Interior
9     Office of the Solicitor
Pacific Southwest Region
10    2800 Cottage Way
Suite E-1712
11    Sacramento, California  95825

12    ALICE C. NEWTON
Lake Mead National Recreation Area
13    601 Nevada Way
Boulder City, Nevada  89005

14

LAUREN BROWN
15    Bureau of Land Management
4701 North Torrey Pines Drive
16    Las Vegas, Nevada  89130

17    On Behalf of the Defendant:

18    CLIVEN D. BUNDY, IN PRO PER
Post Office Box 7175
19    Bunkerville, Nevada  89007
702-346-5564

20

21    Also Present:  Carol Bundy

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

1              Do you see that, sir?

2      A.    Yes, I understand it.

3      Q.    Sir, you've seen this document before?

4      A.    Yes, I have.

5      Q.    Thank you.  Sir, that's just simply to establish

6  we're having a deposition today and here's the document

7  that lined it up.

8              Sir, have you ever been deposed before in a

9  proceeding like this?

10     A.    One other time.  Yes, I have.

11     Q.    When was that?

12     A.    It's been several years dealing with a Department

13 of Transportation, State of Nevada.

14     Q.    Anything to do with cattle?

15     A.    Yeah, it was.

16     Q.    Can you tell us what that was about?

17     A.    We had cattle get hit on the freeway, and I was

18 in there giving deposition on that case.

19     Q.    Was this a case brought by the Department of

20 Transportation?

21     A.    No.  I was with them.  They sued -- or State of

22 Nevada, I guess, and it was my cattle involved so they sued

23 me also, and there was a contractor involved.  They sued

24 them so there's a three-way suit with a private, you know,

25 party suing.

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 3 of 29

1     Q.   I understand.  So the "they" that you're

2   mentioning are the people whose car hit the cattle?

3     A.   Yes.

4     Q.   Was this like in a local State Court or District

5   Court?

6     A.   State Court.  It was a case, which in the freeway

7   fence, you know, we have the open range laws, but this was

8   inside the freeway fence so they had a case against the

9   State because of, you know, maintenance or our gate wasn't

10   closed -- that type of thing.

11     Q.   About where was this accident?  About where did

12   it happen?

13     A.   Probably about mile marker 115, I-15 North.

14     Q.   Okay.  This was several years ago?

15     A.   Yeah. I don't know.  At least over ten years ago

16   probably.

17     Q.   Any other depositions, sir?

18     A.   That's the only one.

19     Q.   I've been deposed myself so it's quite an

20   experience.

21          Sir, let me go through a couple of basics about

22   this deposition.  First, in a big general way, I want to

23   talk to you about your cattle operations as a general

24   subject.

25          When I ask you questions, if you don't understand

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 4 of 29

1       A.   No.

2       Q.   Since the year 2000 -- my question is going to

3  focus from the year 2000 through today -- have you grazed

4  your cattle on lands both inside the former Bunkerville

5  Allotment, which you now have characterized here today as

6  your ranch, as well as lands outside of the Bunkerville

7  Allotment outside your ranch?

8       A.   Yes.

9       Q.   Has that been done routinely over the course of

10  those now 12 years?

11       A.   Yes.

12       Q.   When you graze your cattle, is there some kind of

13  a system or methodology that you use with it?  In other

14  words, is it like a continuous grazing operation that you

15  have out there?

16       A.   Yes.

17       Q.   Year round basically?

18       A.   Yes.

19       Q.   What I'm going to do here, sir -- let's go off

20  the record.

21            (Off the record.)

22            (On the record.)

23            BY MR. PETRIE:

24       Q.   What I'm going to do, sir, is hand you a map that

25  we'll mark as Exhibit 4 that was prepared for this case.

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 5 of 29

1    questions up to this point, if I might express, you know,

2    you asked me if I run cattle on the Bunkerville -- old

3    Bunkerville Allotment, and you asked if I run cattle on the

4    new trespass land, and my answer is yes; then you hand me a

5    map that is a lot broader in my thinking that I had cattle

6    so there's a problem there.  In other words, I answered the

7    question before I seen the map.  Make that part of the

8    record.

9         Q.   That's a good point, and I appreciate that.  I

10   have an appreciation for that, and indeed where I'd like to

11   go next -- and I apologize because I can tell as an aside

12   from your manner, your demeanor, that you feel a little

13   perturbed like maybe I mislead you.  And I apologize

14   because that certainly was not my intent.

15        What I'd like to do next is what I'd like you to

16   do is to mark on this map certain things.  Okay.  To

17   include your understanding of where you ran your cattle,

18   that sort of thing.  Okay?  So that, for example, the map

19   here is not meant to suggest -- and let's just use this as

20   an example of my point -- if you take a look at the map,

21   sir, that we have marked, sir, as Exhibit 4.

22        You see -- if you take a look at where I-15 as it

23   works its way northeast from Las Vegas how it eventually

24   intersects into the portion of the map where you see the

25   new trespass lands being denoted with the hash marks and

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 6 of 29

1    Q.   Okay.  Sir, I think you made the statement you'd

2    like that to be part of the deposition record?

3    A.   Yes.

4    Q.   Okay.  We'll go ahead and just simply mark it as

5    deposition exhibit next in line would be 6.

6              (Whereupon, Exhibit 6 was marked for

7    identification.)

8              THE WITNESS:  And I have a copy I've marked to

9    you.  It's presented at deposition October 23, 2012.  It's

10   marked on the paper.

11             BY MR. PETRIE:

12   Q.   What we're going to do, sir, is take a blown-up

13   version of the Exhibit 4 and we'll just call it Exhibit

14   4-A.

15             (Whereupon, Exhibit 4-A was marked for

16   identification.)

17             BY MR. PETRIE:

18   Q.   What I'd like you to do, sir, is to do a couple

19   of things.  First, take a look at it.  Make sure you're

20   satisfied that it appears to be a larger version of Exhibit

21   4.  And then what I'd like to do from there is to gain your

22   assistance in having you through a series of marks and

23   locate and identify for the record those places that --

24   first, we'll do the farthest south, farthest north,

25   farthest east, farthest west that you have an understanding

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 7 of 29

 1   that you have grazed your cattle.

 2          So take your time and make sure as you compare

 3   the two first.

 4      A.   Okay.  I recognize this as being the same as the

 5   map that has the coding on which indicates that this map

 6   represents several Government entities or owned land and

 7   also cities and Clark County, Nevada -- anyway, several,

 8   most of them being some type of Government agency.

 9          With the response that I just basically filed or

10   gave to you as a deposition, I would say that I have

11   answered your questions here, I guess, asked and answered.

12   I've asked -- you've asked about these things and I've

13   explained what my position is so asked and answered.

14      Q.   Is your objection?

15      A.   Is my objection.

16      Q.   I appreciate that.  Let me respond to that.

17          First, I plan as I was mentioning a moment or two

18   ago to ask you to mark the farthest locations

19   directionally -- north, south, east, west -- that you have

20   an understanding that your cattle have grazed.  By my

21   understanding, that's a different question that I've not

22   asked you before.

23          The closest question that comes to it is a

24   different question and that question was whether or not you

25   have since the year 2000, in fact, grazed your cattle

                    FREE STATE REPORTING, INC.
                   Court Reporting/Transcription
                      D.C. Area 301-261-1902
                     Balt.& Annap. 410-974-0947

                                              U.S. Mot. Summ. J. - Ex. 4
                                              Page 8 of 29

 1    outside what you now today call your ranch, which the

 2    Government has understood to be the former Bunkerville

 3    Allotment.  Your answer was yes, that indeed you have done

 4    so, and so on the face of it, they're different questions.

 5              And further you've also testified here today that

 6    the map that depicts the new trespass lands are larger,

 7    broader than what you had understood; and so by virtue of

 8    this question, it also serves to allow you to, in a sense,

 9    to limit the contours of where you believe that you have

10    grazed your cattle.

11              So if you could, sir, what I'd like to do is to

12    start to the north and so what I'd like you to do --

13         A.   But my objection here is the fact that this is a

14    United States map claiming they own this property, and I

15    claim -- my claim is I do not run cattle on federal land.

16    I run cattle on -- and I don't mind telling you -- I guess

17    I'll mark this, but I want this part of the record -- I

18    will mark this and the end of my statement it will be

19    Nevada State public land.

20         Q.   Sir, I understand your contention, which is that

21    these lands that are depicted on this map as new trespass

22    lands that the parties have a fundamental disagreement over

23    who owns those lands.  Okay.  You contend it's owned by the

24    State of Nevada.  The Government says no, the United States

25    owns that land.

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 9 of 29

1         Please understand that the act of you labeling

2   something on this map to show the limits, the outer

3   contours of where you graze your cattle, is not a

4   concession by you that the land, in fact, is owned by the

5   United States.  That's something the parties are going to

6   have to fight over.  We're just focusing here in this

7   deposition on the location, the places where your cattle

8   have grazed.  Does that help?

9         A.   It does to a certain extent.  I do not deny that

10  I'm in the ranching business.  I do not deny that I run

11  cattle on my ranch, and I do not deny that my cattle have

12  run on what you call new trespass lands.  I have -- I don't

13  deny any of those things.

14        I did state that this new trespass land is a lot

15  broader than I feel that my cattle run, but when I start

16  marking a United States map that's coded like this, it

17  seems to me like I'm agreeing that that is United States

18  land, and I'm not agreeing with that.

19        Q.   I understand your reservation.  I understand your

20  reservation, but suffice it to say, one, I've assured you

21  that you're not making that concession.  Second, with the

22  help of the court reporter, the transcript itself will

23  reflect that Cliven Bundy said that I am not conceding that

24  this land denoted as new trespass lands, in fact, is owned

25  by the United States.  You've made that point very clear,

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 10 of 29

1    sir.

2             And to help us out here just so that the record

3    is clear, as you place the marks, let's do it

4    directionally.  So as we go to the north as you recall, the

5    farthest northern most point, let's use the letter "N" and

6    circle it; and we'll do the same thing for each of the

7    other directions.  East will be an "E;" south will be an

8    "S;" west would be a "W."

9        A.    You sure you want it on this big map because I

10   can do it on a smaller one

11       Q.    Yeah, I'll tell you what.  If -- let's -- I think

12   it makes sense.  Let's do it on the smaller map because I

13   don't see the smaller map getting particularly cluttered.

14       A.    You want me to do it with this pen?

15       Q.    Yes.

16       A.    You want a bigger marker?

17       Q.    I don't think I have a bigger marker.  So if you

18   could, just circle with the letter for the direction.  Now,

19   wait one second.  I've got perhaps an assist coming.

20   Somebody's got a marker.  Okay.

21       A.    Ask me the question one more time and I'll try to

22   do it.

23       Q.    Absolutely.  What I'd like you to do is to -- let

24   me propose it this way.  What I'd like to do for each of

25   the directions on the compass -- north, south, east,

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 11 of 29

1    west -- have you mark that; and then realizing that the

2    area in which the cattle have grazed will not form a

3    perfect circle, what I'd like you to do is connecting those

4    northern and eastern and southern and western most points

5    then, draw a very -- and I want the record to be very

6    clear.  It's an approximation -- of the total landmass in

7    which you have an understanding that your cattle graze.

8    Does that make sense?

9         A.   Yes, I will try to do that.

10        Q.   Okay.  Take your time, sir.

11        A.   (Witness complies.)  Anyway, I'll draw a lot of

12   lines here quite bold and so we can see.

13        Q.   Sure.

14        A.   Now, I've started on the northeast corner.

15        Q.   That's fine, wherever you'd like.

16        A.   Okay.  I got myself drawing too broad here.  I

17   might have to start a new map.  Hell, it's all right.  I'll

18   go for this where we're at.  My problem was I was

19   thinking --

20        Q.   You mind if I come over to your side?

21        A.   Yeah, it's all right.  I can draw another line

22   and void that.  How's that?  How would that be?

23        Q.   That would be fine.

24        A.   Okay.  You see, I was thinking at this point here

25   and I went through here.  I really need to come right down

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 12 of 29

1    to this point here so I'll pick up a little bit of this

2    here like this.

3        Q.   What you're depicting is on the west side of the

4    Overton arm?

5        A.   Yeah, the Valley of Fire.

6        Q.   You know what you could do is just -- yeah.

7        A.   Right here.

8        Q.   What you might want to do is just draw a squiggly

9    line all the way through it.

10        A.   Okay.

11        Q.   Okay.  And what we want to do is get this really

12    clear that this is not the line.  I've had better pens.

13        A.   That pen is not working very good.

14        Q.   Just so the record captures what we're doing

15    here --

16        A.   Okay.  Now, here's a big area.  See, I'm picking

17    up a little here.  And this is actually was a community

18    allotment we have in common here, but you got it marked

19    that way so I'm identifying it that way.  This whole area,

20    as far as I know, I haven't had a cow in it.

21        Q.   Just so the record's able to follow what we're

22    talking about here.  First, you were describing how in the

23    west side of the Overton arm that the line you had

24    initially drawn coming south from the Valley of Fire State

25    Park basically ran coterminous with the western side of

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 13 of 29

1    what the map depicts as the new trespass lands for that

2    part of the map; and then it then gets close to the bottom

3    of it; and then it takes a right-angle turn and connects to

4    the Overton arm or Lake Mead.

5              And you were saying and have now changed the map

6    to reflect that no, no, no, that was an overstatement.  And

7    instead what we have now is a diagonal line that runs from

8    the Valley of Fire State Park in a southeasterly direction

9    where it now connects to apparently the shoreline of Lake

10   Mead, the Overton arm.  So that is the first line.

11             Did I state that correctly, sir?

12        A.   Yes.

13        Q.   Then the second thing that you commented on is up

14   at the north end of the map, north of what would be I-15,

15   the boundary that you drew showing your understanding of

16   where your cattle were, that is west of the northern-most

17   part of the former Bunkerville Allotment, which is part of

18   what you consider your ranch that there was a community

19   allotment there within it.

20        A.   Yeah, we run in common there, and that's never

21   been fenced away or anything.

22        Q.   Just so we're clear about what you're saying, is

23   that community allotment active today by your

24   understanding?

25        A.   No.

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 14 of 29

1      Q.   About when did it come to a close?

2      A.   I would say in the early '70s.

3      Q.   Okay.  And then the third item -- and you add to

4  it if I'm omitting anything -- the third point that you

5  made is that essentially what would be -- this is a rough

6  characterization of it -- the northwest part of the new

7  trespass lands to encompass the area that's north of the

8  area that's marked as Glendale in white --

9      A.   Glendale -- let's see -- Glendale, Logandale, and

10  Overton.

11      Q.   Yes, north of it is land where you do not believe

12  your cattle have grazed?

13      A.   Right.

14      Q.   Okay.  And so that boundary there is on the east

15  and appears to be coterminous with the boundaries for the

16  former Bunkerville Allotment and your land until it gets to

17  I-15?

18      A.   Right.

19      Q.   Is that an accurate recitation, sir?

20      A.   Yes.

21      Q.   Okay.  Thanks.

22      A.   Now, I'm going to mark the southeast of Lake Mead

23  that I feel like my cattle have run on the new trespass

24  lands, and I'll do that right now.  That pen --

25      Q.   That pen is dying on us.

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 15 of 29

61

 1        A.   It's all right.  I think I'll be able to --

 2        Q.   What we might do is if I could ask somebody to go

 3   to the main office --

 4        A.   I've got it good enough.  We'll scratch it on

 5   there.

 6        Q.   We really want it -- if you could indulge me here

 7   for a moment, sir, and we'll go off the record.  We'll have

 8   hopefully a better marker device and ask you to just

 9   retrace it so it's clear to anybody that looks at it

10   they'll be able to figure out what you drew there.

11        A.   Yes, I'll do that.

12             MR. PETRIE:  We can go ahead and go off the

13   record.

14             (Off the record.)

15             (On the record.)

16             BY MR. PETRIE:

17        Q.   Mr. Bundy, we're back on the record.  And during

18   the break, we took steps to address a failing on my part.

19             Lawyer 101 says you have markers that make

20   bright, delible marks that are easy for all to see; and the

21   original instrument we used, a red ink pen, was not up to

22   the task.

23             So what we've done is over that red ink line and

24   we have asked you and you have retraced that red line with

25   a black Magic Marker; is that correct, sir?

62

```
 1        A.    Yes.

 2        Q.    And, again, just for the record here so that it's

 3   clear, those black lines represent by your understanding

 4   the outer limits of where your cattle have grazed?

 5        A.    Yes.

 6        Q.    I'm going to hand you, sir, another document.

 7   We'll have this marked as Exhibit 7.

 8              (Whereupon, Exhibit 7 was marked for

 9   identification.)

10              BY MR. PETRIE:

11        Q.    I think this will look familiar to you.

12        A.    Well, I got interested in reading, I guess.

13        Q.    Sir, do you recognize this document?

14        A.    Well, let me go through it a little bit more.

15        Q.    Sure.

16        A.    Okay.  I recognize at least part of it.

17        Q.    Sir, I'm focused specifically on the first page.

18   Sir, does this document appear to be information contained

19   on a blog spot that's titled bundyranch.blogspot.com?

20        A.    Yes.

21        Q.    Sir, on the first page of this exhibit, there's

22   an entry that's dated May 12, 2012.  Do you see that?

23        A.    Yes.

24        Q.    And at the bottom of that entry appears to be

25   your name, Cliven D. Bundy.
```

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 17 of 29

64

```
 1        A.    Right.

 2        Q.    Where is the Gold Butte headquarters located?

 3   And let's go ahead and mark it again on this map.  We'll

 4   use the black marker and we'll just use HQ to denote that.

 5        A.    This thing turned round right here. HQ?

 6        Q.    Yes, sir.

 7        A.    (Witness complies.)

 8        Q.    Thank you.  And this appears to be located in

 9   what would be the southeast corner of the area that you

10   previously marked for the outer limits for where you

11   understand your cattle have grazed; is that correct, sir?

12        A.    Yes.

13        Q.    And that appears to be a portion of the map,

14   which the Government contends is new trespass lands?

15        A.    Yes.

16        Q.    Thank you.

17              Speaking of the cattle that were grazing, sir, we

18   talked earlier about how your ranch has employed the use of

19   brand marks and earmarks, brands and earmarks; is that

20   right, sir?

21        A.    Yes.

22        Q.    Okay.  Some of the cattle that you have grazed,

23   are they unbranded?

24        A.    Yes.

25        Q.    About what percentage, if you've got a sense of
```

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 18 of 29

1    that?

2        A.   On the knoll -- new trespass land, I would just

3    estimate -- you wanted to know about the branded or

4    nonbranded now?

5        Q.   Nonbranded.

6        A.   I would say approximately 40 percent of them are

7    nonbranded.

8        Q.   If -- don't laugh at this question because it's

9    probably got a very logical answer, but you're fielding a

10   question from a guy who does not run cattle.  For somebody

11   like Petrie, he goes out there and he comes across one of

12   your unbranded cattle.  Is there anything about the cow

13   that would tell Petrie that, yes, this cow belongs to

14   Cliven Bundy?

15       A.   Two things, the genetic of the animal and the

16   herd it was running with.

17       Q.   The latter suggesting that, if an unbranded cow

18   is in the presence of other Bundy marked cattle, there is

19   pretty good odds it's also a Bundy cow?

20       A.   Yes.

21       Q.   I wasn't clear on that and I appreciate you're

22   educating me.

23            Sir, and this will revisit an item we were

24   discussing earlier, but specifically to the new trespass

25   lands, do you have any kind of fee title to any of those

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 19 of 29

 1   Nevada statute's saying that State of Nevada has as it says

 2   in NRS 321.596 that the State of Nevada has a strong moral

 3   claim to the land?

 4        A.   A strong moral claim?

 5        Q.   Yeah.  If you actually read the first statute in

 6   that citation, but aside from the strong moral claim

 7   language, I understand that you're saying the effect of

 8   that statute allows you to use, but it's not the same thing

 9   as a lease; is it?

10        A.   No, it's not.  But it is a form of a lease, I

11   guess, if I have the rights.

12        Q.   Form of an authorization to use it?

13        A.   Yes.

14        Q.   But it's just not the typical lease?

15        A.   No, it's not a typical lease between you and me.

16        Q.   Okay.  I get what you're saying there and I

17   appreciate that.

18             Sir, do you -- and, again, it's the same line of

19   questions here -- do you have any authorization from BLM to

20   use any of the new trespass lands that the Government, BLM,

21   administers on behalf of the United States recognizing that

22   you dispute the ownership of it but nonetheless BLM does

23   carry out activities to administer some of the lands

24   located within the new trespass?  Do you have any kind of

25   authorization from them?

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 20 of 29

```
 1        A.   No.

 2        Q.   How about -- the same question but from the

 3   vantage point of Nation Park Services.  Do you have any

 4   kind of authorization from National Park Service?

 5        A.   No.

 6        Q.   Okay.  Let's just take a quick break.

 7             (Off the record.)

 8             (On the record.)

 9             BY MR. PETRIE:

10        Q.   Sir, are you aware that the Federal Government

11   has designated certain portions of the lands out there in

12   the Gold Butte area as lands where it has designated

13   habitat for different species to be protected under the

14   Endangered Species Act such as the desert tortoise and the

15   southwestern willow fly catcher?  Are you aware of that?

16        A.   Yes.

17        Q.   Sir, do you have any understanding about whether

18   or not your cattle in the course of their grazing have

19   sometimes damaged the vegetation and the habitat for these

20   different species?

21        A.   No.

22        Q.   Are you aware that your cattle have sometimes

23   eaten newly planted vegetation in areas, which are trying

24   to restore the land, the vegetation on it?

25        A.   No.
```

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 21 of 29

```
1        A.    Could be.

2        Q.    Okay.  How about 20?

3        A.    Could be.

4        Q.    30?

5        A.    Could be.

6        Q.    How about 50?

7        A.    Could be.

8        Q.    Okay.  At what point would you say definitely no,

9   I don't have 100, or I don't have 200?  Any sense of that?

10       A.    Well, I probably have near 100 range improvements

11  on that land.

12       Q.    So that we're clear, when you say "that land," is

13  that the former Bunkerville?

14       A.    Yes, the Bundy ranch.

15       Q.    Okay.  How about same line of questions?  I'm

16  just trying to get a sense of the number for range

17  improvements in what the government characterizes as new

18  trespass lands.

19       A.    I have none.

20       Q.    None?  Okay.

21       A.    Let me clarify some things that have happened

22  there that I've had something to do with.  For example, if

23  there's a waterline broke or a water not getting into the

24  water trough, if I go there, I fix that waterline and put

25  it in the trough if I can do it.  There's been a couple of
```

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 22 of 29

 1   occasions where I've done that kind of improvement or

 2   maintenance, either way you want to call it; and I do that

 3   for two purposes.  I do it for more than two purposes.

 4         One, I do it because it does benefit any

 5   livestock or wildlife that's in the area.  It's a safety

 6   thing for a human to come along there with a broken car or

 7   something and needs a drink, and it's a waste of a resource

 8   if I can do some kind of improvement.  I'll move a rock or

 9   two or build a dam or put a pipeline together all the time,

10   even if it's on new trespass land.

11         Q.   I understand.  Then the waterlines that you're

12   referring to, are sometimes those waterlines in pipes?

13         A.   Yes.

14         Q.   And you've repaired pipes that were burst or

15   broken or cracked out there in the new trespass land?

16         A.   Maybe one or two in the sense of fixing it,

17   putting it into the trough and making sure the water is not

18   wasted. No type of major maintenance on a waterline have I

19   ever done in the new trespass lands.

20         Q.   Do you have any understanding as to who placed

21   the water trough or the water pipeline?

22         A.   Only that the prior ranch owners did that.

23         Q.   Do you have any understanding about whether or

24   not the pipeline or water troughs that you have come across

25   in the new trespass lands were placed there initially for

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 23 of 29

1    livestock purposes or for any other purpose?  Do you have

2    any sense of that?

3         A.   It was for livestock and wildlife.

4         Q.   I'm not doubting you when I ask this.  What's the

5    basis for your understanding that it was placed there

6    initially for those purposes?

7         A.   The benefit of wildlife and cattle.

8         Q.   I'm asking how it is that you know that?  Is it

9    because the person who placed it there told it to you, for

10   example, or is it just common sense that tells you that out

11   here in the middle of nowhere it's got to be for that

12   reason?

13        A.   No.  Your question is partly yes.  That's part of

14   the reason, but the other part is that I've witnessed

15   livestock and wildlife using those things, and I know that

16   they've been improved by man, which I assume the rancher is

17   the man that improved that.  The new trespass land mainly

18   talks about the Gold Butte area now, not Gold Butte area

19   but Gold Butte.

20            We're talking about one hundred plus years of

21   range improvements on that that are still existing.

22   They're still there, and so the pipelines, the head houses,

23   the troughs, the trails -- all those things still exist

24   upon that land even though there's not a rancher there.

25        Q.   Okay.  Do you have any authorization from BLM or

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 24 of 29

1    from NPS for any range improvements since the year 2000 out

2    in the former Bunkerville Allotment?

3        A.   No.

4        Q.   How about same question since the year 2000, but

5    in this instance for the new trespass lands?

6        A.   No.  I could back up a little bit.

7        Q.   If you need to, please do.

8        A.   Just on temporary use of say trails, say

9    temporary trails, the Park Service has okayed that type of

10   action, and I really don't have anything in writing, but

11   they've provided me with a lock and key to get into their

12   property and to do those kind of things.  And we have put

13   up a temporary trail and fences and then basically took

14   them down when they're through.  So in other words, I have

15   done some of that kind of work on that land.

16       Q.   Have you placed salt licks on the new trespass

17   land?

18       A.   Yes.

19       Q.   How about placing hay on the new trespass land?

20       A.   Only for trapping.

21       Q.   Trapping --

22       A.   Trapping cattle.  In other words, try to gather

23   those cattle off that land.

24       Q.   Have you -- I think you answered this earlier so

25   I apologize if I'm being redundant.  In the new trespass

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 25 of 29

 1   help orient you, I'm going to show you a map that's a USGS

 2   map, and it says BLM 2005 Nevada, Lake Mead, and the scale

 3   is 1 to 100,000.

 4          And what I'm going to do is show you a place on

 5   this map that's marked as Mockingbird Spring.  You see

 6   that, sir?

 7       A.   Okay.

 8       Q.   And then in conjunction with where that's

 9   located, if you can then take a look at Exhibit 4 and get

10   an idea roughly from comparing the two maps where

11   Mockingbird Spring would be --

12       A.   This is what we call headquarters right here.

13       Q.   Yes, sir.

14       A.   And Mockingbird Spring -- I don't know where it

15   is so show me.

16       Q.   It's right here, sir.  It's to the west of what

17   you called headquarters, Mockingbird Spring.

18          Do you see the entry here on the USGS map?

19       A.   Okay.  I can see it.  I never know that was

20   Mockingbird Spring, but now Quail is a little more

21   familiar.

22       Q.   Quail Spring, yes.

23       A.   Okay.  Ask me what you want to know.

24       Q.   Well, the question I had was whether or not you

25   have used a corral at the Mockingbird Spring site?

FREE STATE REPORTING, INC.
Court Reporting/Transcription
D.C. Area 301-261-1902
Balt.& Annap. 410-974-0947

U.S. Mot. Summ. J. - Ex. 4
Page 26 of 29

1          A.   Definitely, no.  If somebody's used a corral,

2     then it must be somebody stealing my cows.

3          Q.   Do you know if -- and I phrased the question in

4     the context of you using a corral.  Do you know if there's

5     a corral there even if you haven't used it?

6          A.   No, I don't believe -- in my way of looking at

7     this map, there's no corral there.  Let me see.  Well,

8     Quail, Spring Quail Wash.  I know where that is.  Quail

9     Spring.

10          You know, I don't know -- if that's Mockingbird

11     in the way I'm looking at this, I might have to take that

12     statement back.  I don't know what the name of it was, but

13     yes, I have trapped some cattle or attempted to trap cattle

14     there.  And if I'm looking at this at Quail Spring Wash, I

15     know where that is, and I know there's a good corral there.

16     So I would assume that that's probably a corral that I have

17     used. I mean, I think I probably used it one time and in

18     the last say several years to try to trap some cattle

19     there.

20          Q.   And so there, as you think further, that perhaps

21     indeed there is a corral there that was used?

22          A.   Yeah, I think so.  Yes.

23          Q.   Any idea who put that corral there in the first

24     place?

25          A.   Well, it's prior ranchers.  I don't know whether

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 27 of 29

1          Now, let's go back to the question.  Let's assume

2    the federal authorities have the authorization to present

3    themselves on land, whether you call it your ranch or the

4    former Bunkerville Allotment, or for that matter the new

5    trespass lands, and they've got the authorization in hand

6    to remove cattle that belongs to you and they literally,

7    physically, take the steps necessary to accomplish that

8    right there and you're standing by.

9          Are you going to undertake any effort to

10   physically stop that?

11       A.   Yes.

12       Q.   What efforts would that be?

13       A.   Whatever it takes.

14       Q.   Okay.  Would that include -- when you say

15   "whatever it takes," would that include the soliciting, the

16   assistance of neighbors, friends, family, supporters of

17   yours to do whatever it takes in the scenario I just

18   described?

19       A.   Yes.

20       Q.   Whatever it takes -- well, no.  Okay.

21          Sir, as you know, there was an earlier

22   proceeding, an earlier case, that the United States brought

23   against you back in the late '90s, 1998, 1999.

24          Do you recall that the Court issued an order for

25   you to remove your cattle that the Court determined were

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 28 of 29

 1   trespassing on the lands that we call the former

 2   Bunkerville Allotment and which you now call the Bundy

 3   ranch?  Do you recall that?

 4       A.   Yes.

 5       Q.   You never removed your cattle, did you?

 6       A.   Right.

 7       Q.   Sir, one last question here and we'll let you and

 8   your wife get on with your day.  After that topic, whatever

 9   it takes, this is going to be a tame ending.

10            If you would take a look at the answer that you

11   filed in this case -- and I don't think I have it marked as

12   an exhibit, and I'll do that right now and we'll mark it as

13   Exhibit 12.  It's the answer that you filed in this case.

14            (Whereupon, Exhibit 12 was marked for

15   identification.)

16            BY MR. PETRIE:

17       Q.   Sir, does that document look familiar to you?

18       A.   Yes, I'm familiar with it.

19       Q.   It's the answer that you filed in this Court in

20   response to the Government's complaint, and your answer was

21   filed on June 4, 2012.

22            Sir, on page 3, if you would, if you'd take a

23   look at that on page 3, and this touches on something that

24   at least tangentially we addressed earlier, but there's

25   another phrase in here I wanted to ask you about.

**FREE STATE REPORTING, INC.**
**Court Reporting/Transcription**
**D.C. Area 301-261-1902**
**Balt.& Annap. 410-974-0947**

U.S. Mot. Summ. J. - Ex. 4
Page 29 of 29